# PROVIDER REIMBURSEMENT REVIEW BOARD DECISION

2006-D29

**PROVIDER -**
Montefiore Medical Center
New York City, New York

Provider No.: 33-0059

vs.

**INTERMEDIARY -**
BlueCross BlueShield Association/
Empire Medicare Services

**DATE OF HEARING -**
July 7, 2004

Cost Reporting Periods Ended -
December 31, 1991 and December 31, 1993

CASE NOs.: 97-1202 and 99-2900

## INDEX

| | Page No. |
|---|---|
| Issues | 2 |
| Medicare Statutory and Regulatory Background | 2 |
| Statement of the Case and Procedural History | 2 |
| Parties' Contentions | 5 |
| Findings of Fact, Conclusions of Law and Discussion | 7 |
| Decision and Order | 14 |

ISSUES:

Issue No.1   Were the Intermediary's adjustments offsetting rental income received by the Provider for employee housing against both operating and capital costs proper?

Issue No 2   Was the Centers for Medicare & Medicaid Services' methodology for determining the Provider's exceptions to the hospital-based skilled nursing facility cost limits proper?

MEDICARE STATUTORY AND REGULATORY BACKGROUND:

This is a dispute over the amount of Medicare reimbursement due a health care provider.

The Medicare program provides health insurance to the aged and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare & Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services (DHHS) charged with the program's administration. CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as fiscal intermediaries. Fiscal intermediaries determine payment amounts due providers under Medicare law and interpretative guidelines published by CMS. See, 42 U.S.C. §1395(h), 42 C.F.R. §§413.20(b) and 413.24(b).

At the close of its fiscal year, a provider must submit a cost report to the fiscal intermediary showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. The fiscal intermediary reviews the cost report, determines the total amount of Medicare reimbursement due the provider, and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R §405.1803. A provider dissatisfied with the intermediary's final determination of total reimbursement may file an appeal with the Provider Reimbursement Review Board (Board) within 180 days of the NPR. 42 U.S.C. §1395oo; 42 C.F.R. §405.1835.

STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

Montefiore Medical Center (Provider) is a 1,129 bed acute care hospital located in New York City, New York. During its cost reporting periods ended December 31, 1991 and December 31, 1993, the Provider owned and operated apartment buildings that it used almost exclusively to furnish below-market housing to its employees. One of the reimbursement disputes at issue in this case pertains to the proper treatment of the rental income generated from the apartments.

The Provider reported the costs of the apartments in the Maintenance of Personnel cost center within its Medicare cost report. In addition, the Provider reported the rental income from the apartments as an adjustment (reduction) to those expenses. However, Empire Medicare Services (Intermediary) reviewed the cost reports and found that a

portion of the apartment costs consisted of capital-related costs (e.g., $1,904,713 in 1991) which flowed from the Maintenance of Personnel cost center to an area of the cost report where capital costs are identified and reimbursed separately from operating expenses. Since the apartment costs were split between operating costs that remained in the Maintenance of Personnel cost center and capital-related costs that were separately identified, the Intermediary made an adjustment prorating the apartment rental revenue between the two categories of expenses (e.g., the $1,904,713 apartment capital-related costs were reduced by $1,398,781 in apartment rental revenue).[1]

The Intermediary's adjustments prorating the apartment revenue reduced the Provider's program reimbursement. The Provider is a shot-term acute care hospital; therefore, it is reimbursed under Medicare's Prospective Payment System (PPS) for inpatient services. Under this system, providers are paid a pre-determined rate per discharge for Medicare Part A inpatient operating costs. Since inpatient Part A costs represent an extremely high proportion of a hospital's total Medicare costs, any increases or decreases in a hospital's operating costs has limited affect on program reimbursement. However, during the Provider's 1991 cost reporting period, capital-related costs under PPS continued to be reimbursed based upon the actual, reasonable costs a hospital incurred. Therefore, the Intermediary's adjustment had a far greater impact on the Provider's allowable costs and program reimbursement than it would have had as an offset only to Maintenance of Personnel expenses.[2]

Also, during the cost reporting periods at issue, the Provider's facility included a hospital-based skilled nursing facility (SNF). The Provider's SNF was reimbursed based upon the reasonable costs it incurred to provide health care services to Medicare beneficiaries (42 U.S.C. §1395x(v)), and was subject to the cost limits placed upon SNF costs at 42 U.S.C. §1395yy.

In accordance with 42 C.F.R §413.30(f)(1), the Provider requested that its SNF be granted an exception to the cost limits because it furnished atypical services. The Provider's requests were approved, and there was no dispute regarding the reasonableness of the Provider's costs in excess of the limit. However, the Provider disagrees with the methodology used to calculate the amount of the exception ultimately granted in each of the subject cost reporting periods. The Provider believes it should be reimbursed all of its costs in excess of the limit. The Provider's argument is based upon 42 U.S.C. §1395yy(3), which sets the limit for hospital-based SNFs at the limit established for freestanding SNFs plus 50 percent of the amount by which 112 percent of the mean per diem routine service costs for hospital-based SNFs exceeds the limit for freestanding SNFs. The Intermediary, however, calculated the amount of the Provider's exceptions based upon program instructions in Medicare's Provider Reimbursement

---

[1] Intermediary Position Paper at 24-26. (Note: Although applicable to both cost reporting periods at issue, references to Intermediary and Provider position papers contained herein refer to Case No. 97-1202.)

[2] The Board notes that a capital-related cost prospective payment system was implemented by CMS effective with cost reporting periods beginning on or after October 1, 1991, and the Intermediary's adjustment prorating the Provider's apartment revenue had a significantly lesser impact on the Provider's reimbursement in 1993 than it had in 1991.

Page 4                                                                CNs: 97-1202 and 99-2900

Manual, Part I (HCFA Pub. 15-1) §2534, entitled <u>Request For Exception to SNF Cost Limits</u>. In effect, the manual directs intermediaries to calculate cost limit exceptions for hospital-based SNFs at amounts exceeding 112 percent of the mean per diem routine service costs for hospital-based SNFs "(not the cost limit). . . ."[3]

42 C.F.R. §413.30(f), states:[4]

> Exceptions. Limits established under this section may be adjusted upward for a provider under the circumstances specified in paragraphs (f)(1) through (f)(8) of this section. . . . An adjustment is made only to the extent the costs are reasonable, attributable to the circumstances specified, separately identified by the provider, and verified by the intermediary.
>
> > (1) Atypical services. The provider can show that the---
> >
> > > (i) Actual cost of items of services furnished by a provider exceeds the applicable limit because such items or services are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified; and
> > >
> > > (ii) Atypical items or services are furnished because of the special needs of the patients treated and are necessary in the efficient delivery of needed health care.

The intent of Congress in providing an exception to the cost limits to compensate providers for the additional costs associated with the provision of atypical services was to ensure that providers would be reimbursed their full costs for providing those additional services and that patients not covered by Medicare would not be unfairly burdened with subsidizing the cost of the care of Medicare patients. 42 U.S.C. §1395yy(a); 42 U.S.C. §1395x(v)(1)(A).

The Provider appealed the Intermediary's adjustments regarding the offset of rental income against capital-related costs and the calculation of its SNF cost limit exception amount to the Board pursuant to 42 C.F.R. §§405.1835-405.1841 and met the

---

[3] HCFA Pub. 15-1 §2534 was implemented in July 1994 through the issuance of CMS Program Transmittal No. 378.

[4] 42 C.F.R. §413.130(f)(1) was first issued effective July 1, 1994. The precise language of this regulation was issued as an amendment effective July 1, 1979.

jurisdictional requirements of those regulations. The amount of Medicare funds in controversy exceeds $500,000.

The Provider was represented by Dennis M. Barry, Esq., of Vinson & Elkins LLP. The Intermediary was represented by James R. Grimes, Esq., Associate Counsel, Blue Cross Blue Shield Association.

PARTIES' CONTENTIONS:

Issue No. 1-Rental Income Offset

The Provider contends that it treated the costs of its apartments and the rental income received from those apartments in accordance with Medicare's cost report instructions.[5] The cost of the apartments was reported in the Maintenance of Personal cost center on Worksheet A, line 11 of the Medicare cost report, and the rental income was reported as an adjustment to those expenses on Worksheet A-8, line 16 of the cost report, entitled Rental of quarters to employees and others. The Provider contends that the cost report instructions regarding this matter (HCFA Pub. 15-2 §2407), clearly direct that Worksheet A-8 adjustments be made against costs shown on Worksheet A, and not against capital costs shown on Worksheet B, Part II as represented by the Intermediary.

The Provider cites a case study on the Medicare cost report prepared by the Blue Cross Blue Shield Association that shows rental income as an offset only to operating costs and to Questions and Answers (Qs & As) issued by CMS during the implementation of its prospective payment system for capital-related costs. In part, Q&A number 12 states:[6]

> . . . current regulations and manual instructions do not provide for an apportionment of revenue offsets between capital-related and operating costs. Moreover, the cost report forms do not provide a mechanism for such an apportionment. Therefore, revenue received from the operation of a day care center for employees' children should be offset consistently as cafeteria revenue [i.e., offset only against operating costs].

The Provider also contends that rental income was offset against operating costs when CMS was developing PPS rates for Medicare Part A inpatient costs. Therefore, offsetting rental income against capital-related costs at this time would constitute a "double dip" by the Medicare program.

The Intermediary contends that its adjustments offsetting a portion of rental income against capital-related costs is both logical and fair.[7] Rental fees reflect operating costs as well as capital costs, and rental revenue is a recovery of each of those types of expenses. Worksheet A-8 adjustments are used to help assure that Medicare does not pay

---

[5] Provider's Position Paper on Lease Offset and SNF Exception Issues at 7.
[6] Exhibit P-9.
[7] Intermediary's Final Position Paper at 27.

for costs that have already been paid by another entity (HCFA Pub. 15-2 §2410). In this instance, the tenants' rent payments have partially paid for both the operating costs and the capital costs of the Provider's apartments. Therefore, offsetting a portion of the rental income against capital costs avoids a duplication of program payments.

The Intermediary notes that the Provider's methodology would result in the offset of $2,687,895 of income against only $1,755,145 of expense and leave excess income of $932,750 not accounted for, and that the Provider's position "just does not make sense."

Issue No. 2-SNF Cost Limit Calculations

The Provider claims that by refusing to grant an exception for the portion of its per diem costs which do not exceed 112 percent of the total peer group mean cost, CMS has created a reimbursement "gap" that is arbitrary, capricious, not in accordance with law and denies reimbursement of costs that qualify as an exception for atypical services.

In addition, the Provider contends that the "gap" methodology in HCFA Pub. 15-1 §2534.5 directly contradicts the regulation controlling atypical service exceptions. The Provider believes that CMS should be given no deference in interpreting this regulation because it has not applied its interpretation consistently over time, and its interpretation is not the result of thorough and reasoned consideration. The "gap" methodology in HCFA Pub. 15-1 §2534.5 is also inconsistent with the statute prohibiting cross-subsidization between Medicare and other payors.

The Provider also believes that the "gap" methodology in HCFA Pub. 15-1 §2534.5 is invalid because it was not adopted pursuant to the notice and comment rule making provisions of the Administrative Procedure Act (APA) or as a regulation as required by statute.

Additionally, the Provider contends that the language of regulation 42 C.F.R. §413.30(f)(1) could not have originally been intended to support the reimbursement "gap" of HCFA Pub. 15-1 §2534.5. Indeed, the original interpretation of the regulation that measured exceptions from the cost limits had been consistently maintained by CMS for fifteen years prior to the issuance of HCFA Pub. 15-1 §2534. Because CMS' current interpretation of the regulation was not developed contemporaneously with the regulation's original promulgation and is inconsistent with CMS' earlier interpretations, it is due no deference. The Provider cites St. Luke's Methodist Hospital v. Thompson, 182 F. Supp. 2d 765 (N. D. Iowa 2001), aff'd. Eighth Circuit (St. Luke's), finding HCFA Pub. 15-1 §2534.5 "invalid as an unreasonable interpretation of 42 C.F.R. §413.30 in light of the language of that regulation and the principles underlying the Medicare statute,"[8] and Mercy Medical Skilled Nursing Facility v. Thompson, Civ. No. 02-2253 (D.D.C. May 14, 2004) striking down CMS' approach of limiting exception relief to costs in excess of 112 percent of the peer group.[9]

---

[8] Provider's Position Paper on Lease Offset and SNF Exception Issues at 25.
[9] Provider's Proposed Findings of Fact and Conclusions of Law at 15.

The Intermediary contends that the methodology it used to determine the amount of the Provider's exception requests, as set forth in HCFA Pub. 15-1 §2534.5, is consistent with the plain meaning of 42 U.S.C. §1395yy(1) and 42 C.F.R. §413.30. The Intermediary relies upon the court's decision in St. Francis Health Centre v. Shalala, 205 F. 3d 937, 6th Cir. 2000, finding that HCFA Pub. 15-1 §2534.5 is a proper interpretation of both the statute and regulation.[10]

FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION:

The Board, after consideration of Medicare law and guidelines, parties' contentions, and evidence presented, finds and concludes as follows:

Issue No. 1-Rental Income Offset

It is undisputed that the net costs the Provider incurred for providing housing to its resident physicians and other staff are allowable Medicare costs, and that the revenues and expenses recorded on the books of the related housing company were not contested by the Intermediary. The only question the Board has been asked to decide in this case is whether the revenue generated by the housing units should be offset against both capital-related costs and operating costs, or as the Provider has argued, only against operating costs.

Whether the revenue should be offset against both capital-related and operating costs is a question that goes to the very heart of the objective of Medicare cost reimbursement principles – the principle that Medicare pays its fair share of the cost of services to program beneficiaries - no more and no less. The answer to this question is addressed in two Generally Accepted Accounting Principles (GAAP): 1) the concept of the proper matching of costs and revenues, and 2) the concept of income and expenses.

Despite myriad changes in Medicare reimbursement principles over time, the overarching goal of equitable reimbursement remains unchanged. Before an analysis can be performed, a short summary of the origin of the dispute is needed.

The Provider rented approximately 566 apartments to its resident physicians, staff and to a few others. The financial records of the Provider's related party housing company (Exhibit I-23) reveal that it received rental income of $2.7 million from its tenants in 1991 and incurred expenses of $3.6 million associated with the rental units. This left "Maintenance of Personnel" costs of approximately $900,000 – costs in which the Medicare program has agreed to share. The financial records show that the $3.6 million expense was comprised of $1.9 million of capital-related costs and $1.7 million of operating costs.

The Provider included the income and expenses of the housing company on its as-filed cost report. This was accomplished by two Worksheet A-8 adjustments to the Maintenance of Personnel line on Worksheet A: one that added the $3.6 million in cost

---

[10] Intermediary's Position Paper Dated July 1, 2004 at 4.

and the other that offset the $2.7 million in rental income. These adjustments resulted in $900,000 of unrecovered costs on Worksheet A. This cost center then accumulated overhead costs and the total costs were allocated to the Medicare program through the cost finding process of the cost report.[11]

During the Provider's 1991 cost reporting period, capital costs were reimbursed on a cost basis. In its cost report the Provider directly assigned the capital-related costs incurred by the housing company to the Maintenance of Personnel cost center by adding to Column 0 of Worksheet B, Part II, the $1.9 million of capital-related costs incurred by the housing company. This resulted in the Provider receiving Medicare cost reimbursement based on the $1.9 million of cost.[12]

The reimbursement controversy arose because the Intermediary reduced the directly assigned capital costs the Provider claimed by prorating the offset of the housing company's income against both the capital-related cost and the operating cost.

The Provider maintains that the Intermediary's adjustments are wrong for several reasons. First, because the cost reporting forms themselves do not provide for the adjustment of cost other than through the use of Worksheet A-8; second, because in CMS' "Responses to Capital- PPS Questions – Set 5," (October 28, 1992)[13] it stated in answer to question number 12 that revenues received by a provider from its day care center for employees' children should all be offset against operating costs; third, because a Blue Cross Blue Shield Association (BCBSA) "Commentary and Case Study" of the HCFA Form 2552-89 cost report shows rental income being offset against only the "Maintenance of Personnel" cost center; and fourth, since PPS rates were based on 1981 cost reports and CMS describes rental income as being offset only against operating costs, changing the methodology now would result in a "double-dip" by the program.

The Intermediary contends that unless the rental income is offset proportionately against the capital-related and the operating costs, the Provider will be paid twice for the capital-related costs – once through the rents paid by the tenants and again by the Medicare program through cost reimbursement.

The Board finds that for services reimbursed on the basis of actual cost, the Medicare program's clear intent is to pay the "net cost of covered services." Inherent in the definition of "net costs" is the concept that expenses must be reduced by any related income earned. The way in which the Provider added the directly assigned capital-

---

[11] Because inpatient hospital costs were reimbursed under the prospective payment system during the years at issue, the Provider received Medicare reimbursement only for the portion of these costs allocated to the outpatient departments and the PPS-excluded units.

[12] The Provider states on page 15 of its position paper that "[s]ince it is impossible for capital costs to exceed total net costs (after the rental income offset), a like adjustment should be made to reconcile Worksheet B, Part II with Worksheet B, Part I." The Provider states further that it ". . . missed the anomaly of capital costs exceeding net costs, and thus, the Provider's as- filed cost report did not report capital costs on Worksheet B, Part II consistent with the total net costs from Worksheet B." Should the Provider ultimately prevail in this case, an adjustment must be made to correct this "anomaly."

[13] See Exhibit P-9.

related costs to the cost report cannot be allowed to dictate the correct cost reporting treatment that must be afforded such costs, i.e., form cannot prevail over substance.

The Board finds it inconsequential that the cost reporting forms themselves do not contain a place where the specific offset should be made. There are a number of instances in the cost reporting/reimbursement process where the complexities of a transaction necessitate a computation outside the "flow through" process of the cost report. Moreover, the cost reporting instructions for Worksheet B, Part II, column 0 state in relevant part:

> [w]here capital-related costs have been directly assigned to specific cost centers on Worksheet A, column 7, enter in this column those amounts directly assigned from your records. Where you include cost incurred by a related organization, the portion of these costs that are capital-related costs are considered directly assigned capital-related costs of the applicable cost center.

The Board interprets this instruction to direct a provider to input on Worksheet B, Part II, column 0 the appropriate amount of directly assigned capital-related costs from its records, and that the costs so input are subject to audit by the intermediary. Consistent with the Medicare program's intent to pay its fair share of the "net cost of covered services," the Board finds that the Intermediary properly offset the revenues generated by the rental units against both capital-related and operating costs.

The Board finds merit in the Intermediary's contention that failure to offset the revenue would result in the Provider receiving payment twice for the same costs. This finding is consistent with Medicare's overarching reimbursement principle prohibiting cost shifting found at 42 U. S. C §1395X(v)(1)(A).

The Provider's reliance on both the CMS Q & As and the BCBSA sample cost report to justify its treatment of the rental income in this case is misplaced. Although these examples show revenue generated by a day care center and a small amount of rental income[14] being offset only against operating costs, they do not have the force of law, regulation or program instruction. Furthermore, the rental income at issue here is clearly distinguishable from the revenue generated by a day care center or a cafeteria as discussed in the Q & A.

The Provider states that the rents established for its housing units were initially set between 25 percent and 40 percent below market.[15] The record in this case shows that

---

[14] The Intermediary pointed out that in the sample cost report the amount of rental revenue offset against the Maintenance of Personnel cost center resulted in that cost center having a negative balance. The Board questions whether the intent of this example is as the Provider has characterized it – an exact duplicate of issue in the instant case – or whether its intent is to demonstrate how cost centers with negative balances are handled in the cost reporting process.

[15] Tr. @ 45

the Provider recovered 75 percent of the total costs associated with its rental units. The Board finds that such a rate of recovery is consistent with a conclusion that the rates the Provider set for its units were designed to recover both capital-related and operating costs. Conversely, the Board finds that rates set for food served in a provider-operated cafeteria are primarily designed to recover incremental operating costs – the costs of food and the personnel needed to serve that food – rather than the capital-related costs such as building depreciation, interest, taxes and insurance. Furthermore, a hospital cafeteria operation is incidental to the provision of dietary services within an inpatient facility, while the operation of the Provider's apartment buildings was large enough to support the establishment of a separate housing company to manage the operation. Likewise, the Board finds that revenues generated by a provider-operated day care center would also be designed to recover the incremental operating costs of providing the care – again, primarily personnel and food costs. If rates were set to recover both the operating and the high capital costs typically seen in a health care environment, the rates would not be competitive.

Clearly, both cafeteria and day care center operations are operating-cost intensive, where the cost of owning and maintaining rental properties is capital-cost intensive. When viewed from a Medicare reimbursement perspective, that distinction alone is sufficient for the Board to conclude that the answer given in the Q & As and the example contained in the BCBSA sample cost reporting package do not set forth the proper treatment of the revenues at issue in this case.

Regarding the Provider's assertion that applying rental income offsets against operating costs for purposes of establishing (Prospective Payment System base year) rates and then offsetting rental income against capital costs would constitute a "double-dip,"[16] the Board finds that the Provider's conclusion is incorrect. The Board's position was clearly articulated by the Appeals Court decision in Carle Foundation Hospital v. Shalala, 57 F. 3d 597 (7th Cir. 1995) (Carle). In response to the provider's assertion in that case that a ". . . change of policy violates the requirement of 42 U. S. C. §1395ww(a)(4) that treatment of expense be consistent" between the PPS base year and all subsequent years, the Court stated:

> [t]he Secretary's replies are short and sufficient: (1) the transition rule limits *providers'* ability to reclassify, in order to prevent them from playing both ends against the middle, 48 Fed. Reg. 39752, 39762 (Sept. 1, 1983); here the reclassification was accomplished by the Secretary to achieve the legally mandatory treatment; (2) the 1988 fiscal year (at issue) . . . comes after the close of the transition period . . . . the final regulation eliminates for 1988 the requirement of consistent treatment during the entire transition. 42 C. F. R. sec. 412.113(a). The Secretary is entitled to apply the right understanding of her rules to all fiscal periods that began

---

[16] See Provider's Position Paper at 13.

<u>after October 1, 1986, no matter what the provider and the intermediary did in earlier years</u>. (Underlining added.)

Carle at <u>11-12</u>.

Accordingly, the Board concludes that the Intermediary's treatment of the offset of rental income was proper. The adjustment properly matched the costs associated with the housing units with the revenue they generated, and it resulted in the proper reimbursement outcome associated with the rental units. The Provider's Maintenance of Personnel costs were properly subsidized by the Medicare program, but only after the revenue directly related to the capital-related costs of the housing units had been properly offset.

<u>Issue No. 2-SNF Cost Limit Calculations</u>

The Board finds as it did in <u>Glenwood Regional Medical Center v. Mutual of Omaha Insurance Company</u>, PRRB Dec. No. 2004-D23, January 7, 2004, <u>rev'd</u>, CMS Administrator, August 9, 2004. The methodology applied by CMS in partially denying the Provider's exception requests for per diem costs which exceeded the cost limit was not consistent with the statute and regulation relating to this issue.

The regulation, 42 C.F.R. §413.30(f)(1), permits the Provider to request from CMS an exception from the cost limits because it provided atypical services. It is undisputed that for 15 years the Secretary interpreted the regulation as permitting a provider to recover its reasonable costs that exceeded the limits if it is demonstrated that it met the exception requirements. The Provider's exception request was processed in accordance with HCFA Transmittal No. 378, which was issued in July 1994, and decreed that the atypical services exception of every hospital-based SNF must be measured from 112 percent of the peer group mean for that hospital-based SNF rather than the SNF's limit. This specific requirement was also established as HCFA Pub. 15-1 §2534.5.

In essence, for the purpose of determining atypical service exceptions for hospital-based SNFs, CMS replaced the limit with an entirely new and separate "cost limit" (112 percent of the peer group mean routine services cost). It is also undisputed that 112 percent of the peer group mean of hospital-based SNFs is significantly higher than the hospital's cost limit. As a result, under HCFA Pub. 15-1 §2534.5, a reimbursement "gap" is created between the limit and 112 percent of the peer group mean that represents costs incurred by a hospital-based SNF which it is not allowed to recover.

CMS has reached a conclusion regarding the intent of Congress toward reimbursing the *routine* costs of hospital-based SNFs which provide only *typical* services and illogically applied that same rationale to hospital-based SNFs that provide *atypical* services. This is contrary to what Congress intended when it implemented the exception process to address the additional costs associated solely with the provision of atypical services, and it clearly represents a substantive change in CMS' prior interpretation and application of 42 C.F.R. §413.30(f)(1), which states:

> Limits established under this section may be adjusted upward for a provider under the circumstances specified in paragraphs (f)(1) through (f)(8) of this section. . . . An adjustment is made only to the extent the costs are reasonable, attributable to circumstances specified, separately identified by the provider, and verified by the intermediary.

The only limit intended by Congress and imposed by the plain language of the applicable statute and regulation is the cost limit. To qualify for an atypical services exception a provider must show that the "actual cost of items and services furnished by a provider *exceeds the applicable limit because such items are atypical* in nature and scope, compared to the items or services generally furnished by providers similarly classified." (emphasis added). The fact that the Provider was providing atypical services and, but for the methodology described would have been entitled to an exception, was not contested by CMS.

The controlling regulation specifically states that the provider must only show that its cost "exceeds the applicable limit," not that its cost exceeds 112 percent of the peer group mean. The comparison to a peer group of "providers similarly classified," required by the regulation, is of the "nature and scope of the <u>items</u> and <u>services</u> actually furnished (emphasis added)," not of their cost. Also, it must be noted that Congress itself established the four "peer groups" that are to be considered in determining Medicare reimbursement of skilled nursing facilities: free-standing urban, free-standing rural, hospital-based urban, and hospital-based rural. CMS has no statutory or regulatory authority to establish a *new* "peer group" for hospital-based SNFs (112 percent of the peer group mean routine service cost) and determine atypical service exceptions from an entirely *new* cost limit rather than from the limit intended by Congress.

In addition, the provisions of HCFA Pub. 15-1 §2534.5 that require an exception for hospital-based SNFs to be measured from "112 percent of the peer group mean" rather than from the routine cost limit are invalid because they have not been adopted pursuant to the notice and comment rulemaking as required by the APA.

In this case, CMS' methodology is a departure from its earlier method of determining hospital-based SNF exception requests and requires an explanation for its change of direction. It is a "clear tenet of administrative law that if the agency wishes to depart from its consistent precedent it must provide a principled explanation for its change of direction." <u>National Black Media Coalition v. FCC</u> 775 F.2d 342, 355 (D.C. Cir. 1985).

42 U.S.C. §1395yy only set the formula for determining the cost limit; it did not change the method to be used to determine exceptions to the cost limit nor provide CMS with any legal authorization to adjust its pre-existing policies or regulations. Congressional imposition of a rate that is out of line with economic reality (in a case concerning the composite rate for end-stage renal disease services) "does not give HCFA the right to justify using out-of-line-with-reality component numbers to make exception

determinations." University of Cincinnati, d/b/a University Hospital v. Shalala, 867 F. Supp. 1325 (S.D. Ohio, Nov. 8, 1994).

Because HCFA Pub. 15-1 §2534.5 carves out a *per se* exception methodology contained in the applicable regulation and in the unwritten policy of CMS for 15 years prior to adoption of this manual section, it "effected a change in existing law or policy" that is substantive in nature. Linoz v. Heckler, 800 F.2d 871, 877 (9th Cir. 1986).

Even if HCFA Pub. 15-1 §2534.5 should be considered an "interpretive" rule, it nevertheless constitutes a significant revision of the Secretary's definitive interpretation of 42 C.F.R. §413.30 and is invalid because it was not issued pursuant to notice and comment rulemaking. "Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and rulemaking." Paralyzed Veterans of America v. D.C. Area, 117 F.3d 579, 586 (D.C. Cir. 1997).

In a District of Columbia Circuit Court decision, Alaska Professional Hunters Ass'n., Inc. v. Federal Aviation Admin., 177 F.3d 1030, 1034 (D.C. Cir. 1999), the Court held: "When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." Without question, that is precisely what CMS did when it changed its methodology of determining atypical services exceptions for hospital-based SNFs after having consistently applied it in a much different manner for 15 years prior to making the change.

There is nothing in the statute or regulation that requires the "gap" methodology interpretation at issue here. Congress gave the Secretary broad authority to establish "by regulation" the methods to be used and items to be included in determining reimbursement. 42 U.S.C. §1395 x(v)(1)(A). Had the "gap" methodology been subjected to the rulemaking process under the APA, 5 U.S.C. §553, it would have been a legitimate exercise of that power. However, it was not, and, in addition to the arguments previously presented, the Board is further persuaded by the District Court's decision in the St. Luke's case that HCFA Pub. 15-1§2534.5 does not reasonably interpret 42 C.F.R. §413.30.

The St. Luke's Court found HCFA Pub. 15-1 §2534.5 "invalid as an unreasonable interpretation of 42 C.F.R. §413.30 in light of the language of that regulation and the principles underlying the Medicare statute." The Court reasoned that HCFA Pub. 15-1 §2534.5 created an irrefutable exclusion of gap costs that, if permitted to stand, would allow the Secretary to "substantively rewrite the regulation to impose an additional hurdle for exceptions eligibility not clearly contemplated by the language of 42 C.F.R. §413.30(f) or subsequently enacted statutes."[17] The Court also found that application of

---

[17] The Secretary argued that his rational for the "gap" methodology was based on legislative changes to the statute in 1984 in which 112% of the mean was used to calculate new cost limits. There were no changes to the statute or regulation concerning the exemption process, however.

the "gap" methodology would result in non-Medicare payors subsidizing the care of Medicare patients in violation of 42 U.S.C. §1395x(v)(1)(A).

The St. Luke's Court stated that:

> [t]he Court does not agree that 42 U.S.C. §1395yy, read in conjunction with 42 C.F.R. §413.30, reasonably results in the interpretation promulgated by the Secretary in PRM [HCFA] Pub. 15-1 §2534.5. There is no inherent conflict between the Secretary's original, longstanding interpretation of 42 C.F.R. §413.30 and Congress' subsequent imposition of a two-tiered RCL [reasonable cost limit] measure through 42 U.S.C. §1395yy. Absent persuasive evidence to the contrary, there is no reason to believe that Congress, in enacting 42 U.S.C. §1395yy, meant to override the distinction between typical and atypical service reimbursement eligibility explicitly recognized in 42 C.F.R. §413.30.

St. Lukes at 787.

The Court also determined that HCFA Pub. 15-1 §2534.5 represents:

> . . . an abrupt and significant alteration of a longstanding, consistently followed policy and was developed years after the regulation it interprets and the statute it purports to incorporate. The Secretary has failed to persuade this Court that despite its incongruous and inconsistent procedural history, the interpretation is the product of "thorough and reasoned consideration."

St. Lukes at 781.

The findings and decision of the St. Luke's Court are equally applicable to the present case and support the Board's conclusion that the partial denial of the Provider's requests for exceptions to the SNF cost limits should be revised to permit the Provider to recover its costs.

DECISION AND ORDER:

Issue No. 1-Rental Income Offset:

The Intermediary's adjustments offsetting rental income received by the Provider from employee housing against both operating costs and capital-related costs were proper. The Intermediary's adjustments are affirmed.

Issue No. 2-SNF Cost Limit Calculations:

CMS' methodology for determining the amount of the Provider's exceptions to the hospital-based SNF cost limits was improper. The Provider is entitled to be reimbursed for all of its costs above the cost limit as opposed to being reimbursed only for its costs that exceeded 112 percent of the group's mean per diem costs.

Board Members Participating:

Suzanne Cochran, Esq.
Dr. Gary B. Blodgett
Elaine Crews Powell, C.P.A

FOR THE BOARD:

DATE:  June 5, 2006

                    Suzanne Cochran, Esq.
                    Chairman