**DEPARTMENT OF HEALTH & HUMAN SERVICES**
Centers for Medicare & Medicaid Services
7500 Security Boulevard, Mail Stop C3-01-20
Baltimore, Maryland 21244-1850



CENTERS for MEDICARE & MEDICAID SERVICES

Office of the Attorney Advisor

JUL 2 6 2006

CERTIFIED MAIL

Dennis M. Barry, Esquire
Vinson & Elkins LLP
The Willard Office Building
1455 Pennsylvania Avenue, Suite 600
Washington, DC 20004-1008

RECEIVED AUG - 2 2006 VINSON & ELKINS

Re: Montefiore Medical Center, PRRB No. 2006-D29 (FYEs 12/31/1991 and 12/31/1993)

Dear Mr. Barry:

Enclosed is a copy of the Administrator's decision in the above case affirming Issue No. 1 and reversing Issue No. 2 of the decision of the Provider Reimbursement Review Board. This constitutes the final administrative decision of the Secretary of the Health and Human Services. Pursuant to Section 1878(f) of the Social Security Act and 42 CFR 405.1877, the Provider may obtain judicial review by filing a civil action within 60 days of receipt of this decision.

Sincerely yours,

Jacqueline R. Vaughn
Attorney Advisor

Enclosure

cc: James R. Grimes, Esquire, Intermediary's Representative

# CENTERS FOR MEDICARE & MEDICAID SERVICES

## Decision of the Administrator

| | |
|---|---|
| **IN THE CASE OF:** | **CLAIM FOR:** |
| Montefiore Medical Center | Medicare Reimbursement Fiscal Years Ending: 12/31/91 and 12/31/93 |
| Provider | |
| vs. | **REVIEW OF:** |
| Blue Cross and Blue Shield Assn./ Empire Medicare Services | PRRB Dec. No. 2006-D29 Dated: June 5, 2006 |
| Intermediary | |

This case is before the Administrator, Centers for Medicare & Medicaid Services (CMS), for review of the Provider Reimbursement Review Board (Board) decision. The review is during the sixty-day period mandated in §1878(f)(1) of the Social Security Act (Act) {42 USC 139500(f)(1)}, as amended. The parties were notified of the Administrator's intention to review Issue No. 2 of this case. Subsequently, comments were received from the Provider. Accordingly, the Board decision is now before the Administrator for final administrative review.

## BACKGROUND

The Provider operated a hospital-based skilled nursing facility (SNF) during the Provider's fiscal years ending (FYE) 12/31/91 and 12/31/93. The Provider requested an exception for full relief from the SNF routine cost limits (RCLs) for both fiscal years, on the basis that it furnished atypical services.[1] The Intermediary granted interim per diem exceptions for both fiscal years, and recommended to CMS that the Provider be granted final exception amounts which partially denied the full amounts requested. The Provider filed timely requests for hearings before the Board on the grounds that it was entitled to the full exception relief it requested.

---

[1] See Provider's and Intermediary's Position Papers for FFY 1991 and 1993.

## ISSUE[2] AND BOARD DECISION

The issue is whether CMS' methodology for determining the Provider's exceptions to the hospital-based skilled nursing facility cost limits was proper.

Citing to its decision in Glenwood Regional Medical Center,[3] the Board found that the methodology applied by CMS in partially denying the Provider's exception requests for per diem costs which exceeded the cost limit was not consistent with the statute and regulation relating to this issue.

The Board stated that the regulation at 42 CFR 413.30(f)(1) permits the Provider to request from CMS an exception to the cost limits because it provided atypical services. The Board observed that, for fifteen years, the Secretary interpreted the regulation as permitting a provider to recover its reasonable costs that exceeded the cost limits if the provider demonstrated that it met the exception requirements. The Provider's exception request was processed in accordance with section 2534.5 of the Provider Reimbursement Manual (PRM),[4] issued in July 1994. That section states that the atypical services exception of every hospital-based SNF must be measured from 112 percent of the peer group mean for that hospital-based SNF rather than the SNF's limit.

Thus, the Board continued, for the purposes of determining the atypical services exception for hospital-based SNFs, CMS replaced the limit with a new "cost limit," i.e., 112 percent of the peer group mean routine services cost. It is also undisputed, the Board stated, that 112 percent of the peer group mean of hospital-based SNFs is significantly higher than the hospital's cost limit. Thus, under section 2534.5 of the PRM, a reimbursement "gap" is created between the limit and 112 percent of the peer group mean that represents costs incurred by a hospital-based SNF, which it is not allowed to recover.

The Board stated that, in creating this reimbursement gap, CMS misinterpreted the intent of Congress, and the policy represents a substantive policy change from CMS' prior interpretation of section 413.30(f)(1). The Board observed that the only limit intended by Congress and imposed by the plain language of the statute and regulation is the cost limit. To qualify for an atypical services exception, a provider must demonstrate that the "actual cost of items and services furnished by a provider exceeds the applicable limit because such items are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified." The Board noted that CMS did not dispute

---

[2] The Board's Decision on Issue No. 1, whether the Intermediary's adjustments offsetting rental income received by the Provider for employee housing against both operating and capital costs was proper, is summarily affirmed.

[3] PRRB Dec. No. 2004-D23, rev'd CMS Admr. Aug. 9, 2004.

[4] HCFA [now CMS] Transmittal No. 378.

the fact that the Provider was furnishing atypical services and would have been entitled to the exception but for the "methodology described."

The Board found that the regulation states that the provider must only show that its cost "exceeds the applicable limit," not that its cost exceeds 112 percent of the peer group mean. The Board stated that the regulation's required comparison to a peer group of "providers similarly classified" referred to the "nature and scope of the items and services actually furnished," not of their cost.

Moreover, the Board continued, Congress established the four peer groups to be considered in determining Medicare reimbursement of SNFs: free-standing urban, free-standing rural, hospital-based urban, and hospital-based rural. There was no statutory or regulatory authority granted to CMS to establish a new peer group for hospital-based SNFs, i.e., 112 percent of the peer group mean routine service cost, and to determine atypical service exceptions from a new cost limit rather than from the Congressionally intended limit.

The Board also found that the provisions of section 2534.5 of the PRM referring to the 112 percent requirement are invalid because they were not adopted pursuant to the notice and comment requirements of section 553 of the Administrative Procedure Act (APA). The Board stated that this case is a departure from CMS' earlier method of determining hospital-based SNF exception requests, and, therefore requires an explanation for such a change. Section 1888 of the Act only set the formula for determining the cost limit. It did not change the method to be used to determine exceptions. Nor did it provide CMS with authorization to adjust its pre-existing policies or regulations.

Further, the Board cited to a court decision to support the principle that, because section 2534.5 of the PRM carves out a per se exception methodology contained in the applicable regulation and in the unwritten policy of CMS for fifteen years prior to adoption of section 2534.5, it "'effected a change in existing law or policy'" that is substantive in nature.[5] However, the Board found that, even if section 2534.5 is interpretive, it nevertheless constitutes a significant revision of the Secretary's definitive interpretation of section 413.30 and is invalid because it was not issued pursuant to the APA's notice and comment rulemaking.[6]

In addition, the Board found that there is nothing in the statute or regulation that requires the "gap" methodology interpretation at issue. Pursuant to section 1861(v)(1)(A) of the Act, Congress gave the Secretary broad authority to create regulations establishing the

---

[5] Linoz v. Heckler, 800 F.2d 871, 877 (9th Cir. 1986).
[6] The Board cited to Paralyzed Veterans of America v. D.C. Area, 117 F.3d 579, 586 (D.C. Cir. 1997) and Alaska Professional Hunters Ass'n., Inc. v. Federal Aviation Admin., 177 F.3d 1030, 1034 (D.C. Cir. 1999).

methods to be used and items to be included in determining reimbursement. If the gap methodology had been subjected to the APA rulemaking process, the Board stated that it would have been a legitimate exercise of that authority. But it was not, and, in addition to the previous arguments herein, the Board stated that it was further persuaded by the District Court's decision in St. Luke's Methodist Hospital v. Thompson[7] that section 2534.5 does not reasonably interpret section 413.30, and was a substantive rewrite of the regulation which imposed another requirement for exceptions. The court also found that application of the gap methodology would result in non-Medicare payers subsidizing the care of Medicare patients in violation of section 1861(v)(1)(A). The Board found that the St. Luke's court's findings and decision are equally applicable to the present case and support the Board's conclusion that the partial denial of the Provider's requests for exceptions to the SNF cost limits should be revised to permit the Provider to recover its costs.

## SUMMARY OF COMMENTS

The Provider contended that the Board's decision regarding the issue under review was correct, consistent with applicable regulations, and conformed to court interpretations of the law. The Provider maintained that the Administrator's notice of review did not point out why the Board's decision may be inaccurate, rendering the notice of review deficient, with the result that the Provider did not have adequate information to respond. The Provider observed that it did not know what comments, if any, would be submitted by the Intermediary or CMS. Accordingly, the Provider concluded that it would rely upon its arguments made in its position papers and at the Board hearing.

## DISCUSSION[8]

The entire record furnished by the Board has been examined, including all correspondence, position papers, exhibits, and subsequent submissions. All comments timely received have been considered and included in the record.

During the cost years at issue, Medicare reimbursement for services provided in SNFs was largely on the basis of reasonable cost as defined by section 1861(v)(1) of the Act. In addition, section 1861(v)(1)(A) sets forth the requirement that Medicare shall not pay for costs incurred by non-Medicare beneficiaries and vice-versa, i.e., Medicare prohibits cross-subsidization of costs. Section 1861(v)(1)(A) also authorizes the Secretary to establish limits on the allowable costs incurred by providers of health care services. The limits are based on estimates of the costs necessary for the efficient delivery of needed health care services. The limits on inpatient general routine service costs set forth at section 1861(v)(1)(A) apply to SNF inpatient routine costs, excluding capital-related costs.

---

[7] 182 F. Supp. 2d 765 (ND Iowa 2001), aff'd 315 F.3d 984 (8th Cir. 2003).
[8] The Centers for Medicare Management submitted coments after the fifteen-day comment period and, thus, they were not considered.

Rather than defining reasonable cost with precision section 1861(v)(1)(A) empowered the Secretary to issue appropriate regulations setting forth the methods to be used in computing such costs. The regulations at 42 CFR 413.9 establish that the determination of reasonable costs must be based on costs related to the care of Medicare beneficiaries. If the provider's costs include amounts not related to patient care, or costs that are specifically not reimbursable under the program, those costs will not be paid by the Medicare program. Further, section 413.9 provides that the reasonable cost of any services must be determined in accordance with regulations establishing the method or methods to be used and the items to be included.

The regulations codified at section 413.30, et. seq. implement the cost limit provisions of section 1861(v)(1) of the Act. Prior to 1972, the regulations contemplated reimbursement of the entirety of a provider's services to Medicare patients unless its costs were found to be substantially out of line with those of similar institutions.

In 1972, in response to rising costs and recognizing that the original Medicare payment structure provided little incentive for providers to operate efficiently in delivering services,[9] Congress amended the statute, specifying that reasonable costs meant only those "actually incurred, excluding therefrom any part of incurred cost[s] found to be unnecessary in the efficient delivery of needed health services." Additionally, Congress authorized the Secretary to "provide for the establishment of limits ... based on estimates of the costs necessary in the efficient delivery of needed health services" under section 223 of the Social Security Amendments of 1972.[10] The section 223 cost limits were to reflect the maximum expenses incurred by an efficient provider; costs exceeding the limits would be presumed unreasonable and not be allowed unless pursuant to an exception.[11]

Section 223 cost limits for SNFs were first implemented on October 1, 1979. Pursuant to section 1861(v)(1)(A) of the Act, CMS promulgated yearly schedules of limits on SNF inpatient routine service costs and notified participating providers of the exceptions process in the Federal Register.[12] Beginning with the initial implementation of section 223 limits on SNF inpatient routine costs, separate reimbursement limits were derived for hospital-based SNFs and free-standing SNFs on the basis of the cost reports submitted by the two types of providers. These separate limits were implemented because hospital-based SNFs maintained that they incurred higher costs because of the allocation of

---

[9] See H.R. Rep. No. 92-231 at 82-85 (1971); S. Rep. No. 92-1230 at 188-89 (1972).
[10] Pub. L. No. 92-603.
[11] S. Rep. No. 92-603.
[12] See e.g., 42 Fed. Reg. 36,237 (1976); 44 Fed. Reg. 29, 362 (1979); 44 Fed. Reg. 51,542 (1979); 45 Fed. Reg. 58,699 (1980); 46 Fed. Reg. 48,026 (1981); 47 Fed. Reg. 42,894 (1982).

overhead costs required by Medicare and higher intensity of care.[13] Of note, effective for cost reporting periods beginning on or after October 1, 1980, these cost limits were based on 112 percent of the average per diem costs of each comparison group.[14]

Section 102 of TEFRA eliminated separate limits for hospital-based SNFs and free-standing SNFs, mandating single limits based on the lower costs of free-standing SNFs, subject to appropriate adjustments.[15] However, the single limits based on the lower costs of the free-standing SNFs were never implemented. Section 2319 of DEFRA of 1984 rescinded the single TEFRA limit for SNFs and directed the Secretary to set separate limits on per diem inpatient routine service costs for hospital-based SNFs and free-standing SNFs, revising section 1861(v) of the Act and adding a new section 1888 to the Act.[16] Section 1888(a) specifies the methodology for determining the separate cost limits rather than delegating authority to the Secretary to do so by regulation. Under section 1888(a), the RCLs are determined based on per diem limits, which are equal to a percentage of the mean per diem inpatient routine service costs of free-standing or hospital-based facilities (qualified by whether the facility is urban or rural). The basis for computing the RCLs for both free-standing SNFs and hospital-based SNFs is the amount of the free-standing SNF RCL; the RCL for the higher cost hospital-based SNFs is computed with an add-on to the free-standing SNF RCL. Section 1888(a) states that:

> The Secretary, in determining the amount of the payments which may be made under this title with respect to routine service costs of extended care services[,] shall not recognize as reasonable (in the efficient delivery of health services)[,] per diem costs of such services to the extent that such per diem costs exceed the following per diem limits ...: (1) [and (2)] With respect to freestanding skilled nursing facilities ..., the limit shall be equal to 112 percent of the mean per diem routine service costs for freestanding skilled nursing facilities .... (3) [and (4)] With respect to hospital-based skilled nursing facilities ..., the limit shall be equal to the sum of the limit

---

[13] See HCFA, Report to Congress on the Study of the Skilled Nursing Facility Benefit under Medicare at 99 (1985).

[14] See e.g., 45 Fed. Reg. 58,699 (1980); 46 Fed. Reg. 48,026 (1981); 47 Fed. Reg. 42,894 (1982). See also 51 Fed. Reg. 11,234 (1986) (Prior to the schedule of ... single limits (required by Pub. L. 97-248 (1982)[,] the SNF cost limits for inpatient routine services were calculated at 112 percent of the mean of the routine costs for freestanding and hospital-based SNFs, respectively. Further, the routine costs considered for each comparison group were the routine costs attributable to the particular group...." Id.).

[15] TEFRA of 1982, Pub. L. No. 97-248. See 47 Fed. Reg. 42,894 (1982).

[16] Deficit Reduction Act of 1984, Pub. L. No. 98-369 (Medicare and Medicaid Budget Reconciliation Amendments of 1984), applicable as provided in section 2319(c) and (d) of the amendments. See also section 2530, et. seq. of the PRM.

> for freestanding skilled nursing facilities..., plus 50 percent of the amount by which 112 percent of the mean per diem routine service costs for hospital-based skilled nursing facilities ... exceeds the limit for freestanding skilled nursing facilities....

In summary, under TEFRA, for cost reporting periods beginning on or after October 1, 1982 and before July 1, 1984, the cost limits for routine services for the hospital-based SNFs and free-standing SNFs were to have been 112 percent of the mean inpatient routine service per diem costs for free-standing SNFs, the lower cost group; however, because the TEFRA provisions never became effective, there were separate limits during that period for hospital-based SNFs and free-standing SNFs based upon 112 percent of their respective mean peer group cost. For cost reporting periods beginning after July 1, 1984, including the cost reporting periods at issue in this case, the RCLs for free-standing SNFs remained at 112 percent of the mean peer group inpatient routine service per diem costs. For those same cost reporting periods, Congress dictated that the RCLs for hospital-based SNFs would equal the free-standing RCL plus 50 percent of the difference between 112 percent of the mean peer group inpatient routine service per diem costs and the free-standing RCL. In short, DEFRA rejected the concept of a single set of RCLs for SNFs and established a somewhat more generous reimbursement for hospital-based SNFs as compared to free-standing SNFs. The hospital-based SNF RCLs are set at an amount halfway between the free-standing SNF RCLs, which are 112 percent of the free-standing peer group mean per diem costs, and an amount less than what would be an amount directly corresponding to the free-standing RCLs using the peer comparison, i.e., 112 percent of the hospital-based SNF peer group mean per diem costs.

Under the DEFRA provisions, the Secretary was also given broad discretion to authorize adjustments to the cost limits. Section 1888(c) provides:

> The Secretary may make adjustments in the limits set forth in subsection (a) with respect to any skilled nursing facility to the extent the Secretary deems appropriate, based upon case mix or circumstances beyond the control of the facility. The Secretary shall publish the data and criteria to be used for purposes of this subsection on an annual basis.

In accordance with the foregoing provisions of section 1861(v)(1)(A), as amended, and section 1888, the regulations at 42 CFR 413.30 specify the process by which CMS would establish limits on providers' routine costs and allow for various adjustments.[17] Further,

---

[17] The Administrator notes that CMS has published schedules of limits in the Federal Register, which outline the methodology and data used to determine the costs on which the RCLs are based. See also section 2530.4 of the PRM. The methodology for determining the RCLs, pursuant to DEFRA, for hospital-based SNFs was first described in an April 1, 1986 notice of the schedule of limits. 51 Fed. Reg. 11234, 11237, 11253. See

in accordance with section 1888(c) of the Act, section 413.30(f) provides for exceptions to the cost limits to the extent that costs are reasonable, attributable to the circumstances specified, separately identified by the provider, and verified by the intermediary. Pertinent to this case, section 413.30(f)(1) specifically provides for an exception for atypical services:

> The provider can show that the —(i) Actual cost of items or services furnished by a provider exceeds the applicable limit because such items or services are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified; and (ii) Atypical items or services are furnished because of the special needs of the patients treated and are necessary on the efficient delivery of needed health care.

Consistent with the statute and regulations, CMS set forth the general provisions concerning payment rates for certain SNFs in Chapter 25 of the PRM. In July 1994, to provide the public with current information on the SNF cost limits under section 1888 of the Act, CMS issued Transmittal No. 378.[18] Prior to the issuance of Transmittal No. 378, Chapter 25 of the PRM did not address the methodology used to determine exception requests. Transmittal No. 378 explained that new manual sections, at sections 2530, et. seq., were being issued to "provide detailed instructions for skilled nursing facilities (SNFs) to help them prepare and submit requests for exceptions to the inpatient routine service cost limits."

---

also 52 Fed. Reg. 37,098, 37,099 (Oct. 2, 1987); 56 Fed. Reg. 13,317 (Apr. 1, 1991). CMS explained that it was publishing a revised schedule of limits for cost reporting periods beginning on or after July 1, 1984 in conformity with section 2319 of DEFRA. The notice explained that DEFRA required that separate RCL limits apply to hospital-based SNFs and free-standing SNFs; the RCLs for hospital-based SNFs were required to be equal to the RCLs for corresponding free-standing SNFs plus 50 percent of the amount by which 112 percent of the mean per diem routine service costs for hospital-based SNFs exceed the corresponding limit, i.e., the RCL, for corresponding free-standing SNFs.

The schedule of limits effective for cost reporting periods beginning on or after October 1, 1989 is applicable to the cost years at issue in this case. For those cost reporting periods, the hospital-based SNF RCLs continued to be equal to the free-standing RCLs (112 percent of the average labor related and average nonlabor-related costs) plus 50 percent of the difference between the mean peer group per diem routine service costs of hospital-based SNFs and the free-standing SNF RCLs, i.e., higher than the free-standing cost limits, set at 112 percent of the free-standing peer group mean cost, but lower than 112 percent of the hospital-based peer group mean cost. 56 Fed. Reg. 13,317 (Apr. 1, 1991).

[18] Transmittal No. 378 also deleted sections 2520-2527.4 of the PRM., adopted in July 1975, under Transmittal No. 129, as obsolete.

Section 2534.5, as adopted in Transmittal No. 378, "Determination of Reasonable Costs in Excess of Cost Limit or 112 Percent of Mean Cost," explains the process and methodology for determining an exception request based on atypical services. In determining reasonable costs, a provider's costs are first subject to a test for low occupancy and then are compared to per diem costs of a peer group of similarly classified providers. Section 2534.5B of the PRM explains the methodology CMS developed to quantify the peer group comparison that is part of the test for reasonableness:

> <u>Uniform National Peer Group Comparison</u>. – The uniform national peer group data are based on data from SNFs whose costs are used to compute the cost limits. The peer group data are divided into four groups: Urban Hospital-based, Urban Freestanding, Rural Hospital-based, and Rural Freestanding. For each group, an average per diem cost (less capital-related costs) is computed for each routine service cost center (direct and indirect) that the provider reported on its Medicare cost report. For each cost center, a ratio is computed as the average per diem cost to total per diem cost. Those cost centers not utilized on the Medicare cost report must be eliminated and all ratios are revised based on the revised total per diem cost ....
>
> With cost reporting periods beginning prior to July 1, 1984, for each freestanding group and each hospital-based group, each cost center's ratio is applied to the cost limit applicable to the cost reporting period for which the exception is requested. For each hospital-based group with cost reporting periods beginning on or after July 1, 1984, the ratio is applied at 112 percent of the group's mean per diem cost (<u>not the cost limit</u>), adjusted by the wage index and cost reporting year adjustment factor applicable to the cost reporting period for which the exception is requested. The result is the Provider's per diem cost is disaggregated into the same proportion of its peer group mean per diem cost for each cost center.
>
> The SNF's annual per diem cost or, if applicable, the cost as adjusted for low occupancy for each applicable routine cost center (less capital-related costs) is compared to the appropriate component of the disaggregated cost limit or 112 percent of the hospital-based mean per diem cost. If the SNF's per diem cost exceeds the peer group per diem cost for any cost center, the higher cost must be explained. Excess per diem costs which are not attributable to the circumstances upon which the exception is requested and cannot be justified may result in either a reduction to the amount of the exception or a denial of the exception.

Contrary to the Board's findings, the Administrator finds that the exception guidelines in Chapter 25 of the PRM are reasonable and appropriate, as they closely adhere to the

requirements of section 1888(a) of the Act and are within the scope of the Secretary's discretionary authority under section 1888(c) of the Act to make adjustments in the SNF RCLs, and under the implementing regulations at section 413.30(f)(1)(i). The Administrator rejects the Board's view that section 1888(a) of the Act and the implementing regulation at 42 CFR 413.30 entitle all SNFs to be paid the full amount by which their costs exceed the applicable RCL.

Of particular relevance to this case, the regulation at section 413.30(f) specifically requires a reasonableness determination in granting an exception request:

> Exceptions: Limits established under this section may be adjusted upward for a provider under the circumstances specified in paragraphs (f)(1) through (f)(5) of this section. An adjustment is made only to the extent the costs are reasonable, attributable to the circumstances specified, separately identified by the provider, and verified by the intermediary. [Emphasis added.]

In contrast to the Board, the Administrator finds that the policy interpretation in section 2534.5B, requiring the hospital-based costs to be compared to 112 percent of the group's mean per diem costs, is an appropriate method of applying the reasonable cost requirements and is not inequitable. Relevant to the reasonable cost determination, in the case of free-standing SNFs, Congress set the RCLs at the peer group mean costs.[19] In the case of hospital-based SNFs, Congress determined it appropriate to set the cost limits at an amount less than the peer group mean costs. The Administrator agrees with the Board that, presumably, Congress believed there to be no adequate justification for the higher mean per diem costs of hospital-based SNFs relative to free-standing SNFs, other than the possibility that higher hospital-based SNF costs are due to inefficiencies. Thus, as validated by its Report to Congress,[20] CMS properly determined, in developing the exception process, that 50 percent of the difference between the free-standing SNF and the hospital-based SNF cost limits, i.e., the "gap," was due to hospital-based SNFs' inefficiencies. As such costs are not reasonable, CMS properly determined that these costs could not be reimbursed pursuant to the exception process.

---

[19] Both Congress and CMS have used 112 percent of, or one standard deviation from, the mean to establish the range of reasonable costs. See, e.g., section 1861(v)(1) (home health agency cost limits); 57 Fed. Reg. 23,618, 23,635 (Jun. 4, 1992) (explaining that the 108 percent threshold for a wage index reclassification is based on the average hospital wage as a percentage of its area wage (96 percent) plus one standard deviation (112 percent); 58 Fed. Reg. 46,270, 46,286 (Sep. 1, 1993) and 60 Fed. Reg. 45,778, 45,780 (Sep. 1, 1995) (using standard deviation in establishing diagnosis-related group value). The standard deviation is a statistical measure of data about a mean value. See also, e.g., 60 Fed. Reg. 35,854, 35,862 (1995).

[20] HCFA, Report to Congress on the Study of the Skilled Nursing Facility Benefit under Medicare at 99 (1985).

Moreover, the plain language of section 413.30(f)(1)(i) supports the use of a peer group comparison such as that made under the methodology set forth in section 2534.5B of the PRM to determine both reasonableness and atypicality. Section 413.30(f)(1)(i) establishes that a provider must show that the:

> Actual costs of items or services furnished by a provider exceeds the applicable limit because such items or services are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified.

Thus, the policy set forth in the regulations requires examination of both the reasonableness of the amount that a provider's actual costs exceed the applicable cost limits and the determination of the atypicality of the costs by using a peer group comparison, i.e., the 112 percent threshold. If a hospital-based SNF can establish that its costs are reasonable and atypical <u>in relation to its peer group</u>, the provider then has the opportunity to demonstrate that, inter alia, its atypical costs are related to the special needs of its patients. The Administrator finds that use of this methodology is appropriate and a valid exercise of the Secretary's discretion under section 1888(c) of the Act to make adjustments to the RCLs. In the Administrator's view, CMS properly applied a test of the reasonableness of the amount of the costs in excess of the cost limits claimed to be due to the atypical services based on the 112 percent of the per diem mean for hospital-based SNFs.

Furthermore, the Administrator finds use of the methodology set forth in section 2534.5B of the PRM in no way alters or revises Medicare policy as set forth in the regulations at section 413.30(f)(1)(i) but is one method of applying that policy. Indeed, section 2534.5B did not effect a change in CMS policy. Although Congress changed the RCLs for hospital-based SNFs in 1984, the published cost limits since 1980[21] reflect that CMS had previously used a methodology under which the SNFs' per diem costs were compared to a percentage of the peer group mean per diem cost.[22]

---

[21] 45 Fed. Reg. 41,292 (1980) ("We are proposing that the limits be set at 112 percent of each group's mean cost. We believe that the 12 percent allowance above mean cost is a reasonable margin factor in view of the refinements made in the method used to establish the limits."); 45 Fed. Reg. 58,699 (1980) ("[l]imits set at 112 percent of the average per diem labor-related and nonlabor costs of each comparison group." Id.) 46 Fed. Reg. 48,026 (1981); 51 Fed. Reg. 11,234 (1986).

[22] See, e.g., 44 Fed. Reg. 51,542, 51,544 (Aug. 31, 1979) ("We believe the use of a limit based on the average to be superior to a percentile limit. The average is a good measure of the cost incurred in the efficient delivery of services by peer providers .... Since these are the first limits we have established for SNFs, the methodology used does not account for

Notably, section 2534.5B refers to the "cost limit" rather than to 112 percent of a SNF's peer group mean per diem cost, only where the terms are interchangeable, i.e., where the cost limit is equal to 112 percent of the SNF's peer group mean cost. For periods prior to the effective date of the hospital-based SNF RCL under DEFRA, July 1, 1984, the term, "112 percent of the peer group mean per diem cost" was synonymous with the term, "cost limit," for both free-standing SNFs and hospital-based SNFs. After June 1984, the free-standing SNF RCL remained at 112 percent of the peer group mean per diem cost. However, as explained above, Congress changed the amount of the hospital-based SNF RCL. Thus, section 2534.5B uses the term of cost limit to refer to 112 percent of the free-standing SNF mean per diem cost, but cannot use the same term for the hospital-based SNFs. Section 2534.5B simply recognizes that, after July 1, 1984, the term of cost limit can no longer be used interchangeably with the term of 112 percent of the peer group mean per diem cost for hospital-based SNFs. In short, although the statutory cost limit for hospital-based SNFs was changed under DEFRA, that change did not impact CMS' peer group methodology.

Thus, the Administrator also disagrees with the Board's finding that the methodology for determining an exception for atypical services of a hospital-based SNF using the uniform peer group comparison, as set forth in section 2534.5 of the PRM, constituted a change in policy requiring notice and comment rule-making under 5 USC 552 (the APA). First, as noted, CMS has consistently compared SNF costs to their comparison group in applying the cost limits. The Administrator finds that the methodology at issue does not involve application of a "substantive" rule requiring publication of notice and comment under the APA. The Secretary has broad authority to promulgate regulations under sections 1861(v)(1)(A) and 1888 of the Act. Relevant to this case, the Secretary has promulgated a regulation at section 413.30(f)(1) establishing a specific exception from the RCLs based on atypical services. The Secretary does not have an obligation to promulgate regulations that specifically address every conceivable situation in the process of determining reasonable costs.[23] Rather, the Intermediary is required to make a determination of the reasonableness of the exception request, applying the existing reasonable cost statute, controlling regulations, and any further guidance that CMS has issued. The methodology set forth in section 2534.5 of the PRM is a proper interpretation of the statute and the

---

any conceivable variable which could affect SNF costs. As we gain information and experience, the methodology will be refined.").

[23] See Shalala v. Guernsey Memorial Hospital, 514 US 87, 96 (1995) (The Supreme Court also explained that, "[t]he APA does not require that all the specific applications of a rule evolve by further more, precise rules rather than by adjudication."); Chrysler Corp. v. Brown, 441 US 281, 302, n. 31 (1979) ("An interpretive rule is issued by the agency to advise the public of the agency's construction of the statutes and the rules which it administers," quoting the Attorney General's Manual on the Administrative Procedure Act," 30 at n. 3 (1947).).

Secretary's rules allowing an exception to the limits on reasonable costs based on atypical services.[24]

Accordingly, after review of the record and applicable law, the Administrator finds that the methodology set forth in section 2534.5B of the PRM is consistent with the plain meaning of sections 1861(v) and 1888(a)-(c) of the Act, the legislative intent and the regulations at 42 CFR 413.30.

## DECISION

The Administrator summarily affirms the Board's decision on Issue No. 1 in this case. The Administrator reverses the decision of the Board on Issue No. 2 in this case.

THIS CONSTITUTES THE FINAL ADMINISTRATIVE DECISION OF THE
SECRETARY OF HEALTH AND HUMAN SERVICES

Date: 7/21/06

Leslie V. Norwalk, Esq.
Deputy Administrator
Centers for Medicare and Medicaid Services

---

[24] Similarly, the Intermediary's application of the methodology set forth at section 2534.5 of the PRM does not constitute a substantive rule, and is consistent with the reasonable cost rules in effect for the cost years at issue. Moreover, the nature of reasonable cost reimbursement requires the determination of allowable costs after the close of the cost reporting period. Application of any reasonable cost comparison determination would constitute a retroactive rulemaking under the Provider's definition of that term.