## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MONTEFIORE MEDICAL CENTER | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.1:06CV01636 (RMU) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Plaintiff respectfully moves for summary judgment in its favor on all claims on the grounds that there are no material facts in dispute and that plaintiff is entitled to judgment as a matter of law. In support of this motion, the Court is respectfully referred to the accompanying Plaintiff's Memorandum in Support of Plaintiff's Motion for Summary Judgment, and Plaintiff's Statement of Material Facts As To Which There Is No Genuine Issue. A proposed order setting the relief requested by this motion is also attached.

Respectfully submitted,

_____/ s /_____
Dennis M. Barry
D.C. Bar No. 375152
Vinson & Elkins L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004-1008
202.639.6791/202.879.8891 (fax)

Counsel for the Plaintiff

October 19, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MONTEFIORE MEDICAL CENTER )<br><br>Plaintiff, )<br>v. )<br><br>MICHAEL O. LEAVITT, Secretary,<br>U.S. DEPARTMENT OF HEALTH AND )<br>HUMAN SERVICES )<br><br>Defendant. ) | Case No. 1:06-CV-01636 (RMU) |

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Dennis M. Barry
    DC Bar No. 375152
J. Harold Richards (Admission Pending)
    DC Bar No. 469524
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C.  20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

October 19, 2007

**Table of Contents**

I.      THE PARTIES ................................................................................................. 2
II.     BACKGROUND ON THE MEDICARE PROGRAM AND THE ROUTINE COST
        LIMITATION .................................................................................................. 3
        2.1.    Medicare Coverage for Services Furnished by Skilled Nursing Facilities .............. 3
        2.2.    Reimbursement of "Actual," "Reasonable Costs" Incurred by Skilled Nursing
                Facilities in Furnishing Medicare Covered Services.................................................. 4
        2.3.    The Statutory and Regulatory Background for Routine Cost Limits........................ 5
                1.      The Secretary's 1980 Cost Limits .................................................................. 5
                2.      1984 Legislation ............................................................................................. 6
                3.      Availability of Exception Relief to the Cost Limits...................................... 6
                4.      Defendant Secretary's 1994 Policy Barring Full Exception Relief for
                        Hospital-Based SNFs ..................................................................................... 9
III.    STATEMENT OF FACTS AND PROCEDURAL BACKGROUND ................................ 11
IV.     STANDARD OF REVIEW ................................................................................. 13
V.      ARGUMENT .................................................................................................. 15
        5.1.    The Secretary's Manual Provision Is a Plainly Erroneous Interpretation of the
                Controlling Regulation.............................................................................................. 16
        5.2.    PRM § 2534.5 Violates the APA Because the Secretary Did Not Follow Notice
                and Comment Rulemaking......................................................................................... 19
                1.      PRM § 2534.5 Changed the Secretary's Established Interpretation of the
                        Atypical Services Regulation........................................................................ 19
                2.      PRM § 2534.5 Is a Substantive Rule That Must Be Promulgated Through
                        Notice and Comment Rulemaking ............................................................... 21
        5.3.    The Secretary's Manual Provision Is Arbitrary, Capricious, an Abuse of
                Discretion, or Otherwise Not in Accordance with Law. ........................................... 23
                1.      The Provision is "Arbitrary and Capricious" and "Not in Accordance with
                        the Law Because It Is Contrary to the Statute and Congress' Intent............. 24
                2.      The Secretary's Decision Is an Arbitrary and Capricious Departure from
                        Past Agency Practice .................................................................................... 29
                3.      PRM § 2534.5 Violates the Medicare Cross-Subsidization Prohibition and
                        Is Inconsistent With Other Provisions of the Medicare Act........................... 31
                4.      PRM § 2534.5 Is Arbitrary and Capricious Because It Discriminates
                        Between Hospital-Based and Freestanding SNFs. ........................................ 33
        5.4.    The 1994 Manual Revision May Not Properly Be Applied Retroactively to 1991
                and 1993 Cost Reporting Periods............................................................................... 36
VI.     CONCLUSION ............................................................................................... 39

# TABLE OF AUTHORITIES

## Cases

Air Transp. Ass'n of Am. v. FAA, 291 F.3d 49 (D.C. Cir. 2002) .................................. 21

Airmark Corp. v. FAA, 758 F.2d 685 (D.C. Cir. 1985).......................................... 34

Alaska Prof'l Hunters Ass'n, Inc. v. FAA, 177 F.3d 1030 (D.C. Cir. 1999)................... 19, 20, 21

Am. Hosp. Ass'n v. Bowen, 834 F.2d 1037 (D.C. Cir. 1987) ............................... 22, 23

American Mining Congress v. Mine Safety & Health Administration,
   995 F.2d 1106 (D.C. Cir. 1993) .......................................................... 22

AT&T Corp. v. FCC, 86 F.3d 242 (D.C. Cir. 1996) ....................................... 14

Biloxi Reg'l Med. Ctr. v. Bowen, 835 F.2d 345 (D.C. Cir. 1987).......................... 14

Bowen v. Georgetown University Hospital, 488 U.S. 204 (1988)............................ 36

Burlington Truck Lines, Inc. v. United States, 371 U.S. 156 (1962)........................ 14

Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,
   467 U.S. 837 (1984) ................................................................... 13, 24

Christensen v. Harris County, 529 U.S. 576 (2000) ..................................... 13, 24, 25

GCI Health Care Ctrs., Inc. v. Thompson, 209 F.Supp.2d 63 (D.D.C. 2002) ............... 25

Greater Boston Television Corp. v. FCC, 444 F.2d 841 (D.C. Cir. 1970).................... 29

Greyhound Corp. v. ICC, 551 F.2d 414 (D.C. Cir. 1977)................................ 14, 30

Guardian Fed. Sav. and Loan Ass'n v. Fed. Sav. and Loan Ins. Corp,
   589 F.2d 658 (D.C. Cir. 1978) .......................................................... 23

Landgraf v. USI Film Products, 511 U.S. 244 (1994) .................................... 36

Local 777, Democratic Union Org. Comm. v. NLRB, 603 F.2d 862 (D.C. Cir. 1978)......... 30

McHenry v. Bond, 668 F.2d 1185 (11th Cir. 1982)...................................... 14

Memorial, Inc. v. Harris, 655 F.2d 905 (9th Cir. 1980)................................. 14

Mercy Med. Skilled Nursing Facility v. Thompson,
   2004 WL 3541332 (D.D.C. 2004) ..................................... 2, 8, 15, 20, 21,

Motor Vehicle Mfrs. Ass'n of the United States, Inc.
  v. State Farm Mut. Auto. Ins. Co.
  463 U.S. 29 (1983) ................................................................................................... 14, 28

Mova Pharm. Corp. v. Shalala, 140 F.3d 1060 (D.C. Cir. 1998) ................................... 29

Paralyzed Veterans of Am. v. D.C. Arena, 117 F.3d 579 (D.C. Cir. 1997) ............... 19, 20

Pub. Citizen, Inc. v. U.S. Dept. of Health and Human Servs.,
  332 F.3d 654 (D.C. Cir. 2003) ................................................................................... 24

Sioux Valley Hospital v. Bowen, 792 F.2d 715 (8th Cir. 1986) ............................... 25, 31

Skidmore v. Swift & Co., 323 U.S. 134 (1944) ............................................... 13, 24, 25

St. Luke's Methodist Hosp. v. Thompson,
  182 F.Supp.2d 765 (N.D. Iowa 2001) ................................................................... passim

St. Luke's Methodist Hospital v. Thompson,
  315 F.3d 984 (8th Cir. 2003) ............................................................................... passim

St. Mary of Nazareth Hosp. Ctr. v. Heckler,
  760 F.2d 1311 (D.C. Cir. 1985) ................................................................................. 31

St. Mary of Nazareth Hosp. Ctr. v. Schweiker, 718 F.2d 459 (D.C. Cir. 1983) ............ 31

Syncor Int'l Corp. v. Shalala, 127 F.3d 90 (D.C. Cir. 1997) ......................................... 22

Thomas Jefferson Univ. v. Shalala, 512 U.S. 504 (1994) ....................................... 13, 16

Transactive Corp. v. United States, 91 F.3d 232 (D.C. Cir. 1996) ........ 14, 29, 30, 34, 35

U.S. v. Mead Corp., 533 U.S. 218 (2001) .................................................................... 24

WLOS TV, Inc. v. FCC, 932 F.2d 993 (D.C. Cir. 1991) ......................................... 14, 30

## Statutes

5 U.S.C. § 553 ........................................................................................................ 19, 20
5 U.S.C. § 706 .............................................................................................................. 13
5 U.S.C. § 706(2)(A) ...................................................................................................... 15
5 U.S.C. § 706(2)(C) ................................................................................................ 16, 36
42 U.S.C. § 1395d(a)(2) .................................................................................................. 3
42 U.S.C. § 1395h(a) ...................................................................................................... 3
42 U.S.C. § 1395i-2(a) .................................................................................................... 3
42 U.S.C. § 1395oo(f) .................................................................................................... 13
42 U.S.C. § 1395x(i) ........................................................................................................ 4

42 U.S.C. § 1395x(v)(1) ............................................................................................................. 5
42 U.S.C. § 1395x(v)(1)(A) ................................................................................. 4, 5, 15, 31, 32, 37
42 U.S.C. § 1395y(a)(9) ........................................................................................................... 4
42 U.S.C. § 1395yy .......................................................................................... 6, 8, 26, 29, 33
42 U.S.C. § 1395yy(a) .................................................................................................. 6, 27, 34
42 U.S.C. § 1395yy(a)(1)-(4) ...................................................................................................... 6
42 U.S.C. § 1395yy(a)(3) ........................................................................................................... 33
42 U.S.C. § 1395yy(c) ................................................................................... 26, 27, 34, 3542

## Regulations

C.F.R. § 405.460(f) ............................................................................................................... 7
42 C.F.R. § 405.460(f)(2) ........................................................................................................... 7
42 C.F.R. § 405.1871 ............................................................................................................ 12
42 C.F.R. § 405.1875 ............................................................................................................ 12
42 C.F.R. § 411.15(g) ........................................................................................................... 4
42 C.F.R. § 413.5(a) ............................................................................................................. 5
42 C.F.R. § 413.30 (1993) .................................................................................... 18, 20, 21, 23
42 C.F.R. § 413.30(f) (1993) ............................................................................................ passim
42 C.F.R. § 413.30(f)(1) (1993) ....................................................................................... passim
42 C.F.R. § 413.30(f)(1)(i) (1993) ......................................................................... 16, 17, 30
42 C.F.R. § 413.50(b) ............................................................................................................ 5
39 Fed. Reg. 20164 (June 6, 1974) ............................................................................................. 7
44 Fed. Reg. 31802 (June 1, 1979) .................................................................................... 7, 38
45 Fed. Reg. 58699 (Sept. 4, 1980) ............................................................................... 5-6
51 Fed. Reg. 34790 (Sept. 30, 1986) ........................................................................................ 7
63 Fed. Reg. 26252 (May 12, 1998) ........................................................................................ 4
64 Fed. Reg. 42610 (Aug. 5, 1999) .......................................................................................... 7

## Other Authorities

Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Comm.
on March 21, 1984, S. Comm. on Finance, Senate Print 98-169, v.1, as reprinted in Medicare
and Medicaid Spending Reductions in the Deficit Reduction Act of 1984, Explanation by the
Senate Finance Committee and text of title IX of the Bill MEDICARE AND MEDICAID GUIDE
(CCH), Pt. II, No. 423 (Apr. 13, 1984) (CCH), Pt. II, No. 423 (Apr. 13, 1984)..... 8, 28, 33, 35

Deficit Reduction Act of 1984, Pub. L. No. 98-369 (July 18, 1984),
(codified at 42 U.S.C. § 1395yy) ........................................................................ 6, 25, 27, 33

H.R. Rep. 92-231, 92nd Cong., 2nd Sess. (1972),
as reprinted in 1972 U.S.C.C.A.N. 4989 ...............................................................................37, 38

Provider Reimbursement Manual § 2534.5 ..........................................................................passim

Provider Reimbursement Manual (HCFA Transmittal No. 378, Pub. 15-1) (1994)................9, 36

Social Security Amendments of 1972, Pub. L. No. 92-603, § 223 (Oct. 30, 1972)......................5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MONTEFIORE MEDICAL CENTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 1:06-CV-01636 (RMU) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary, | ) | |
| U.S. DEPARTMENT OF HEALTH AND | ) | |
| HUMAN SERVICES | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Montefiore Medical Center, a Medicare-participating nonprofit hospital, is challenging the Defendant Secretary's application of an informal agency manual provision so as to improperly limit the Plaintiff's Medicare reimbursement for its 1991 and 1993 cost reporting periods.

Plaintiff Hospital operates a skilled nursing facility that treats Medicare patients. By statute, Defendant Secretary pays Plaintiff Hospital directly for skilled nursing facility services furnished to Medicare patients. The amount of payment for the years in dispute, 1991 and 1993, was based on Plaintiff Hospital's "actual" "reasonable cost," subject to overall limitations on routine cost. Exception relief to the cost limitations was available, and Plaintiff Hospital applied for exception relief for both years at issue. Plaintiff Hospital's request for exception payments was reviewed in detail by Defendant Secretary's contractor (the Medicare "fiscal intermediary") which recommended approval to Defendant Secretary. The contractor did not identify any costs

that were not reasonable. Defendant Secretary approved the exception requests, but under agency policy, the amount of exception payments was *not* the full amount of costs in excess of the limitation but was only those costs in excess of 112 percent of the mean costs for hospital-based SNFs, an amount well above the cost limit. Thus, even though Defendant Secretary concluded that Plaintiff Hospital was entitled to exception relief because of the atypical acuity of its patients and other circumstances, and no unreasonable costs were identified, the total amount of payment even with the exception relief was substantially less than actual, reasonable costs— approximately $1.7 million for the two years together.

It had been the Secretary's longstanding policy to pay the full amount of reasonable costs in excess of the applicable cost limitation when the Secretary granted exception relief. Nothing in Defendant Secretary's regulations suggests that the full amount of costs will not be paid when an exception request is granted. Nevertheless, without notice or comment, Defendant Secretary reversed longstanding policy with the issuance of an interpretive Manual provision in 1994 that arbitrarily limited exception payments.

This Court decided the same issue in favor of the plaintiff hospital in the case of <u>Mercy Medical Skilled Nursing Facility v. Thompson</u>, 2004 WL 3541332, at *2–*3 (D.D.C. 2004) ("<u>Mercy</u>"). Similarly, the same issue was decided in favor of the appealing hospital in <u>St. Luke's Methodist Hospital v. Thompson</u>, 315 F.3d 984 (8th Cir. 2003). There is no basis for distinguishing this case from these two prior decisions.

## I.     THE PARTIES

Plaintiff, Montefiore Medical Center ("Plaintiff Hospital" or "Hospital"), is an academic medical center located in The Bronx, New York. The Plaintiff is organized as a not-for-profit corporation under the laws of New York and is tax-exempt under IRC § 501(c)(3). Plaintiff Hospital is and was at all times relevant hereto a "provider of services" participating in the

Medicare Program established under Title XVIII of the Social Security Act. Plaintiff Hospital operates a skilled nursing facility that is "hospital-based." The Medicare reimbursement dispute in this case relates to payments for services furnished by Plaintiff Hospital in its skilled nursing facility.

Defendant, Michael O. Leavitt, Secretary of the United States Department of Health and Human Services ("Defendant Secretary"), is sued in his official capacity. Defendant Secretary is the federal officer to whom Congress has delegated administration of the Medicare program. Defendant Secretary exercises the administrative responsibility of the Medicare program primarily through the Centers for Medicare and Medicaid Services ("CMS") (formerly known as the Health Care Financing Administration), an agency of the Department of Health and Human Services. Defendant Secretary contracts with private organizations (usually an insurance company) to perform certain audit, administrative and payment functions with respect to the Medicare program. 42 U.S.C. § 1395h(a). These contractors are usually called "fiscal intermediaries" or "intermediaries". The fiscal intermediary assigned to Plaintiff Hospital was the Blue Cross/Blue Shield Association and National Government Services (formerly Empire Medicare Services) ("Intermediary").

## II.     BACKGROUND ON THE MEDICARE PROGRAM AND THE ROUTINE COST LIMITATION

### 2.1.     Medicare Coverage for Services Furnished by Skilled Nursing Facilities

The Medicare program[1] is a federal health insurance program that covers patients who are at least 65 years of age, or who are disabled. See 42 U.S.C. § 1395i-2(a); 42 C.F.R. § 410.10. Medicare benefits include payment to the provider for post-hospital extended care services furnished in a skilled nursing facility. 42 U.S.C. § 1395d(a)(2).

---

[1] The statutory provisions governing the Medicare program are set forth at 42 U.S.C. § 1395 *et seq.*

- 3 -

Skilled nursing facility services are less intensive than hospital services but, in order for there to be Medicare coverage, the patient must first have had at least a three-day hospital stay, and must need more than "custodial care."[2]  42 U.S.C. §§ 1395x(i); 1395y(a)(9); 42 C.F.R. § 411.15(g).  Typically, a patient in a skilled nursing facility receives at least one of the following services:  physical therapy; occupational therapy; and speech pathology services.

### 2.2.    Reimbursement of "Actual," "Reasonable Costs" Incurred by Skilled Nursing Facilities in Furnishing Medicare Covered Services

When a skilled nursing facility furnishes covered services to a Medicare patient, Medicare pays the provider directly (except for certain deductible and coinsurance amounts). For the years in dispute, the Medicare program was required by statute to reimburse each skilled nursing facility its "actual" "reasonable cost."[3]  42 U.S.C. § 1395x(v)(1)(A).  "Reasonable cost" is defined as those costs "actually incurred, excluding therefrom any part of incurred cost[s] found to be unnecessary in the efficient delivery of needed health services."  Id.  Although CMS distinguishes between hospital-based and free-standing skilled nursing facilities for purposes of the "routine cost limitations," discussed below, the statutory requirement for payment of "actual" "reasonable cost" applies equally to both hospital-based and freestanding facilities.

Congress delegated the responsibility for establishing methods for determining reasonable cost to the Defendant Secretary.  The reasonable cost "shall be determined *in accordance with regulations* establishing the method or methods to be used, and the items to be

---

[2] Medicare-covered skilled nursing facility services are distinguishable from most nursing facility services because the patients are improving, i.e., they have rehabilitative potential.  Medicare does not cover custodial care services furnished which are the only services furnished by many nursing facilities.  Indeed, many nursing facilities are not even certified as Medicare skilled nursing facilities.

[3] Congress amended the law to provide for Medicare payment to skilled nursing facilities to be based on prospectively determined rates.  42 U.S.C. § 1395yy(e).  Effective in 1998, CMS implemented a new payment mechanism for skilled nursing facilities with nationally applicable rates (subject to adjustment for wage levels in each area).  See 63 Fed. Reg. 26252 (May 12, 1998).

included, in determining such costs for various types or classes of institutions, agencies, and services." 42 U.S.C. § 1395x(v)(1)(A) (emphasis added).

In enacting regulations pursuant to Congress' grant of authority, the Secretary may not shift the costs of Medicare patients to non-Medicare patients or *vice versa*. The Medicare statute prohibits Medicare and other payers from "cross-subsidizing" each other. 42 U.S.C. § 1395x(v)(1)(A). The statute states that

> [s]uch regulations *shall* (i) take into account both direct and indirect costs of providers of services . . . in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this title will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by such insurance programs.

42 U.S.C. § 1395x(v)(1)(A) (emphasis added). See also 42 C.F.R. §§ 413.5(a), 413.50(b).

### 2.3.    The Statutory and Regulatory Background for Routine Cost Limits

#### 1.    The Secretary's 1980 Cost Limits

As noted above, the Secretary is authorized to establish appropriate cost limits as part of the method of determining reasonable costs. 42 U.S.C. § 1395x(v)(1)(A). The Social Security Amendments of 1972, Pub. L. No. 92-603 (Oct. 30, 1972), § 223 amended Section 1861v(1) of the Social Security Act [42 U.S.C. § 1395x(v)(1)] to authorize Defendant Secretary to establish limits on the direct or indirect overall costs of services to be recognized as reasonable.

Pursuant to this statutory authority, Defendant Secretary published separate routine cost limitations ("RCLs or cost limits") for free-standing SNFs and hospital-based SNFs.

Prior to 1984, the routine cost limitation for free-standing SNFs was set at 112 percent of the mean costs for free-standing SNFs, and the routine cost limitation for hospital-based SNFs was set at 112 percent of the mean costs for hospital-based SNFs. 45 Fed. Reg. 58699, 58700

(Sep. 4, 1980). Under this formula, the routine cost limitation for hospital-based SNFs was higher than that of freestanding SNFs.

2.     1984 Legislation

In 1984, Congress enacted the Deficit Reduction Act of 1984 ("DEFRA"), Pub. L. No. 98-369 (July 18, 1984), which added Section 1888 to the Social Security Act. See 42 U.S.C. § 1395yy. This provision changed the routine cost limitation for hospital-based SNFs. This new provision directed the Secretary, effective for cost reporting periods beginning on or after July 1, 1984, to set the RCLs for urban hospitals as follows:

> 1) For freestanding SNFs in urban areas, 112% of the mean per diem routine service costs for freestanding SNFs in urban areas; and
>
> 2) For hospital-based SNFs in urban areas, the sum of the limit for freestanding SNFs in urban areas plus 50% of the amount by which 112% of the mean per diem routine service costs for hospital-based SNFs in urban areas exceeds the limit for freestanding SNFs in urban areas.

42 U.S.C. § 1395yy(a).[4] Thus, while the routine cost limitation for freestanding SNFs remained the same, the limitation for hospital-based SNFs was lowered. 42 U.S.C. § 1395yy(a)(1)-(4).

3.     Availability of Exception Relief to the Cost Limits

As a result of its authority under the Medicare statute to establish limits on the allowable costs of Medicare services, by regulation, Defendant Secretary also promulgated various exceptions to the RCLs.[5] One such exception was for providers that furnish atypical services:

---

[4] The statute also set similar limits for rural skilled nursing facilities.

[5] In the legislative history to the 1972 amendments authorizing the cost limits, Congress made clear that it contemplated an exception process:

> Providers would, of course, have the right to obtain reconsideration of their classification for purposes of cost limits applied to them and to obtain relief from the effect of the cost limits on the basis of evidence of the need for such an exception.

H.R. Rep. 92-231, 92nd Cong., 2d Sess. (1972), reprinted in 1972 U.S.C.C.A.N. 5071.

(f)    Exceptions.    Limits established under this section may be adjusted . . . for a provider under the circumstances specified. . . . An adjustment is made only to the extent the costs are reasonable, attributable to the circumstances, specified, separately identified by the provider, and verified by the intermediary.

(1)    *Atypical services.*  The provider can show that the –

(i)    Actual cost of items or services furnished by a provider exceeds the applicable limit because such items or services are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified; and

(ii)    Atypical items or services are furnished because of the special needs of the patients treated and are necessary in the efficient delivery of needed health care.

42 C.F.R. § 413.30(f).

The atypical services exception was first issued as a regulation effective July 1, 1974. Federal Health Insurance for the Aged and Disabled; Limitations on Coverage of Costs; Interim Schedule, 39 Fed. Reg. 20163, 20164 (June 6, 1974) (*codified at* 42 C.F.R. § 405.460(f)(2)). The language of the regulation was revised effective July 1, 1979, and has remained unchanged from 1979 until after the years at issue.   Medicare Program; Limiting Reimbursement for Provider Costs and for Services by Hospital-Based Physicians, 44 Fed. Reg. 31802, 31804 (June 1, 1979) (*codified at* 42 C.F.R. § 405.460(f)).   The regulation was redesignated as 42 C.F.R. § 413.30(f) in 1986, with no changes to its text.   Medicare Program; Redesignation of Reasonable Cost Regulations, 51 Fed. Reg. 34790 (Sep. 30, 1986).   This designation was in use during the time period relevant to this dispute and is the designation used throughout this brief.[6]

Following the revision of the regulation in 1979, the Secretary interpreted the regulation to allow full reimbursement for costs above the cost limits that were the result of atypical

---

[6] The regulation has since been amended and redesignated as 42 C.F.R. § 413.30(e).  Medicare Program; Revisions of the Procedures for Requesting Exceptions to the Cost Limits for Skilled Nursing Facilities and Elimination of Reclassifications, 64 Fed. Reg. 42610, 42612-13 (Aug. 5, 1999).

services. See PRRB Dec., A.R. at 41 ("It is undisputed that for 15 years the Secretary interpreted the regulation as permitting a provider to recover its reasonable costs that exceeded the limits if it is demonstrated that it met the exception requirements."). See also Mercy, 2004 WL 3541332 at * 1.

The 1984 statutory amendments did not alter the Secretary's rules that permitted SNFs qualifying for an atypical services exception to receive full reimbursement for their reasonable costs, and the legislative history states that providers meeting the criteria for exception relief should receive "up to all of their reasonable costs" through the exception process:

> Under this provision, *both hospital-based and freestanding facilities* could continue to apply for and receive exceptions from the cost limits in circumstances where high costs result from more severe than average case mix or circumstances beyond the control of the facility. Indicators of more severe case mix include a comparatively high proportion of Medicare days to total patient days, comparatively high ancillary costs, or relatively low average length of stay for all patients (an indicator of the rehabilitative orientation of the facility). *Facilities eligible for exceptions could receive, where justified, up to all of their reasonable costs.*

Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984, Committee on Finance, United States Senate, Senate Print 98-169, v.1, *as reprinted in* Medicare and Medicaid Spending Reductions in the Deficit Reduction Act of 1984, Explanation by the Senate Finance Committee and Text of Title IX of the Bill, MEDICARE AND MEDICAID GUIDE (CCH), Pt. II, No. 423 (Apr. 13, 1984) (emphasis added). After the 1984 codification of 42 U.S.C. § 1395yy(a), and consistent with this legislative history and with the agency's interpretation of 42 C.F.R. § 413.30(f)(1) prior to the codification of 42 U.S.C. § 1395yy, the Secretary continued to measure the exceptions he awarded to hospital-based SNFs from the cost limit, and not from some point above the cost limit. PRRB Dec., A.R. at 41; Mercy, 2004 WL 3541332 at * 1.

    4.      Defendant Secretary's 1994 Policy Barring Full Exception Relief for Hospital-Based SNFs

In July 1994, Defendant Secretary changed his policy on how much should be paid to hospital-based SNFs which showed that they qualified for an exception to the routine cost limitations that were created ten years previously in the 1984 statutory amendments. Transmittal No. 378 to the Provider Reimbursement Manual. Transmittal No. 378, which was issued without notice or the opportunity for comment, added PRM § 2534.5 and associated appendices. The changes applied solely to hospital-based SNFs; exception payments for freestanding SNFs were not affected. Thus, if a hospital-based SNF and a freestanding SNF had identical costs and the same valid reasons for exceeding the applicable cost limits, the hospital-based SNF would be paid less than the freestanding SNF.

Prior to 1994, when the Secretary found that a hospital-based SNF had justified its costs in excess of the applicable cost limitation, the full amount of such costs was paid to the hospital-based SNF. That ceased in 1994, and a reimbursement gap was created when the Secretary found that a hospital-based SNF had justified its costs in excess of the limitation. The gap was between the applicable cost limit and 112 percent of the mean costs for hospital-based SNFs, as illustrated below:

## Application of PRM § 2534.5



The mechanical operation of this new policy was a bit more complicated than this illustration since the cost limit was disaggregated into thirteen separate cost categories[9] with a comparison of the requesting hospital-based SNF's costs to the 112 percent of the mean costs for each of the thirteen categories. See PRM, Ch. 21, App. B, attached as Exhibit 1, for an

---

[7] The cost limit for HB-SNFs is set at: cost limit for FS-SNFs + ½ (112% of the mean costs of all HB-SNFs − cost limit for FS-SNFs). To use the example given in the chart above: $100 + ½ ($150 − $100) = $125

[8] The cost limit for FS-SNFs is set at 112% of the mean costs for all FS-SNFs (i.e., $100).

[9] Direct expense; employee health and welfare; administrative and general; maintenance/operation of plant; laundry; housekeeping; dietary; cafeteria; nursing administration; central services/supplies; pharmacy; medical records; and social services/activities.

illustration of the mechanics of the computation of exception relief for a hospital-based SNF. What was not changed in 1994 was the previous requirement that *no* exception relief would be granted unless the requesting provider demonstrated with well-documented facts that its costs exceeded the cost limits for reasons specified in Defendant Secretary's regulation, e.g., atypical patients who required more intensive services than patients in other facilities.

## III.    STATEMENT OF FACTS AND PROCEDURAL BACKGROUND

The Loeb Center, Plaintiff's hospital-based SNF, furnished the requisite atypical services, entitling the Plaintiff to the routine cost limit exception available under 42 C.F.R. § 413.30(f). Pursuant to 42 C.F.R. § 413.30(f)(1), the Plaintiff requested that its hospital-based SNF be granted an exception to the routine cost limitation for its fiscal years ending December 31, 1991 and December 31, 1993, because it furnished atypical services during these cost reporting periods. A.R. at 33, 829-1261, 1704-05. The Fiscal Intermediary and the Secretary agreed that the Plaintiff had provided atypical services and was entitled to an award of additional reimbursement in the form of an atypical services exception payment. PRRB Dec., A.R. at 33. However, pursuant to the new manual provision, PRM § 2534.5, the Fiscal Intermediary and the Secretary reimbursed the Plaintiff only for its costs in excess of 112 percent of the peer group (hospital-based SNFs in urban areas) mean costs, rather than for all its costs in excess of the routine cost limitation, as had been the Secretary's interpretation of its governing regulation for a period of fifteen years. See PRRB Dec., A.R. at 33-34, 41. This resulted in a reimbursement gap between the reasonable cost limitation and the exception for atypical services payment. The amount in controversy is approximately $500,000 for 1991 and $1,200,000 for 1993. This amount represents the amount of reasonable costs for which the Plaintiff was not reimbursed due solely to the application of the challenged manual provision. (Plaintiff does not seek a money

judgment, but instead prays for a reversal of the Secretary's decision and a remand to the Secretary to compute amounts owing to Plaintiff pursuant to the Court's order.)

Plaintiff filed timely appeals of the denial of its full costs in excess of the cost limit with the PRRB for both cost reporting periods at issue. A.R. at 1920-23, 1929-31. The PRRB is a board established by statute and appointed by the Secretary to hear appeals when a provider is not satisfied with the amount of Medicare payment. A decision of the PRRB becomes a final decision unless the Secretary reverses, affirms, or modifies the decision. See 42 C.F.R. § 405.1871; 405.1875.

On June 5, 2006, the PRRB issued its decision in this case, finding Plaintiff Hospital entitled to reimbursement for all of its costs in excess of the routine cost limitation. PRRB Dec., A.R. at 31-45. The Board reasoned that "[t]he methodology applied by CMS in partially denying the Provider's exception requests for per diem costs which exceeded the cost limit was not consistent with the statute and regulation relating to this issue." PRRB Dec., A.R. at 41. Furthermore, the Board found that it is "undisputed that for 15 years the Secretary interpreted the regulation as permitting a provider to recover its reasonable costs that exceeded the limits if it is demonstrated that it met the exception requirements." PRRB Dec., A.R. at 42. The PRRB also found that the Secretary's methodology, as embodied in PRM § 2534.5, is "a departure from its earlier method of determining hospital-based SNF exception requests and requires an explanation for its change of direction." PRRB Dec., A.R. at 42.

On July 21, 2006, the Secretary issued a decision reversing the PRRB's decision. Adm'r Dec., A.R. at 2-14. The Secretary found that the methodology used in PRM § 2534.5 was an appropriate application of the reasonable cost requirements and was not inequitable. Adm'r Dec., A.R. at 11. The Secretary also found that PRM § 2534.5 did not represent a change in

CMS policy and thus the Agency was not required to engage in notice and comment rulemaking before promulgating the manual provision at issue in this case. Adm'r Dec., A.R. at 13.

Pursuant to 42 U.S.C. § 1395oo(f), Plaintiff is seeking judicial review of the Secretary's decision.

## IV.    STANDARD OF REVIEW

Jurisdiction over this action lies under 42 U.S.C. § 1395oo(f), which provides that the case "shall be tried pursuant to the applicable provisions under" the Administrative Procedure Act ("APA"). The applicable provisions of the APA require a reviewing court to set aside the Secretary's decision if it is contrary to the statute, arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 5 U.S.C. § 706.

Agency interpretations of statutes that are properly promulgated through notice and comment rulemaking are generally entitled to substantial deference. See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 844 (1984). *Informal* agency interpretations of statutes, such as the manual provision that is being challenged in this case, "are 'entitled to respect' under [the Supreme Court's] decision in Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the 'power to persuade.'" Christensen v. Harris County, 529 U.S. 576, 587 (2000) ("Christensen") (quoting Skidmore, 323 U.S. at 140).[10]

An agency's interpretation of a *regulation* may be overturned when the agency's interpretation is plainly erroneous, inconsistent with the plain language of the regulation, or when an alternative interpretation of a regulation is indicated by the agency's intent when it adopted the regulation, Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994).

---

[10] Similarly, under 42 C.F.R. § 405.1867, the PRRB is required to "afford great weight to interpretive rules" of CMS, yet in this case still ruled in favor of Plaintiff Hospital.

The scope of review under the arbitrary and capricious standard entails a careful, searching inquiry as to whether:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Further, an agency decision that constitutes an unexplained departure from agency precedent must be overturned as arbitrary and capricious. Transactive Corp. v. United States, 91 F.3d 232, 237-38 (D.C. Cir. 1996); WLOS TV, Inc. v. FCC, 932 F.2d 993, 996-98 (D.C. Cir. 1991); Greyhound Corp. v. ICC, 551 F.2d 414, 416 (D.C. Cir. 1977). In addition, an agency decision is arbitrary and capricious if the agency offers insufficient reasons for treating similar situations differently. Transactive Corp., 91 F.3d at 237.

Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" taking into account "whatever in the record fairly detracts from its weight." AT&T Corp. v. FCC, 86 F.3d 242, 247 (D.C. Cir. 1996) (quoting NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939) and Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)). Thus, the reviewing court must subject the agency's decision to searching, careful, and close judicial scrutiny. See Biloxi Reg'l Med. Ctr. v. Bowen, 835 F.2d 345, 350-53 (D.C. Cir. 1987); McHenry v. Bond, 668 F.2d 1185, 1190 (11th Cir. 1982); Memorial, Inc. v. Harris, 655 F.2d 905, 912 (9th Cir. 1980).

Finally, a reviewing court may uphold agency action only on the basis articulated by the agency in its decision, not on post-hoc rationalizations offered by the agency or its counsel in litigation. See, e.g., Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-169 (1962); Biloxi Reg'l Med. Ctr., 835 F.2d at 348 n.12, 351 n.18.

## V.    ARGUMENT

The issue in this case was previously decided in this district in favor of the appealing hospital by Judge Jackson in Mercy Medical Skilled Nursing Facility v. Thompson, 2004 WL 3541332, at *2 – *3 (D.D.C. 2004).  As a matter of judicial economy and comity, this Court should accept the well-reasoned opinion of Judge Jackson in Mercy.

As the Plaintiff Hospital shows below, the Secretary's manual provision, PRM § 2534.5, is invalid for the following reasons, each of which is sufficient, without more, for reversal:

(1)    The Secretary's decision is inconsistent with the plain language of the regulation.

(2)    The Secretary has improperly applied a policy that is invalid because the Secretary failed to go through notice and comment rulemaking under the APA in issuing PRM § 2534.5

(3)    The Secretary's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), because:

    a.    it is inconsistent with clearly stated Congressional intent;

    b.    it is an unexplained departure from the Secretary's long-standing practice of measuring atypical services exceptions from the point of the cost limit, and as such is an abuse of discretion; and

    c.    it violates the statutory prohibition against cross-subsidization between beneficiaries of the Medicare program and other insurance programs, 42 U.S.C. § 1395x(v)(1)(A).

(4)    The Secretary's policy arbitrarily and capriciously discriminates in favor of freestanding SNFs and against hospital-based SNFs.

(5)  The Secretary's decision is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), because it is an impermissible retroactive application of PRM § 2534.5.

### 5.1.  The Secretary's Manual Provision Is a Plainly Erroneous Interpretation of the Controlling Regulation

An agency's interpretation of a regulation must be overturned when the agency's interpretation is plainly erroneous, inconsistent with the plain language of the regulation, or when an alternative interpretation of a regulation is indicated by the agency's intent when it adopted the regulation, Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) ("[W]e must defer to the Secretary's interpretation unless an 'alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation'") (quoting Gardebring v. Jenkins, 485 U.S. 415, 430 (1998)).

The manual provision at issue in this case contradicts the plain language of the Secretary's own regulations by imposing a blanket and arbitrary limit that sets the threshold level for reimbursement under the atypical services exception at 112% of the peer group mean rather than the "applicable limit." See 42 C.F.R. § 413.30(f)(1)(i).

As Plaintiff Hospital shows below, the language of the regulation requires that the atypical services exception amount be measured from the cost limit and not from an arbitrary point above the limit.  In effect, the manual provision establishes an additional threshold requirement that a hospital-based SNF must meet in order to qualify for the atypical services exception, a requirement that is authorized by neither the statute or regulations.

In order to a receive an atypical services exception to the cost limit, under 42 C.F.R. § 413.30(f)(1), a SNF must show:  1) that the "actual cost of services furnished by the SNF[] exceeds the applicable limit because the services are atypical in nature and scope" (compared to

the services generally furnished by SNFs similarly classified) and 2) that the "atypical services are furnished because of the special needs of the patients treated and are necessary in the efficient delivery of needed health care." The language of the regulation is clear and unambiguous. The controlling regulation requires only that a provider's costs due to atypical services exceed the "applicable limit" in order to receive an exception amount. 42 C.F.R. § 413.30(f)(1)(i). If a provider shows that it is entitled to an exception, the regulation provides that the "limits established under this section may be adjusted upward." 42 C.F.R. § 413.30(f). Here, however, the Secretary disregarded his own regulation – the limit was not adjusted upward. Instead through a convoluted calculation, the Secretary accepted some costs in excess of the limit while other justified costs were not. The Secretary's manual provision imposes an additional requirement on providers that is inconsistent with the regulatory language. The manual goes beyond the regulatory language by imposing an additional threshold requirement that hospital-based SNFs must meet in order to be eligible for *any* exception amount. This additional requirement is in conflict with an existing requirement contained in the regulation. As discussed above, the controlling regulation specifically states that the provider must only show that its costs "exceed[] the applicable limit," i.e., the RCL. 42 C.F.R. § 413.30(f)(1)(i). As found by the 8th Circuit in St. Luke's Methodist Hospital v. Thompson ("St. Luke's II"), the "applicable limit" is the RCL amount, not some arbitrary higher amount:

> [W]e believe that the "applicable limit" is the RCL for that particular SNF, not 112% of the mean per diem cost for hospital-based SNFs. We think that these upward adjustments are intended to give SNFs a kind of "safety net" that prevents them from being penalized for providing necessary atypical services to [M]edicare patients.

315 F.3d 984, 989 (8th Cir. 2003). See also St. Luke's Methodist Hosp. v. Thompson, 182 F. Supp.2d 765, 776 (N.D. Iowa 2001) ("St. Luke's I"); PRRB. Dec., A.R. at 42.

- 17 -

Under the manual provision, the RCL exception payment amount is no longer tied to the "applicable limit," but to a higher amount arbitrarily set by CMS. By requiring that a hospital-based SNF show that its costs are higher than 112% of the peer group mean, the Secretary has completely disregarded the portion of the regulation that requires that the atypical services exception amount be measured from the routine cost limit, the "applicable limit." See St. Luke's I, 182 F.Supp.2d at 786 ("[T]he Court agrees with St. Luke's that PRM § 2534.5 . . . imposes an additional substantive requirement that cannot reasonably be found in or inferred from the text of 42 C.F.R. § 413.30 . . . PRM § 2534.5 attempts to significantly narrow the scope of (f)(1) exception-eligibility in contravention of any reasonable reading of the regulation and the Medicare Act"). Indeed, in St. Luke's I, the Court reasoned that the challenged manual provision created an irrebuttable exclusion of gap costs that, if permitted to stand, would allow the Secretary to "substantively rewrite the regulation to impose an additional hurdle for exceptions eligibility not clearly contemplated by the language of [the regulation] or subsequently enacted statutes." Id. at 784.

As Plaintiff Hospital has shown above, the manual provision at issue in this case is a plainly erroneous interpretation of the Secretary's own regulation. Indeed, the Eighth Circuit has found that "PRM § 2534.5 is a 'plainly erroneous' interpretation of the provisions that allow the Secretary to grant an upward adjustment to the hospital-based SNFs and thus, in any event, PRM § 2534.5 is not entitled to our deference." St. Luke's II, 315 F.3d at 988.

The regulation requires that a hospital-based SNF's atypical services costs must "exceed the applicable limit," i.e., the routine cost limit. There is simply no other reasonable reading of the regulation. PRM § 2534.5 goes beyond the regulation by requiring that a hospital-based

SNF's costs exceed a point *well above the applicable limit*. Because PRM § 2534.5 is a plainly erroneous interpretation of the regulation, the manual provision should be invalidated.

**5.2.    PRM § 2534.5 Violates the APA Because the Secretary Did Not Follow Notice and Comment Rulemaking.**

      1.    PRM § 2534.5 Changed the Secretary's Established Interpretation of the Atypical Services Regulation

PRM § 2534.5 should be invalidated because the Secretary failed to follow notice and comment rulemaking procedures under the APA, 5 U.S.C. § 553, to change his established interpretation that measured the amount of the atypical services exception from the cost limit. It is undisputed that the Secretary had consistently granted the Plaintiff's atypical services exception requests for all of a provider's costs in excess of the cost limit for a period of fifteen years prior to the issuance of the manual provision. PRRB Dec., A.R. at 41.

The D.C. Circuit Court has found that "[w]hen an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." Alaska Professional Hunters Ass'n, Inc. v. FAA, 177 F.3d 1030, 1034 (D.C. Cir. 1999) ("Alaska Professional Hunters"). The D.C. Circuit has further explained that "[o]nce an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." Paralyzed Veterans of Am. v. D.C. Arena, 117 F.3d 579, 586 (D.C. Cir. 1997) ("Paralyzed Veterans").

The Secretary's interpretation contained in the manual is a significant departure from his long-standing, established prior approach, but was not promulgated as part of a "notice and comment" rulemaking published in the Federal Register. PRM § 2534.5 changed the qualifying reimbursement level for a hospital-based SNF from the cost limit to 112% of the SNF's peer group mean per diem costs. Under the Secretary's established, fifteen-year prior interpretation

of 42 C.F.R. § 413.30, hospital-based SNFs that qualified for the atypical services exception were entitled to recover all reasonable costs above the cost limit. Under the Secretary's new interpretation, as embodied in PRM § 2534.5, a hospital-based SNF is not entitled to reimbursement for *any* atypical services costs between the cost limit amount and 112% of its peer group mean. Thus, the manual provision fundamentally altered the Secretary's established methodology for calculating the atypical services exception. Therefore, by failing to go through notice and comment rulemaking when it issued the challenged manual provision, the Secretary violated the rulemaking provisions of the Administrative Procedure Act ("APA"). 5 U.S.C. § 553.

Relying upon the D.C. Circuit Court's decisions in Alaska Professional Hunters and Paralyzed Veterans, this Court has previously invalidated PRM § 2534.5 under the APA because of the Secretary's failure to engage in notice and comment rulemaking. Mercy, 2004 WL 3541332 at *2 - *3.

> [W]hether it is written down or not, a consistent ten-year practice of granting atypical cost exceptions in the same manner year after year reflects a "definitive" interpretation of the relevant authoritative text. [Citation omitted]. Any significant alteration of that established practice requires notice and an opportunity for those affected to comment. To hold otherwise would grant agencies the power to reinterpret regulations at will so long as their prior interpretations, no matter how established, had not been written down.
>
> The Court finds that the Secretary had a long established practice of granting atypical cost exceptions from the RCL limit. The Secretary carried out that practice without fail for, at least, the years between 1984 and July 1994. The length and consistency of that practice is sufficient to establish a definitive agency interpretation of § 413.30(f)'s language concerning the granting of "reasonable" exceptions to the RCL for atypical costs. The plaintiffs relied on this interpretation for 10 years and shaped their practices on the basis of it. The Secretary's abrupt shift in policy brought about through PRM § 2534.5 constitutes a substantial departure from that interpretation and the Secretary's failure to follow the APA's notice and comment procedures in making the change constitutes a violation of the APA.

Id.

This case presents precisely the same legal issue that was already decided by this Court in

Mercy Medical Skilled Nursing Facility v. Thompson – the validity of PRM § 2534.5 in light of

the Secretary's established fifteen-year interpretation of the controlling regulation, 42 C.F.R.

§ 413.30(f). Accordingly, the manual provision at issue in this case should be invalidated

because of the Secretary's failure to engage in notice and comment rulemaking procedures.

> Furthermore, the PRRB found in the hearing for this appeal:

> Even if [PRM] §2534.5 should be considered an "interpretive" rule, it nevertheless constitutes a significant revision of the Secretary's definitive interpretation of 42 C.F.R. §413.30 and is invalid because it was not issued pursuant to notice and comment rulemaking....

> In a District of Columbia Circuit Court decision, *Alaska Professional Hunters Ass'n., Inc. v. Federal Aviation Admin.*, 177 F.3d 1030, 1034 (D.C. Cir. 1999), the Court held: "When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." Without question, that is precisely what CMS did when it changed its methodology of determining atypical services exceptions for hospital-based SNFs after having consistently applied it in a much different manner for 15 years prior to making the change.

PRRB Dec., A.R. at 43.

> 2.   PRM § 2534.5 Is a Substantive Rule That Must Be Promulgated Through Notice and Comment Rulemaking

As discussed above, the Plaintiff argues that the manual provision at issue here changed

the Secretary's established policy in determining the amount of payment to a hospital-based SNF

that has justified having actual costs in excess of the applicable cost limit. In addition to this

argument, the Plaintiff argues that PRM § 2534.5 is a substantive rule that should have been

promulgated through notice and comment rulemaking under the APA. It is well-settled that the

APA requires notice and comment rulemaking procedures be followed when an agency enacts a

new substantive rule. Air Transp. Ass'n of Am. v. FAA, 291 F.3d 49, 55-56 (D.C. Cir. 2002).

Substantive rules are rules that "grant rights, impose obligations, or produce other significant effects on private interests." Am. Hosp. Ass'n v. Bowen, 834 F.2d 1037, 1045 (D.C. Cir. 1987) (quoting Batterton v. Marshall, 648 F.2d 694, 701-02 (D.C. 1980)). In American Mining Congress v. Mine Safety & Health Administration, the D.C. Circuit set forth four factors that would distinguish an interpretive rule from a legislative rule:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties,
>
> (2) whether the agency has published the rule in the Code of Federal Regulations,
>
> (3) whether the agency has explicitly invoked its general legislative authority, or
>
> (4) whether the rule effectively amends a prior legislative rule.

995 F.2d 1106, 1112 (D.C. Cir. 1993). Furthermore, the D.C. Circuit has noted that any one of these factors would be sufficient to identify a rule as a substantive rule. Syncor Int'l Corp. v. Shalala, 127 F.3d 90, 96 (D.C. Cir. 1997). Two of the factors identified in American Mining are particularly relevant here.

First, PRM § 2534.5 had the effect of amending a prior legislative rule, 42 C.F.R. § 413.30(f), by adding an additional threshold cost requirement that hospital-based SNFs must meet in order to be eligible for an atypical services exception. As discussed in greater detail above, PRM § 2534.5 requires hospital-based SNFs to prove that their atypical services costs are greater than 112% of the peer group mean in order to qualify for the exception. As such, it has the effect of amending the regulation, which required only that SNFs exceed the "applicable limit." 42 C.F.R. § 413.30(f).

Second, in the absence of PRM § 2534.5, there would have been no ostensible basis for the agency's action. The Secretary could not have relied on 42 C.F.R. § 413.30(f) to change the amount of atypical costs needed to qualify for the exception. As discussed above, under 42

C.F.R. § 413.30(f), a hospital-based SNF may qualify for the atypical services exception so long as its costs exceed the "applicable limit," which is the cost limit. Furthermore, as discussed in greater detail above, the language of the statute and legislative history supports this reading of the regulation. Accordingly, neither the statute nor the regulation permits the Secretary to measure the atypical services exception from 112% of the peer group mean. The regulations require that the exception be measured from the cost limit. Accordingly, the Secretary could not have relied on either the Medicare statute or 42 C.F.R. § 413.30 in issuing PRM § 2534.5.

Furthermore, in the D.C. Circuit, rules that "narrowly limit[] administrative discretion" are generally considered substantive rules. <u>Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp</u>, 589 F.2d 658, 666-67 (D.C. Cir. 1978). <u>See also</u> <u>Am. Hosp. Ass'n v. Bowen</u>, 834 F.2d 1037, 1047 (D.C. Cir. 1987). PRM § 2534.5 removes all agency discretion with respect to calculating the atypical services exception and requires mechanical application of its standard. <u>See</u> <u>St. Luke's I</u>, 182 F.Supp.2d at 786 ("The PRM removes all discretion from the Secretary to consider reimbursement" that is due to a hospital-based SNF under 42 C.F.R. § 413.30(f)).

### 5.3.    The Secretary's Manual Provision Is Arbitrary, Capricious, an Abuse of Discretion, or Otherwise Not in Accordance with Law.

The challenged manual provision is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law for at least four reasons: (1) the language of the provision is inconsistent with the legislative intent of the governing statute; (2) it violates the statutory prohibition against cross-subsidization between beneficiaries of the Medicare program and other insurance programs, (3) it is an unexplained departure from the Secretary's long-standing practice of measuring atypical service exceptions from the point of the routine cost

- 23 -

limitation, and as such is an abuse of discretion; and (4) it discriminates in favor of freestanding SNFs and against hospital-based SNFs without providing a reasonable explanation.

        1.      The Provision is "Arbitrary and Capricious" and "Not in Accordance with the Law Because It Is Contrary to the Statute and Congress' Intent

            (a)      <u>Skidmore</u> Deference Should Apply to the Secretary's Interpretation of the Medicare Statute

As noted above, the substantial deference standard does <u>not</u> apply to informal agency interpretations of statutes, such as the manual provision that is being challenged in this case. <u>See</u> <u>Christensen v. Harris County</u>, 529 U.S. 576, 587 (2000). <u>See also</u> <u>U.S. v. Mead Corp.</u>, 533 U.S. 218, 227-28 (2001). As the Supreme Court explained in <u>Christensen</u>,

> Interpretations such as those in opinion letters – like interpretations contained in policy statements, *agency manuals*, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference. . . Instead, interpretations contained in formats such as opinion letters are "entitled to respect" under our decision in *Skidmore v. Swift & Co.*, but only to the extent that those interpretations have the "power to persuade."

529 U.S. at 587 (internal citations omitted) (emphasis added).

Plaintiff Hospital asserts that the less deferential standard established by <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944), should apply here. The D.C. Circuit has specifically noted that agency manuals are the "archetype of the kind of document that is not entitled" to substantial deference. <u>Pub. Citizen, Inc. v. U.S. Dept. of Health and Human Servs.</u>, 332 F.3d 654, 660 (D.C. Cir. 2003) (noting that the Supreme Court has twice cited agency manuals as the kind of document that is not entitled to substantial deference and applying <u>Skidmore</u> deference to CMS' Peer Review Organization Manual). Indeed, this Court, applying <u>Christensen</u>, has found that the Provider Reimbursement Manual, the particular manual at issue here, "contain[s] informal interpretive rules that do not carry the force of law" and that the "Secretary's interpretations

contained in the PRM [are reviewed] under the standard set forth by the Supreme Court in Skidmore." GCI Health Care Ctrs., Inc. v. Thompson, 209 F. Supp. 2d 63, 70-71 (D.D.C. 2002).

Under Christensen, informal interpretations are "'entitled to respect' under [the Supreme Court's] decision in Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), but only to the extent that those interpretations have the 'power to persuade.'" Christensen, 529 U.S. at 587 (quoting Skidmore, 323 U.S. at 140).

According to the Eighth Circuit, "Deference is due when an agency has developed its interpretation contemporaneously with the regulation, when the agency has consistently applied the regulation over time, and when the agency's interpretation is the result of thorough and reasoned consideration." Sioux Valley Hospital v. Bowen, 792 F.2d 715, 719 (8th Cir. 1986) (citing Skidmore and finding little deference due where policy had been interpreted consistently and was embodied in a PRM section which had not gone through the notice and comment rulemaking process). In St. Luke's I, the District Court, applying Christensen, found that the particular manual provision at issue in this case, PRM § 2534.5, was entitled to little deference under the Skidmore standard because it was adopted years after the statute and regulation and because it conflicted with the Secretary's prior longstanding interpretation of the regulation. 182 F.Supp.2d at 778-80. Therefore, to the extent that the challenged manual provision is an interpretation of a statute, Skidmore deference should apply.

          (b)     The Manual Provision Is Inconsistent with the Statute and Congressional Intent

The language of the statute and the legislative history to the 1984 statutory amendments show that Congress clearly intended for exceptions to be measured from the cost limit, not from a higher amount. As noted above, in 1984, Congress changed the routine cost limits for hospital-based SNFs as part of DEFRA. Pub. L. No. 98-369, § 2319(b), 1984 U.S.C.C.A.N. (98 Stat.)

494, 1083 (codified at 42 U.S.C. § 1395yy). The 1984 amendments specifically authorized the

Secretary to "make adjustments in the limits set forth in subsection (a)." *Id.* The adjustments

"set forth in subsection (a)" are the routine cost limits for freestanding and hospital-based SNFs.

Indeed, the Eighth Circuit has noted:

> We note...that § 1395yy(c) states that the Secretary 'may make adjustments in the
> limits set forth in subsection (a),' and we believe that Congress intended by this
> provision to allow adjustments to be made to the RCL, not to some point above
> the RCL.

St. Luke's II, 315 F.3d at 989. Furthermore, the legislative history of the statute even more

clearly shows that Congress intended that the exception amount for a hospital-based SNF to

continue to be measured from the cost limit, not from an arbitrary, higher amount.

The Administrator notes that:

> [P]resumably, Congress believed there to be no adequate justification for the
> higher mean per diem costs of hospital-based SNFs relative to free-standing
> SNFs, other than the possibility that higher hospital-based SNF costs are due to
> inefficiencies. Thus, as validated by its Report to Congress, (footnote omitted)
> CMS properly determined, in developing the exception process, that 50 percent of
> the difference between the free-standing SNF and the hospital-based SNF cost
> limits, i.e., the "gap," was due to hospital-based SNFs' inefficiencies.

Adm'r Dec., A.R. at 11.[11] To the extent that the Secretary relies upon a 1985 report to support

his assertion that Congress believed that the difference in costs between hospital-based and

freestanding SNFs was due to "inefficiencies," we believe his reliance is misplaced. First, the

1985 report was not published until *after* the enactment of the 1984 amendments, so it is far from

clear that Congress would have relied on its findings in enacting the 1984 amendments. See St.

Luke's I, 182 F.Supp.2d at 780. Second, quoting multiple passages from the 1985 report, the

---

[11] The Provider notes that CMS did not rely upon its 1985 Report to Congress at the Board hearing. Subsequently, CMS submitted untimely comments to the Administrator, which specifically relied on the 1985 Report. The Administrator noted that CMS' comments were untimely and were "not considered." See Adm'r Dec., A.R. at 5, fn 8. Although the Administrator notes that these comments were "not considered," the Administrator included them in the Administrative Record that was furnished to the Provider, and they are included immediately after the Administrator's decision. A.R. at 17-23.

Court in St. Luke's I determined that the report "candidly acknowledges that the methodologies in effect at the time of the studies yielded inconsistent results and precluded accurate assessment of the contributing factors to the cost differences." Id.

However, *even if* Congress did believe that the difference in costs between freestanding and hospital-based SNFs was partially due to inefficiency, the 1984 statutory amendments did not alter the Secretary's rules permitting SNFs that qualify for an atypical services exception from receiving full reimbursement of their reasonable costs. Although 42 U.S.C. § 1395yy(a) did distinguish between hospital-based SNFs and free-standing SNFs with respect to calculating the *routine cost limits*, Congress never expressed an intent to distinguish between the types of SNFs in reimbursing for *atypical costs*. 42 U.S.C. § 1395yy(c). The Eighth Circuit found it significant that "§ 1395yy(c) authorizes upward adjustments to 'any skilled nursing facility' without distinguishing between hospital-based SNFs and free-standing SNFs, or using any language that supports the 'gap' created by PRM § 2534.5." St. Luke's II, 315 F.3d at 988-89).

In its decision for this case, the PRRB found:

> CMS has reached a conclusion regarding the intent of Congress toward reimbursing the *routine* costs of hospital-based SNFs which provide only *typical* services and illogically applied that same rationale to hospital-based SNFs that provide *atypical* services. This is contrary to what Congress intended when it implemented the exception process to address the additional costs associated solely with the provision of atypical services...."

PRRB Dec., A.R. at 41.

Indeed, the legislative history of the DEFRA amendments confirms that Congress intended that SNFs meeting the criteria for exception relief should continue to receive "up to all of their reasonable costs" through the exception process:

> Under this provision, *both hospital-based and freestanding facilities* could continue to apply for and receive exceptions from the cost limits in circumstances where high costs result from more severe than average case mix or circumstances beyond the control of the facility. Indicators of more severe case mix include a

comparatively high proportion of Medicare days to total patient days, comparatively high ancillary costs, or relatively low average length of stay for all patients (an indicator of the rehabilitative orientation of the facility). *Facilities eligible for exceptions could receive, where justified, up to all of their reasonable costs.*

Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984, Committee on Finance, United States Senate, Senate Print 98-169, v.1, as reprinted in Medicare and Medicaid Spending Reductions in the Deficit Reduction Act of 1984, Explanation by the Senate Finance Committee and Text of Title IX of the Bill, MEDICARE AND MEDICAID GUIDE (CCH), Pt. II, No. 423 at p. 948 (Apr. 13, 1984) (emphasis added).

Thus, it was Congress' clear intent that CMS continue to grant exception requests for the full amount of atypical costs above the RCL. St. Lukes II, 315 F.3d at 989. Indeed, the PRRB in this case found that "[t]he intent of Congress in providing an exception to the cost limits . . . was to ensure that providers would be reimbursed their *full costs* for providing those additional [atypical] services." PRRB Dec., A.R. at 34 (emphasis added).

In enacting the manual provision at issue in this case, the Secretary went beyond the statute and the intent of Congress. Accordingly, the Secretary's decision in this case is "not in accordance with the law" and should be invalidated. Furthermore, since the Secretary has failed to address Congress' manifest intent in implementing the 1984 statutory amendments, the Secretary has "failed to consider an important aspect" of the issue, Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983), namely Congress' expressed intent that qualifying Providers be reimbursed for "up to all of their reasonable costs." Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984, Committee on Finance, United States Senate, Senate Print 98-169, v.1. Even if the Secretary believes that its interpretation best reflects the plain meaning of the statute (which it does not), the Secretary should have considered the clear intentions of the drafters and not implemented the

- 28 -

statute in a manner "demonstrably at odds with [these] intentions." <u>Mova Pharmaceutical Corp.</u> <u>v. Shalala</u>, 140 F.3d 1060, 1068 (D.C. Cir. 1998) (citing to <u>United States v. Ron Pair Enter.</u>, 489 U.S. 235, 242 (1989)). Thus, the Secretary's manual provision must be invalidated.

There is simply no statutory basis for failing to reimburse a hospital-based SNF's costs between the cost limit and 112% of the peer group mean, yet CMS's method does exactly that. Indeed, after the 1984 codification of 42 U.S.C. § 1395yy(a), and consistent with this legislative history and with his interpretation of 42 C.F.R. § 413.30(f)(1) prior to the codification of 42 U.S.C. § 1395yy, the Secretary continued to measure the exceptions he awarded to hospital-based SNFs from the routine cost limitation, and not from some point above the routine cost limitation. <u>See</u> PRRB Dec., A.R. at 41.

> 2.    The Secretary's Decision Is an Arbitrary and Capricious Departure from
>        Past Agency Practice

Second, Defendant Secretary's decision is arbitrary and capricious because it constitutes an unexplained departure from the plain language of the regulation and the Secretary's established fifteen year policy of granting exception requests for the full amount above the cost limit. An agency decision that constitutes an unexplained departure from past agency precedent must be overturned as arbitrary and capricious. <u>Transactive Corp. v. United States</u>, 91 F.3d 232, 236-37 (D.C. Cir. 1996) ("In order to ensure that an agency's decision has not been arbitrary, we require the agency to have identified and explained the reasoned basis for its decision"); <u>Greater</u> <u>Boston Television Corp. v. FCC.</u>, 444 F.2d 841, 852 (D.C. Cir. 1970) (footnote omitted). ("[A]n agency changing its course must supply a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from prior precedents without discussion it may cross the line from the tolerably terse to the intolerably mute"); <u>Local 777, Democratic Union Org. Comm. v. NLRB.</u>, 603 F.2d 862, 882

(D.C. Cir. 1978) (finding that where the agency "announces no principled reason" for a change in policy, "its action is arbitrary and the courts should be quick to so declare"). See also WLOS TV, Inc. v. FCC, 932 F.2d 993, 996-98 (D.C. Cir. 1991); Greyhound Corp. v. ICC, 551 F.2d 414, 416 (D.C. Cir. 1977).

Because PRM § 2534.5 is contrary to the regulations and to the Secretary's longstanding practice of granting exception requests for the full amount of a SNF's costs in excess of the limits, the Secretary is required to "identif[y] and explain[] the reasoned basis for its decision." Transactive Corp., 91 F.3d at 236. Here, the Secretary has offered *no explanation at all* with respect to the sudden shift in policy that occurred with the promulgation of PRM § 2534.5. The Administrator's decision notes that "the methodology set forth in section 2534.5B of the PRM in no way alters or revises Medicare policy as set forth in the regulations at section 413.30(f)(1)(i) but is one method of applying that policy." Adm'r Dec., A.R. at 12. However, the Administrator failed to explain his abrupt shift from consistently granting exception requests for the full amount in excess of the limits to setting an arbitrary limit for which a hospital-based SNF can never be reimbursed. Accordingly, PRM § 2534.5 should be invalidated.

When the regulation governing the atypical services exception went into effect, CMS did not require hospitals to prove that their costs exceed 112% of the peer group mean. 42 C.F.R. § 413.30(f)(1). Under the language of the regulation, a provider only needed to show that its costs "exceed[] the applicable limits." Id. Until PRM § 2534.5 was enacted, for a period of 15 years the Secretary consistently applied the language of the regulation and granted RCL exception relief to providers for all costs that exceeded the applicable RCL. See PRRB Dec., A.R. at 41 ("It is undisputed that for 15 years the Secretary interpreted the regulation as permitting a provider to recover its reasonable costs that exceeded the limits if it is demonstrated

that it met the exception requirements"). <u>See also</u> <u>St. Luke's I</u>, 182 F.Supp.2d at 779 n.16

(analyzing 42 C.F.R. § 413.30(f)(1) and concluding that "there is nothing ambiguous in the text

of the regulation itself").

> 3.    PRM § 2534.5 Violates the Medicare Cross-Subsidization Prohibition and
>        Is Inconsistent With Other Provisions of the Medicare Act

The cross-subsidization prohibition forbids the shifting of Medicare costs to non-

Medicare patients and vice versa. 42 U.S.C. § 1395x(v)(1)(A). This provision states:

> [R]egulations shall take into account both direct and indirect costs of providers of
> services . . . in order that, under the methods of determining costs, the necessary
> costs of efficiently delivering covered services to individuals covered by the
> insurance programs established by this title will not be borne by individuals not so
> covered, and the costs with respect to individuals not so covered will not be borne
> by such insurance programs.

*Id.*

According to the D.C. Circuit, "[t]his provision clearly is meant to prevent the Medicare

program from subsidizing non-Medicare related costs, but it equally clearly proscribes Medicare

from being subsidized by non-Medicare sources." <u>St. Mary of Nazareth Hosp. Ctr. v. Schweiker,</u>

718 F.2d 459, 462 (D.C. Cir. 1983). <u>See also</u> <u>St. Mary of Nazareth Hosp. v. Heckler</u>, 760 F.2d

1311, 1316-18 (D.C. Cir. 1985); <u>Sioux Valley Hosp. v. Bowen</u>, 792 F.2d 715, 721 (8th Cir.

1986) ("Central to the Medicare reimbursement program is that 'reasonable costs' are calculated

so that non-Medicare payors do not subsidize the care of Medicare patients").

Using the Secretary's methodology contained in PRM § 2534.5, hospital-based SNFs that

provide atypical services whose costs exceed the cost limit can never be reimbursed for all of

their reasonable atypical services costs in excess of the cost limit. This denial violates the

prohibition against cross-subsidization between Medicare and other payers because the provision

shifts Medicare costs to non-Medicare patients. In effect, the provision forces non-Medicare

payers to subsidize the costs of Medicare patients in violation of the statutory prohibition.

In St. Luke's I, the Court found:

> PRM § 2534.5 is problematic because a provider with typical costs that fall within the RCL but that exceeds the RCL only *because* it provides necessary atypical services is nevertheless precluded from reimbursement for those services within the gap. Rather, the Secretary applies an irrebuttable presumption that such costs are not reasonable. Thus, non-Medicare recipients bear the full brunt of all costs incurred within the gap even though had those same services been provided to the same patients above or below the gap they would be reimbursable. The Court finds this irrebuttable presumption unreasonable in light of the Medicare Act's explicit prohibition on cross-subsidization.

182 F.Supp.2d at 787.

Because PRM § 2534.5 shifts Medicare costs to non-Medicare patients, it is contrary to the cross-subsidization provision in the Medicare Act and should be invalidated.

Furthermore, PRM § 2534.5 is unreasonable because its application undercuts the Medicare program's goal of reimbursing costs that are "necessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). By refusing to reimburse hospital-based SNFs for any of their costs between the cost limit and 112% of the peer group mean, the Secretary "is likely to discourage efficient hospital-based SNFs that have typical costs below the RCL from providing atypical services to those who need them because the SNFs will not be reimbursed for the reasonable cost of those services." St. Luke's II, 315 F.3d at 989. The Secretary's enactment of the manual provision at issue creates a disincentive for hospital-based SNFs to provide atypical services, contrary to the Medicare program's mandate encouraging health care providers to supply needed medical services. Accordingly, PRM § 2534.5 is an unreasonable interpretation of the Medicare statute because it undercuts a pivotal goal of the Medicare program.

     4.     PRM § 2534.5 Is Arbitrary and Capricious Because It Discriminates Between Hospital-Based and Freestanding SNFs.

PRM § 2534.5 is arbitrary and capricious because CMS has not provided a rational basis for discriminating against hospital-based SNFs in favor of freestanding SNFs. Under the manual provision, a hospital-based SNF that qualifies for the atypical services exception will *never* be reimbursed for *any* portion of its costs between the cost limit and 112% of the peer group mean per diem costs. Freestanding SNFs, on the other hand, may receive *all* of their reasonable costs in excess of the cost limit.

As discussed above, in 1984 Congress changed the routine cost limitation for hospital-based SNFs as part of the Deficit Reduction Act of 1984. Deficit Reduction Act of 1984 ("DEFRA"), Pub. L. No. 98-369 (July 18, 1984), codified at 42 U.S.C. § 1395yy. The provision set the RCL for freestanding SNFs in urban areas at 112% of the mean per diem routine service costs for freestanding SNFs in urban areas, but lowered the RCL for hospital-based SNFs to "the sum of the limit for freestanding [SNFs] located in urban areas, plus 50 percent of the amount by which 112 percent of the mean per diem routine service costs for hospital-based [SNFs] located in urban areas exceeds the limit for freestanding [SNFs] located in urban areas." 42 U.S.C. § 1395yy(a)(3).

Under the Secretary's policy as embodied in PRM § 2534.5, free-standing SNFs that provide atypical services are at a distinct advantage, being reimbursed for all their costs in excess of their RCL, which is set at 112% of the peer group mean for freestanding SNFs. Hospital-based SNFs, on the other hand, receive less than full reimbursement for their costs, because the RCL for hospital-based SNFs is set lower than 112% of the peer group mean for hospital-based SNFs. They are penalized under PRM § 2534.5, which provides a disincentive to provide atypical services.

A long line of D.C. Circuit precedent has established that an agency action is arbitrary when the agency has "offered insufficient reasons for treating similar situations differently." Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996). See also Airmark Corp. v. FAA, 758 F.2d 685, 691 (D.C. Cir. 1985) ("Deference to agency authority or expertise, however, 'is not a license to . . . treat like cases differently'") (quoting United States v. Diapulse Corp, 748 F.2d 56, 62 (2nd Cir. 1984).

The Secretary has offered no rational explanation for his discriminatory treatment of hospital-based SNFs, and the language of the statute, regulation, and legislative history do not provide one.  Indeed, the Secretary's post hoc rationalization for the discriminatory treatment, as embodied in the Administrator's Decision in this case, is that in setting the cost limits differently for hospital-based and freestanding SNFs, "presumably, Congress believed" that differences were caused by "inefficiencies" of hospital-based SNFs.  Adm'r Dec., A.R. at 11.   The Administrator also relied up on a 1985 Report to Congress that, as discussed above, was inconclusive in its findings.  See St. Luke's I, 182 F.Supp.2d at 780-81.  Furthermore, even if the Administrator is correct in his presumption of Congress' belief, as discussed above, the legislative history to the statute shows that Congress did not intend to differentiate between freestanding and hospital-based SNFs with respect to their atypical costs and the exception process.  As the Eighth Circuit noted:

> We agree with the district court that the Secretary, in his attempt to justify PRM § 2534.5, confuses two distinct concerns:  reimbursement of SNFs for their typical costs (addressed in § 1395yy(a)) and reimbursement of an individual SNF for providing services atypical of similarly classified providers (addressed in § 1395yy(c)).  Section 1395yy(a) provides a formula for reimbursing the typical costs of hospital-based SNFs; it does not speak to adjustments based on the "special needs or situations" of "particular providers," [citation omitted]. Assuming, without deciding, that Congress enacted § 1395yy(a) in 1984 in part because of concerns about the efficiency of hospital-based SNFs as a group, we note that at the same time Congress elected not to restrict upward adjustments

> "based upon case mix or circumstances" beyond an individual hospital-based SNF's control, see 42 U.S.C. § 1395yy(c): Significantly, § 1395yy(c) authorizes upward adjustments to "any skilled nursing facility" without distinguishing between hospital-based SNFs and freestanding SNFs, or using any language that supports the "gap" created by PRM § 2534.5.

St. Luke's II, 315 F.3d at 988-89.

Indeed, Congress stated that both freestanding and hospital-based SNFs would continue to be eligible for "up to all of their reasonable costs" under the exception process. Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984, Committee on Finance, United States Senate, Senate Print 98-169, v.1, as reprinted in Medicare and Medicaid Spending Reductions in the Deficit Reduction Act of 1984, Explanation by the Senate Finance Committee and Text of Title IX of the Bill, MEDICARE AND MEDICAID GUIDE (CCH), Pt. II, No. 423 at p. 948 (Apr. 13, 1984). Furthermore, the Secretary waited a period of ten years after Congress' enactment of the 1984 amendments and nine years after publication of CMS' Report to Congress to enact the manual provision at issue in this case.

In conclusion, the Secretary apparently relies upon its presumption of what Congress believed in enacting the two-tier cost limit structure in 1984 and on a later 1985 report to Congress that was inconclusive in its findings and that pertained to *typical*, routine costs to discriminate between freestanding and hospital-based SNFs with respect to their *atypical* costs. The Secretary's explanation for discriminating between freestanding and hospital-based SNFs with respect to their *atypical* costs is not reasonable and is unsupported by the facts of this case. Because the Secretary has offered no reasonable explanation for his discriminatory treatment of hospital-based SNFs, PRM § 2534.5 must be invalidated. Transactive Corp. v. U.S., 91 F.3d 232, 237 (D.C. Cir. 1996).

**5.4.    The 1994 Manual Revision May Not Properly Be Applied Retroactively to 1991 and 1993 Cost Reporting Periods.**

Finally, the Secretary's decision is "in excess of statutory jurisdiction, authority, or limitations," 5 U.S.C. § 706(2)(C), because it is an impermissible retroactive application of PRM § 2534.5.

The methodology used by the Secretary to calculate the amount of Plaintiff's atypical services exception request was issued in July 1994 as HCFA Transmittal No. 378, which added § 2534.5 to the PRM. PRRB Dec., A.R. at 41. The Secretary admits in his Answer that § 2534.5 was applied to Plaintiff's reimbursement requests for hospital cost reporting periods ending December 31, 1991 and December 31, 1993. Answer ¶ 23. It is also undisputed that prior to 1994, the Secretary had consistently granted the Provider's atypical services exception requests for a period of 15 years. PRRB Dec., A.R. at 41. In this case, the Secretary has retroactively applied PRM § 2534.5, which was adopted in 1994, to the Plaintiff's costs for 1991 and 1993.

The general rule on retroactive application of administrative regulations, as set forth by the Supreme Court in <u>Bowen v. Georgetown University Hospital</u>, 488 U.S. 204, 208 (1988), is that "[r]etroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." The Court in <u>Bowen</u> went on to hold that "[b]y the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress *in express terms*." *Id.* (emphasis added).

In <u>Landgraf v. USI Film Prods.</u>, 511 U.S. 244 (1994), the Court reaffirmed the holding of <u>Bowen</u> that retroactive application of administrative rules or statutes is not permitted absent clear indication from Congress that retroactivity was authorized. <u>Id.</u> at 266.

In Bowen, as here, the administrative regulation at issue involved a limitation on Medicare reimbursement. On June 30, 1981, the Secretary issued a cost-limit schedule that included a new rule for calculating the hospital wage index, a factor used then and now to reflect nationwide variations in salary levels for hospital employees. Bowen, 488 U.S. at 206-07. After suit was brought in this court by various hospitals in the District of Columbia, this court struck down the wage-index rule, finding that the Secretary had promulgated the rule without following the required APA procedures for public notice and comment. Id. at 207. The Bowen Court specifically held that the statutory provisions of the Medicare Act "establishing the Secretary's general rulemaking power contain *no express authorization of retroactive rulemaking*." Bowen, 488 U.S. at 213 (emphasis added). The Court went on to note that investigation of Congressional intent also indicated that no such authority was contemplated. Id. In the absence of such statutory authorization, the Court held that "[o]ur interpretation of the Medicare Act compels the conclusion that the Secretary has no authority to promulgate retroactive cost-limit rules." Id. at 215.

The Secretary's manual provision is invalid because Congress did not expressly authorize the Secretary to make retroactive rules with respect to cost limits. The statute contains no express authorization to make the cost limits retroactive. See 42 U.S.C. § 1395x(v)(1)(A). Indeed, the legislative history to § 223 of the Social Security Amendments of 1972, which first authorized the Secretary to establish cost limits, states that Congress specifically intended the provisions to be *prospective in effect*. House Report No. 92-231 states:

> Present law provides authority to disallow incurred costs that are not reasonable. However, there are a number of problems that inhibit effective exercise of this authority. The disallowance of costs that are substantially out of line with those of comparable providers after such costs have been incurred creates financial uncertainty for the provider, since, as the system now operates, the provider has no way of knowing until sometime after it incurs expenses whether or not they

> will be in line with expenses incurred by comparable providers in the same period. Furthermore, present law generally limits exercise of the authority to disallow costs to instances that can be specifically proved on a case-by-case basis....
>
> The proposed new authority to set limits on costs recognized for certain classes of providers in various service areas differs from existing authority in several ways and meets these problems. *First, it would be exercised on a prospective, rather than a retrospective, basis* so that the provider would know in advance the limits to Government recognition of incurred costs and have the opportunity to act to avoid having costs that are not reimbursable.

H.R. Rep. 92-231, as reprinted in 1972 U.S.C.C.A.N. 4989, 5069-70. Furthermore, the preamble to the Secretary's own 1979 amendments to the regulations specifically notes that the statute "authorizes the Secretary to set prospective limits on the costs that are reimbursed under Medicare." Medicare Program; Limiting Reimbursement for Provider Costs and For Services By Hospital-Based Physicians, 44 Fed. Reg. 31802, 31802 (June 1, 1979).

Here, the Secretary is attempting to retroactively apply a cost-limit provision in order to limit reimbursement to the Plaintiff for services provided during fiscal years 1991 and 1993. Because Congress did not expressly authorize the Secretary to apply cost limit provisions retroactively, the Secretary's application of PRM § 2534.5 as enacted in July 1994 to plaintiff's reimbursement requests for 1991 and 1993 violates the prohibition against retroactive rulemaking. Indeed, in this case, Congress expressed the intent that the cost limit provisions would be only be *prospective* in application.

## VI.    CONCLUSION

For the foregoing reasons, the Plaintiff respectfully requests that the Court grant its motion for summary judgment.

_____/s/_____

Dennis M. Barry
D.C. Bar No. 375152
Vinson & Elkins L.L.P.
1455 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-1008
202.639.6791
dbarry@velaw.com

Date:  October 19, 2007

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MONTEFIORE MEDICAL CENTER | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No.1:06CV01636 (RMU) |
| | ) |
| MICHAEL O. LEAVITT, Secretary | ) |
| of Health and Human Services, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Federal Rule of Civil Procedure 56 and Rule 7(h) and 56.1 of this Court, Plaintiff respectfully submits the following statement of material facts as to which there is no genuine issue:

**A.    PARTIES AND BACKGROUND ON MEDICARE PROGRAM**

1.    Plaintiff Montefiore Medical Center is a 1,129 bed academic medical center located in the Bronx, New York.  PRRB Dec., Administrative Record ("A.R.") at 32; Answer at ¶ 6.  The Plaintiff is and was at all times relevant hereto a provider of services participating in the Medicare program established under Title XVIII of the Social Security Act.  PRRB Dec., A.R. at 32-33; Answer ¶ 6.

2.    Defendant Michael O. Leavitt, Secretary of the United States Department of Health and Human Services ("HHS"), is the federal officer to whom Congress has delegated administration of the Medicare program.  Answer at ¶ 7.

- 1 -

3.      The Medicare program is a federal health insurance program that furnishes benefits to qualifying patients who have attained the age of 65 or who are disabled. See 42 U.S.C. § 1395i-2(a); 42 C.F.R. § 407.10. A.R. at 32. The benefits include payment for post-hospital extended care services furnished in a skilled nursing facility ("SNF"). 42 U.S.C. § 1395d(a)(2). The statutory provisions governing the Medicare program are set forth at 42 U.S.C. § 1395 et seq.

4.      The Medicare program is administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency within HHS. During the years under appeal, CMS was known as the Health Care Financing Administration ("HCFA"). For simplicity's sake, the Plaintiff refers to the agency throughout by its current name, CMS. A.R. at 32; Answer at ¶ 9.

5.      The Secretary contracts with private organizations known as "fiscal intermediaries" or "intermediaries" to make determinations of the amounts payable to providers for services furnished to Medicare beneficiaries. See 42 U.S.C. §1395h(a); A.R. at 32; Answer ¶ 7.

6.      The fiscal intermediaries make these payment determinations under Medicare law and interpretative guidelines published by CMS. 42 U.S.C. § 1395(d); 42 C.F.R. §§ 413.20(b) and 24(b); A.R. at 32.

7.      The fiscal intermediary for Plaintiff and its skilled nursing facility for the fiscal years in question was Empire Medicare Services, along with Blue Cross & Blue Shield Association. A.R. at 1920, 1929; Answer ¶ 7.

8.      A skilled nursing facility owned by a hospital could qualify for "hospital-based" (also called provider-based) status. Answer at ¶ 11.

- 2 -

9.      During the Plaintiff's cost reporting periods ending December 31, 1991, and December 31, 1993, the Plaintiff operated a hospital-based SNF known as the Loeb Center in the Bronx, New York.  A.R. at 33; Answer at ¶ 6.

## B.      ROUTINE COST LIMITS

10.      During the time period at issue, both hospital-based SNFs and freestanding SNFs were reimbursed by Medicare based upon the "reasonable cost" the SNF incurred to provide covered health care services to Medicare beneficiaries. 42 U.S.C. § 1395x(v)(1)(A); A.R. at 33.  "Reasonable cost" is defined in the statute as those costs "actually incurred, excluding therefrom any part of incurred cost[s] found to be unnecessary in the efficient delivery of needed health services."  42 U.S.C. § 1395x(v)(1)(A).

11.      The Secretary is authorized to establish appropriate cost limits as part of the method of determining reasonable costs.  42 U.S.C. § 1395x(v)(1)(A); Answer ¶ 15.

12.      Prior to 1984, the Defendant Secretary had established routine cost limitations for SNFs.  The routine cost limitation for freestanding SNFs was set at 112 percent of the peer group mean for freestanding SNFs, and the routine cost limitation for hospital-based SNFs was set at 112 percent of the peer group mean for hospital-based SNFs.  The routine cost limitation for hospital-based SNFs was higher than that of freestanding SNFs. A.R. at 41; Answer at ¶ 16; 45 Fed. Reg. 58699, 58700 (Sep. 4, 1980).

13.      The routine cost limitation for hospital-based SNFs changed as part of the Deficit Reduction Act of 1984 ("DEFRA").  Pub. L. No. 98-369, § 2319(b), 1984 U.S.C.C.A.N. (98 Stat.) 494, 1083 (codified at 42 U.S.C. § 1395yy).  This new provision directed the Secretary, effective for

cost reporting periods beginning on or after July 1, 1984, to set the routine cost limits for urban

hospitals as follows:

> 1) For freestanding SNFs in urban areas, 112% of the mean per diem
> routine service costs for freestanding SNFs in urban areas; and

> 2) For hospital-based SNFs in urban areas, the sum of the limit for
> freestanding SNFs in urban areas plus 50% of the amount by which
> 112% of the mean per diem routine service costs for hospital-based
> SNFs in urban areas exceeds the limit for freestanding SNFs in urban
> areas.

> 42 U.S.C. § 1395yy(a); A.R. at 33.

14.    While the routine cost limitation for freestanding SNFs remained the same, the

limitation for hospital-based SNFs was lowered.  42 U.S.C. §§ 1395yy(a)(1)-(4).

15.    Medicare regulations allow exceptions to the routine cost limitation to be granted for

SNFs which provide atypical services as defined therein.  For the time periods at issue, 42 C.F.R.

§ 413.30(f) read as follows:

> (f)    Exceptions.    Limits established under this section may be
> adjusted...for a provider under the circumstances specified.... An
> adjustment is made only to the extent the costs are reasonable,
> attributable to the circumstances specified, separately identified by
> the provider, and verified by the intermediary.

>> (1) *Atypical services*.  The provider can show that the –

>>> (i) Actual costs of items or services furnished by a
>>> provider exceeds the applicable limit because such
>>> items or services are atypical in nature or scope,
>>> compared to the items or services generally furnished
>>> by providers similarly classified; and

>>> (ii)  Atypical items or services are furnished because
>>> of the special needs of the patients treated and are
>>> necessary in the efficient delivery of needed health
>>> care.

16.     The atypical services exception was first issued as a regulation effective July 1, 1974. Federal Health Insurance for the Aged and Disabled; Limitations on Coverage of Costs; Interim Schedule, 39 Fed. Reg. 20163, 20164-65 (June 6, 1974) (codified at 42 C.F.R. § 405.460(f)(2)). The language of the regulation was revised effective July 1, 1979.   Medicare Program; Limiting Reimbursement for Provider Costs and for Services by Hospital-Based Physicians, 44 Fed. Reg. 31802, 31804 (June 1, 1979) (codified at 42 C.F.R. § 405.460(f)).  The regulation was redesignated as 42 C.F.R. § 413.30(f) in 1986, with no changes to its text.  Medicare Program; Redesignation of Reasonable Cost Regulations, 51 Fed. Reg. 34790 (Sep. 30, 1986).  This designation was in use during the time period relevant to this case.

17.     In the fifteen years following the revision of the language in 1979, the Secretary interpreted the regulation to allow reimbursement under the atypical services exception for *all reasonable costs* above the routine cost limitation if a SNF otherwise met the requirements of 42 C.F.R. § 413.30(f).  A.R. at 41.

18.     In July 1994, ten years after the codification of 42 U.S.C. § 1395yy, the Secretary, through the Health Care Financing Administration (HCFA, now CMS) issued Transmittal No. 378 which published new provisions of the Provider Reimbursement Manual ("PRM") relating to SNF exception requests.  This transmittal added PRM § 2534.5, which required that the atypical services exception amount for a hospital-based SNF be measured not from its routine cost limitation, as had been the Secretary's interpretation up through July 1994, but that it now be measured from 112 percent of the SNF's peer group mean, a point significantly higher than the routine cost limitation for a hospital-based SNF.  A.R. at 41.

19.     By requiring that reimbursement under the atypical services exception be measured from 112 percent of the peer group mean, rather than the routine cost limitation, CMS created a "gap" in reimbursement for hospital-based SNFs that did not exist prior to the issuance of PRM § 2534.5. Id.

20.     The Secretary acknowledged in his decision below that prior to the issuance of Transmittal No. 378, Chapter 25 of the Provider Reimbursement Manual did not require the atypical services exception be measured in this manner. A.R. at 9.

### C.     PROCEDURAL BACKGROUND

#### (a)     Fiscal Year 1991

21.     CMS' fiscal intermediary issued its payment determination for services rendered by Plaintiff's SNF, also known as the notice of program reimbursement, for Plaintiff's fiscal year 1991 on September 5, 1996. A.R. at 1966-71.

22.     Plaintiff filed a request for hearing before the Provider Reimbursement Review Board ("PRRB"), asserting dissatisfaction with the intermediary's payment determinations for Plaintiff's fiscal year 1991, on March 3, 1997. A.R. at 1929-31.

23.     Plaintiff filed a request for an exception to the routine cost limitation because of atypical services rendered by its skilled nursing facility for Plaintiff's fiscal year 1991 dated March 4, 1997. A.R. at 1704-05.

24.     It is undisputed that the fiscal intermediary approved Plaintiff's request for exception from the routine cost limitation for the Plaintiff's cost reporting period ending December 31, 1991. A.R. at 33, 1704-05; Answer ¶ 25. However, the fiscal intermediary calculated the amount of

Plaintiff's exception reimbursement based upon PRM § 2534.5, thereby limiting reimbursement under the exception to costs in excess of 112% of the peer group mean. A.R. at 33-34.

### (b) Fiscal Year 1993

25.    CMS' fiscal intermediary issued its payment determination for services rendered by Plaintiff's SNF, also known as the notice of program reimbursement, for Plaintiff's fiscal year 1993 on September 24, 1998. A.R. at 1924.

26.    Plaintiff filed a request for hearing before the PRRB, asserting dissatisfaction with the intermediary's payment determinations for Plaintiff's fiscal year 1993, on March 22, 1999. A.R. at 1920-23.

27.    Plaintiff also filed a request for exception to the routine cost limitation because of atypical services rendered by its skilled nursing facility for Plaintiff's fiscal year 1993. A.R. at 829-1261.

28.    It is undisputed that the fiscal intermediary approved Plaintiff's request for exception from the routine cost limitation for the Plaintiff's cost reporting period ending December 31, 1993. A.R. at 33; Answer ¶ 25.  However, the fiscal intermediary calculated the amount of Plaintiff's exception reimbursement based upon PRM § 2534.5, thereby limiting reimbursement under the exception to costs in excess of 112% of the peer group mean. A.R. at 33-34.

### D.    BOARD HEARING AND ADMINISTRATOR'S DECISION

29.    The PRRB held a hearing on Plaintiff's appeal of its Medicare reimbursement for hospital fiscal year 1991 on July 7, 2004. A.R. at 46.  At the hearing, Plaintiff and the fiscal intermediary agreed to submit the issue in this case for decision on the record. A.R. at 47.

- 7 -

30.    The PRRB issued its written decision for Plaintiff's consolidated appeals for fiscal years 1991 and 1993 on June 5, 2006. A.R. at 31-45.

31.    The Board found that there is no dispute in either fiscal year at issue that Plaintiff provided atypical services and that the Plaintiff's costs in excess of the routine cost limitation were reasonable. A.R. at 33.

32.    The PRRB ruled in favor of the Plaintiff on the routine cost limitation issue. Specifically, the Board found that "[t]he methodology applied by CMS in partially denying the Provider's exception requests for per diem costs which exceeded the cost limit was not consistent with the statute and regulation relating to this issue." A.R. at 41.

33.    The PRRB found that it was "undisputed that for 15 years the Secretary interpreted the regulation as permitting a provider to recover its reasonable costs that exceeded the limits if it is demonstrated that it met the exception requirements." Id.  The PRRB also found that the Secretary's methodology, as embodied in PRM § 2534.5, is "a departure from its earlier method of determining hospital-based SNF exception requests and requires an explanation for its change of direction." A.R. at 42.

34.    The PRRB also found that CMS' implementation of the methodology contained in PRM § 2534.5 was invalid because the Manual provision was not issued pursuant to notice and comment procedures. A.R. at 43.  The PRRB cited St. Luke's Methodist Hospital v. Thompson, 182 F.Supp.2d 765 (N.D. Iowa 2001), aff'd 315 F.3d 984 (8th Cir. 2003), in support of its conclusion that the Manual provision was invalid. A.R. at 43-44.

35.    The PRRB therefore issued its decision in favor of the Plaintiff and ruled that the Plaintiff "is entitled to be reimbursed for all of its costs above the cost limit as opposed to being

reimbursed only for its costs that exceeded 112 percent of the group's mean per diem costs." A.R. at 45.

36.    The Administrator of CMS subsequently issued notice on June 20, 2006, that he would exercise his discretion to review the decision of the PRRB. A.R. at 26. By written decision issued July 21, 2006, the Administrator reversed the decision of the PRRB on the routine cost limitation issue. A.R. at 2-14.

Respectfully submitted,


_____ / s / _____
Dennis M. Barry
D.C. Bar No. 375152
Vinson & Elkins L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004-1008
202 639 6791
202 879 8891 (fax)

Counsel for the Plaintiff

October 19, 2007

- 9 -