## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| MONTEFIORE MEDICAL CENTER, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.1:06CV01636 (RMU) |
| | ) | |
| MICHAEL O. LEAVITT,  Secretary | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiff, Montefiore Medical Center ("Montefiore"), is a hospital that operates a skilled nursing facility ("SNF").  For the periods at issue in this case, Montefiore was reimbursed for furnishing skilled nursing care to Medicare beneficiaries on the basis of its "reasonable costs."  By statute, providers of services paid on a reasonable cost basis are entitled to reimbursement only for costs that are determined to be reasonable and necessary in the efficient delivery of needed health services.  The Medicare statute also provides for cost limits on the reimbursement paid to SNFs.  In some cases, reimbursement to SNFs may exceed the cost limits if the higher costs can be justified because, for example, the SNF treated an unusually costly, or "atypical," mix of patients.

For the fiscal years at issue in this case, Montefiore sought and received an exception to the applicable cost limit on the grounds that it had treated an atypical mix of patients.  The Secretary, however, found that some of the costs Montefiore incurred above the cost limit were

not reasonable and necessary for the efficient delivery of care. The Secretary therefore denied Montefiore's request for reimbursement of those costs. In this lawsuit, Montefiore does not argue that the Secretary was wrong to conclude that some of its claimed costs above the cost limit were unreasonable; nor does Montefiore contend that it is entitled to be reimbursed for unreasonable costs. Instead, Montefiore constructs a straw man argument – that the Secretary has changed his reading of the regulation so as to deny the provider reimbursement for costs that were reasonable.

Specifically, Montefiore argues that the Secretary's long-term practice had been to pay for all of the costs above the cost limit if an exception to the cost limit was granted. According to Montefiore, this practice embodies an authoritative interpretation of the controlling regulation. Montefiore argues that because this "interpretation" was well-established, the Secretary cannot change this interpretation and must pay for all costs above the cost limit, despite the Secretary's view that some of those costs are not reasonable and necessary in the efficient delivery of health care services.

Although a judge of this Court has accepted the arguments advanced by Montefiore (see Mercy Medical Skilled Nursing Facility v. Thompson, 2004 WL 3541332 (D.D.C. 2004), appeal docketed, No. 04-5271 (D.C. Cir. July 27, 2004)), we believe that case to have been erroneously decided. It has never been the Secretary's position that SNFs are necessarily entitled to all costs above the cost limit if they qualify for an exception. The regulation specifically provides that even when an exception is granted, a provider is entitled to be paid for costs above the cost limit only to the extent that they are reasonable. The Secretary has not applied a new legal standard to Montefiore; its request for additional reimbursement was denied because the Secretary found the

costs in question were unreasonable, which would preclude reimbursement under any reading of the regulation. Moreover, the Secretary's conclusion that all of the costs Montefiore incurred above the cost limit were not reasonable and necessary in the efficient delivery of care is supported by substantial evidence. Under the deferential applicable standard of review, this Court should uphold the Secretary's determination.

## STATUTORY AND REGULATORY BACKGROUND

I.    Medicare Generally

This case involves Medicare reimbursement for treatment at skilled nursing facilities ("SNFs"). Under Part A of the Medicare program, the Government reimburses healthcare providers for providing certain services to Medicare beneficiaries. See generally 42 U.S.C. § 1395 et seq. Since the Medicare program began, Congress has amended the statute repeatedly to control costs by ensuring that providers have incentives to operate efficiently. The controversy in this case arises out of the administration by the Secretary of Health and Human Services of the statutory cost-control requirements and the regulations implementing those requirements. We first describe the governing statutory provisions, then summarize the Secretary's regulations and his interpretation and application of those regulations.

II.    Reasonable Cost Payment to SNFs

In 1972, Congress amended the Medicare statute to provide that "reasonable costs" reimbursable under Medicare should exclude "any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." Social Security Amendments of 1972, Pub. L. No. 92-603, § 223(a), 86 Stat. 1329, 1393 (codified at 42 U.S.C. § 1395x(v)(1)(A)). At the same time, it authorized the Secretary to set "limits on the direct or indirect overall incurred costs

3

. . . to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services." Pub. L. No. 92-603 § 223(b).

In setting cost limits under the statute, the Secretary recognized that different types of SNFs face different costs. He divided SNFs into four groups using two criteria. First, SNFs are classified as located in urban areas or in rural areas. Second, they are classified as free-standing or hospital-based. See generally 42 U.S.C. § 1395yy(a) (setting out the current version of this classification).

Each group of SNFs has its own cost limit, known as a "routine cost limit" because it applies to the cost of routine services (including nursing, room, board, and administration), as opposed to ancillary costs (such as laboratory services or drugs) or capital costs. The cost limits, which fix the maximum reimbursement per patient per day of treatment, were initially set at 115% of the mean per diem cost of services at SNFs in each group. See 44 Fed. Reg. 51,542 (1979). The Secretary later lowered them to 112% of the mean per diem cost. See 45 Fed. Reg. 58,670 (1980).

Under this system, the cost limits for hospital-based SNFs were significantly higher than those for free-standing SNFs. In part, this was because hospital-based SNFs tended to treat sicker patients and to provide more intensive care. But a study conducted by the Secretary found that these factors could account for only about half of the cost difference between hospital-based and free-standing SNFs. Administrative Record ("A.R.") at 11. ("CMS properly determined, in developing the exception process, that 50 percent of the difference between the free-standing SNF and the hospital-based SNF cost limits, i.e., the "gap," was due to hospital-based SNFs' inefficiencies.").

4

Concerned that the remaining cost difference was due to inefficiency, Congress in 1984

codified its own system of cost limits.  See Deficit Reduction Act of 1984, Pub. L. No. 98-369,

§ 2319(b), 98 Stat. 494, 1082 (codified at 42 U.S.C. § 1395yy(a)) ("The Secretary, in

determining the amount of the payments which may be made . . . shall not recognize as

reasonable (in the efficient delivery of health services) per diem costs of such services to the

extent that such per diem costs exceed the following per diem limits . . . .").  It maintained the

cost limit for free-standing SNFs at 112% of mean per diem costs, see 42 U.S.C. § 1395yy(a)(1)-

(2), but it lowered the hospital-based SNF cost limits to the sum of the free-standing SNF cost

limits plus half the difference between 112% of mean per diem hospital-based SNF costs and

112% of mean per diem free-standing SNF costs, see id. § 1395yy(a)(3)-(4).  In other words,

Congress concluded that the cost limits for hospital-based SNFs should take into account only

half of those institutions' higher costs.

 In St. Francis Health Care Centre v. Shalala, the Sixth Circuit offered a numerical

example of how this system works.  205 F.3d 937, 942 (6th Cir. 2000).  Suppose that 112% of

mean per diem cost at free-standing SNFs is $80, while 112% of mean per diem cost at hospital-

based SNFs is $120.  Given these figures, the free-standing SNF cost limit will be $80, or 112%

of mean per diem cost.  The hospital-based SNF cost limit will be $100, or $80 + ½($120-$80).

At the same time that it established cost limits, Congress gave the Secretary the

discretionary power to make adjustments to those limits in appropriate cases:

> The Secretary may make adjustments in the [cost limits] with respect to any
> skilled nursing facility to the extent the Secretary deems appropriate, based upon
> case mix or circumstances beyond the control of the facility.

42 U.S.C. § 1395yy(c).  Congress did not specify any particular methodology for granting

5

exceptions to the cost limits.  Instead, adjustments were to be made "to the extent" the Secretary "deem[ed] appropriate" in his discretion.[1]

III.     SNF Cost Limit Exceptions Regulations

Exercising the authority granted by this statutory delegation, the Secretary has adopted a regulation specifying the circumstances under which he may adjust the cost limits.  Such adjustments take two forms: exemptions and exceptions.  An exemption is available to new providers and, if granted, relieves them from the cost limit entirely.  See 42 C.F.R. § 413.30(f) (1994).[2]  Exceptions provide more limited relief.  As the Secretary explained in a preamble to the final rule,"if a provider receives an exception, it is reimbursed on the basis of the cost limit, plus an incremental sum for the reasonable costs warranted by the circumstances that justified its exception."  44 Fed. Reg. 31,802 (1979).  The regulation states:

> **(f) Exceptions.**  Limits established under this section may be adjusted upward for a provider under the circumstances specified . . . .  An adjustment is made only to the extent the costs are reasonable, attributable to the circumstances specified, separately identified by the provider, and verified by the intermediary.

42 C.F.R. § 413.30(f).  One of the specified circumstances is "atypical services."  Id. § 413.30(f)(1).  An exception for atypical services may be granted under this regulation when the provider's costs are reasonable and

---

[1] Congress has since made further changes to the Medicare reimbursement system.  Most significantly, in 1997 it replaced the cost-based reimbursement scheme with a prospective payment system, under which SNFs are paid at a per diem rate without regard to the actual costs they incur.  See Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4432(a), 111 Stat. 251, 414 (codified at 42 U.S.C. § 1395yy(e)).  This amendment applies only to cost-reporting periods beginning on or after July 1, 1998, so it has no effect on this case.  See id. § 4432(d).

[2] In 1999, the Secretary renumbered the regulation and made amendments not relevant to this case.  See 42 C.F.R. § 413.30 (2003); 64 Fed. Reg. 42,610 (1999).  All citations to the regulation in this brief refer to the 1994 version.

6

[t]he provider can show that the —

(i) Actual cost of items or services furnished by a provider exceeds the applicable limit because such items or services are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified; and

(ii) Atypical items or services are furnished because of the special needs of the patients treated and are necessary in the efficient delivery of needed health care.

Id.

Until 1994, the Secretary had not specifically addressed the application of the regulation to hospital-based SNFs or set out a precise methodology for determining the appropriate reimbursement for hospital-based SNFs that qualified for an exception. Instead, his practice was to evaluate such requests depending on the type of service involved. For costs other than nursing service costs, exceptions were allowed only to the extent that the provider's costs exceeded 112% of the mean for SNFs in its group. For nursing services, a "nursing hour" methodology was used, under which the total number of nursing service hours provided per patient-day was multiplied by a salary rate to produce the "atypical nursing service per diem" amount that could be claimed as an exception. Using this approach, it was possible – but not guaranteed – that SNFs that provided atypical nursing services could capture all of their costs above the cost limit.

In 1994, the Secretary issued Health Care Financing Administration Transmittal No. 378, which amended the Medicare Provider Reimbursement Manual ("PRM") by adding a new section, PRM § 2534.5. A.R. at 10. Under § 2534.5, nursing costs are treated like all other costs, and a SNF may obtain an adjustment only to the extent that its costs exceed 112% of the mean costs of providers in its group. Because of the 1984 changes to the statute, this figure, for hospital-based SNFs, is higher than the cost limit. As a result, hospital-based SNFs – even those providing atypical services – cannot recover costs that fall between the cost limit and 112% of

mean per diem cost.

The approach set out in PRM § 2534.5 can be understood by considering three categories of possible costs for a hospital-based SNF. First, a hospital-based SNF whose costs are less than the cost limit will be reimbursed the full amount of its actual reasonable costs. Second, a hospital-based SNF whose costs are between the cost limit and 112% of the mean costs for hospital-based SNFs will receive only the amount of the cost limit. Third, a hospital-based SNF whose costs exceed 112% of the mean costs for hospital-based SNFs will receive the cost limit, plus any additional amount attributable to atypical services, up to the amount by which its reasonable costs exceed 112% of the mean. See St. Francis, 205 F.3d at 943 (describing the operation of PRM § 2534.5).

## FACTS

1. This case involves the reimbursement that Montefiore Medical Center, a hospital located in the Bronx, New York, received for operating a hospital-based SNF for its fiscal years ending ("FYE") December 31, 1991 and 1993. For those years, Montefiore's SNF exceeded the cost limits and sought atypical-services exceptions.

The hospital submitted its requests to its Medicare fiscal intermediary, a private insurance company that processes Medicare claims. See generally 42 U.S.C. § 1395h. The intermediary determined the amount of Montefiore's exception using the methodology of PRM § 2534.5, and therefore denied reimbursement for costs that exceeded the routine cost limit for hospital-based SNFs but amounted to less than 112% of the mean per diem costs of the relevant peer group. Montefiore claims that the amounts of reimbursement at issue are about $500,000 for FYE 1991 and $1,200,000 for FYE 1993. Plaintiff's Memorandum of Points and Authorities ("Pl.'s brief")

at 11. Montefiore appealed the intermediary's decision to the Provider Reimbursement Review

Board, authorized by 42 U.S.C. § 1395oo(a), 42 C.F.R. § 405.1835. The PRRB determined that

the intermediary should have allowed the hospital's costs between the routine cost limit for

hospital-based SNFs but below the 112% of the mean per diem of Montefiore's peer group. A.R.

at 33-34. The Administrator of the Centers for Medicare & Medicaid Services, acting on

authority delegated by the Secretary, see 42 U.S.C. § 1395oo(f)(1), reversed the PRRB's

decision, finding that the denied costs were not reasonable, and therefore, not reimbursable. A.R.

at 2-14. The Administrator's decision is the final decision of the Secretary in this matter.

Montefiore subsequently filed this action seeking judicial review of the Secretary's final

decision.

## SUMMARY OF ARGUMENT

The Secretary found that some of the costs Montefiore incurred over and above the cost

limit were not reasonable and necessary for the efficient delivery of care to Medicare patients.

Pursuant to 42 C.F.R. § 413.30(f), the Secretary is required to deny reimbursement for costs

determined to be unreasonable. Based on the straightforward application of his regulation, the

Secretary therefore denied Montefiore's request to reimbursed for those costs. The Secretary's

determination that Montefiore was not entitled to reimbursement for unreasonable costs is not

only a reasonable interpretation of the regulation, to which this Court would be required to defer

under Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994), but is in fact the only

possible reading of the regulation. The regulation states that if a SNF qualifies for an exception

to the cost limits, "[a]n adjustment is made only to the extent the costs are reasonable . . . ." 42

C.F.R. § 413.30(f)(emphasis added). Thus, the Secretary's action in this case easily passes

muster under the deferential standard of review set forth in the Social Security Act and must be upheld by this Court.

Prior to the passage of the Medicare statute, Congress spent years wrestling with the problem of how providers were to be reimbursed for services rendered to Medicare beneficiaries. *See* S. Rep. No. 404, 89th Cong., 1st Sess., reprinted in [1965] U.S.C.C.A.N. 1943, 1976. Ultimately, Congress chose not to specify any rigid formulae and, instead, simply established general statutory guidelines under which the Secretary was to determine whether or not costs were reasonable. Congress recognized that it was not equipped to answer the more specific question of what does, and does not, qualify for reimbursement. Congress therefore delegated this responsibility to the Secretary. 42 U.S.C. § 1395x(v)(1)(A). The Secretary has "broad discretion" in his exercise of this specifically delegated authority, and his expertise in cost finding is entitled to "great deference." Humana, Inc. v. Heckler, 758 F.2d 696, 699 (D.C. Cir. 1985). In this case, the Secretary exercised this discretion to determine that some of the costs incurred by Montefiore over and above the cost limit were not reasonable and consequently denied reimbursement for those costs.

Montefiore does not contest the Secretary's determination that some of its costs above the cost limit were unreasonable. Instead, Montefiore simply asserts, contrary to the Secretary's finding and without supporting argument, that all of the costs that it incurred above the threshold were reasonable. Building upon this misstatement, Montefiore argues that the Secretary has changed his interpretation of the controlling regulation so as not to reimburse it for all of its reasonable costs. Montefiore devotes the vast majority of its brief to demonstrating that, if the Secretary had changed his interpretation of his regulation, that change would have been

impermissible. These arguments are completely beside the point – the Secretary is <u>not</u> arguing that he has excluded reasonable costs and has the authority to interpret the regulation in a way that allows him to do so. The Secretary's position is that he may not reimburse Montefiore for costs found to be unreasonable.

The Secretary has not changed his interpretation of the regulation; he has merely applied the plain language of the regulation to exclude costs determined to be unreasonable. There is simply no possible reading of 42 C.F.R. § 413.30(f) that requires the Secretary to reimburse Montefiore for costs determined to be unreasonable. Therefore, this Court should uphold the Secretary's decision.

<u>**STANDARD OF REVIEW**</u>

A narrow, deferential standard of review governs this case. Jurisdiction over this action is based exclusively on 42 U.S.C. § 1395oo(f)(1), which provides for judicial review of final agency decisions on Medicare provider reimbursement disputes under the terms of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, <u>et seq.</u> The APA standard of review, 5 U.S.C. § 706(2)(A) and (E), provides that a court may set aside agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute." <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 413-15 (1971). The APA establishes a "narrow" standard of review, and "a court is not to substitute its judgment for that of the agency." <u>Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Ins. Co.</u>, 463 U.S. 29, 43 (1983). <u>See</u> <u>FCC v. National Citizens Comm. for Broadcasting</u>, 436 U.S. 775, 803 (1978).

Under the arbitrary and capricious standard, a court may invalidate an agency action only

11

if it is "not rational and based on consideration of the relevant factors." National Citizens

Comm. for Broadcasting, 436 U.S. at 803. See also Motor Vehicle Mfrs. Ass'n., 463 U.S. at 43.

The substantial evidence standard is satisfied if the final agency decision is supported by "'such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 619-20 (1966), quoting Consolidated

Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938). See Richardson v. Perales, 402 U.S.

389, 401 (1971). Substantial evidence is "something less than the weight of the evidence, and

the possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's findings from being supported by substantial evidence." Consolo, 383

U.S. at 620 (citations omitted). In applying the substantial evidence standard, the reviewing

court may not "displace the . . . choice between two fairly conflicting views, even though the

court would justifiably have made a different choice had the matter been before it de novo."

Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

Given the narrowness of the APA standard of review, the reviewing court owes

substantial deference to the final agency decision. "The agency decision must be upheld as long

as there is a rational basis for the Secretary's interpretation of the statute and regulations." Sun

Towers, Inc. v. Heckler, 725 F.2d 315, 325-26 (5th Cir. 1984), citing Homan & Crimen, Inc. v.

Harris, 626 F.2d 1201, 1211 (5th Cir. 1980). The Secretary's interpretation of his own

regulations is entitled to "substantial deference," and "must be given 'controlling weight unless it

is plainly erroneous or inconsistent with the regulation.'" Thomas Jefferson Univ. v. Shalala,

512 U.S. 504, 512 (1994) (internal citations omitted). Applying the foregoing standards, the

Secretary's final decision is reasonable and should be affirmed.

## ARGUMENT

**I.    Under 42 C.F.R. § 413.30(f), Montefiore Is Not Entitled to the Costs at Issue in this Case Because They Are Not Reasonable Costs.**

As previously stated, the premise which underlies all of Montefiore's arguments, that the Secretary has denied it reimbursement for reasonable costs, is directly contradicted by the record. See A.R. at 11-14.  The Secretary denied reimbursement for the costs at issue in this case because he explicitly found that they were unreasonable.  Id.  The particular costs at issue in this case are costs between the routine cost limit for hospital-based SNFs and 112% of the per diem peer group mean.  See Pl.'s brief at 9-10.  In his decision reversing the PRRB, the Administrator specifically found that the costs for which Montefiore seeks reimbursement were not reasonable costs.  A.R. at 11.  The Administrator stated that "CMS properly determined . . . that 50% of the difference between the free-standing SNF and the hospital-based SNF cost limits, i.e., the 'gap,' was due to hospital-based SNFs' inefficiencies."  A.R. at 11.  Costs which are due to a provider's inefficiencies are, necessarily, not "necessary in the efficient delivery of needed health services." See 42 U.S.C. § 1395x(v)(1)(A).  "As such costs are not reasonable, CMS properly determined that these costs could not be reimbursed through the exceptions process."  A.R. at 11.

Under the controlling regulation, a SNF that receives an exception to the cost limits is only entitled to reasonable costs above the cost limit.   42 C.F.R. § 413.30(f) states that if a SNF qualifies for an exception to the cost limit, it will receive additional reimbursement "only to the extent the costs are reasonable."  Id.  The regulation simply could not be more clear on this point – costs incurred by a SNF above the cost limit that are found to be unreasonable are not reimbursable.  Id.  Once the Secretary found that the costs at issue in this case were unreasonable,

the Secretary had no choice under the regulation but to deny Montefiore's request to be reimbursed for them.

## II.    The Secretary's Conclusion That Some of Montefiore's Costs above the Cost Limit Are Unreasonable Does Not Reflect a Change in the Secretary Interpretation of the Regulation.

Montefiore's argument that the Secretary has changed his interpretation of 42 C.F.R.

§ 413.30(f) necessarily fails because it cannot demonstrate that the Secretary ever interpreted the regulation to allow reimbursement for unreasonable costs.  In order to establish that the Secretary has changed his interpretation of the regulation, Montefiore must presumably identify the Secretary's original interpretation, the Secretary's current interpretation, and how the interpretations are different.  This Court cannot find that the Secretary impermissibly changed his interpretation without identifying what words in the regulation that the Secretary now interprets differently.  Montefiore's problem, of course, is that the Secretary has not changed his interpretation.  Montefiore does not, and cannot, point to any evidence that the Secretary ever interpreted 42 C.F.R. § 413.30(f) to allow (or, more to the point, require) reimbursement for unreasonable costs.  In fact, such a reading would clearly be inconsistent with the plain language of the regulation.  Instead, Montefiore argues that the Secretary has denied it reimbursement for costs that were reasonable.  See Pl.'s Brief at 11 (amount in controversy represents the amount of reasonable costs for which the Plaintiff was not reimbursed).

A.    This Court's Paralyzed Veterans Rule Does Not Require That Provider Reimbursement Manual § 2534.5 Be Adopted Through Notice-And-Comment Rulemaking.

The district court in Mercy held that the exceptions methodology set out in PRM § 2534.5 is invalid because, in its view, that provision represents "a substantial departure" from the

14

Secretary's prior interpretation of 42 C.F.R. § 413.30(f).  Mercy at *3.  Plaintiff urges the Court to follow that analysis and hold the Secretary's decision to be contrary to law.   Pl.'s brief at 15, 19-21.  This Court should not do so because the analysis in Mercy is in error and represents a fundamental misapplication of the principle of administrative law set out in Paralyzed Veterans of America v. D.C. Arena L.P., 117 F.3d 579 (D.C. Cir. 1997).[3]  Under the rule set out in Paralyzed Veterans, "[o]nce an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking."  Id at 586.  Paralyzed Veterans is inapplicable here, however, because PRM § 2534.5 does not articulate a new interpretation of 42 C.F.R. § 413.30(f).

The primary error in Mercy, repeated by Montefiore in this case, is to have assumed that simply because the Secretary had reached a different result (i.e. not reimbursed Montefiore for all costs over the cost limit) after applying 42 C.F.R. § 413.30(f), he necessarily applied a new interpretation of the regulation.  As previously explained, the Secretary has not changed his interpretation of 42 C.F.R. § 413.30(f) – the Secretary gives exactly the same meaning to every word in the regulation that he did from when it was first promulgated.  Moreover, it is not clear that there is any real dispute over the meaning of the regulation.  Both the Secretary and Montefiore believe that the Secretary should reimburse SNFs that qualify for an exception to the applicable cost limit for reasonable costs incurred over that limit.  See Plaintiff's Statement of Material Facts at 17.

_____

[3] While the Secretary recognizes that Paralyzed Veterans is binding upon this Court, the Secretary believes that the rule articulated in Paralyzed Veterans is inconsistent with controlling precedent from the Supreme Court.  That an agency has changed its interpretation of a regulation properly goes to the amount of deference the agency's interpretation is due and should not create a per se rule that the new interpretation is invalid.  See Thomas Jefferson, 512 U.S. at 515.

Despite the lack of any articulation of what the Secretary's prior interpretation of 42 C.F.R. § 413.30(f) actually was or how that interpretation could require the Secretary to reimburse it for unreasonable costs, Montefiore urges the Court to follow the decision in <u>Mercy</u> and find that the Secretary's decision not to reimburse it for unreasonable costs represents a new, impermissible, interpretation of 42 C.F.R. § 413.30(f).  Pl.'s brief at 15.  <u>Mercy</u>, however, misapplies the rule of <u>Alaska Professional Hunters Association v. FAA</u>, and this Court should not repeat that error.  177 F.3d 1030 (D.C. Cir. 1999).  <u>Alaska Hunters</u> and <u>Paralyzed Veterans</u> stand for the proposition that, in some cases, an administrative agency cannot change a well-established interpretation of a regulation without engaging in new rulemaking.  Both cases deal with agency attempts to reinterpret a governing legal standard.  In <u>Alaska Hunters,</u> the court held that the FAA could not decide that hunting guides suddenly counted as "commercial operators" who "'for compensation or hire,' carry persons or property by aircraft" and were thus subject to regulation, after decades of concluding they did not.  <u>Id.</u> at 1031, 1035-36.  In <u>Paralyzed Veterans</u>, upon which Montefiore also relies, the court decided that the Justice Department had not changed its understanding of the requirement that handicapped seating have a "comparable line of sight" when it decided that the line of sight did not need to be over temporary obstructions created by standing spectators.  117 F.3d at 582.  The rule established by these cases is that rulemaking may sometimes be required before a new meaning, which establishes a new legal rule, can be given to words in a regulation.  These cases are simply inapposite here.  Montefiore presents no argument that the Secretary has changed the applicable legal standard, it simply argues that there is a new interpretation (without saying, precisely of what) that can be demonstrated simply because the Secretary reached a new result, without acknowledging that the

new result stems from a different understanding of the facts.

Montefiore's argument that this court should overturn the Secretary's decision confuses the Secretary's <u>application</u> of the regulation with his <u>interpretation</u> of the regulation. The regulation provides for payment over the cost limit but also provides for a factual test that may reduce that reimbursement if costs are found not to be reasonable. 42 C.F.R. § 413.30(f)(adjustments are made "<u>only to the extent the costs are reasonable</u>"). A simple example illustrates this point. Suppose that the regulation in question stated that Medicare would for pay for safe and effective drugs. After many years of paying for (hypothetically) an anemia drug, the Secretary discovered that taking the drug greatly increased the risk of heart attack. If the Secretary subsequently decided not to continue paying for the drug because he found that it was not safe and effective, the drug's manufacturer could not reasonably argue that the Secretary had changed his interpretation of the regulation or his understanding of the words "safe and effective." To the contrary, the Secretary would simply be applying the same standard to a new understanding of the facts. The drug manufacturer might argue that the Secretary was wrong and that the drug really was safe and effective, but the manufacturer would not have a procedural challenge under <u>Paralyzed Veterans</u> that the Secretary had changed his interpretation of the regulation. The situation in this case is exactly parallel to the preceding example, the only difference being that the regulation calls for the Secretary to reimburse SNFs for reasonable costs over the cost limit instead of requiring him to pay for safe and effective drugs.

Binding precedent from the Court of Appeals in this Circuit recognizes exactly this distinction between the application of a regulation and the interpretation of a regulation. In <u>Hudson v. FAA</u>, the D.C. Circuit rejected the argument that the FAA had impermissibly changed

17

its interpretation of a regulation when the FAA changed its policy and stopped requiring actual

demonstrations to determine how quickly new designs of airplanes could be evacuated. 192 F.3d

1031 (D.C. Cir. 1999). The regulation at issue in Hudson required that before new airplane

designs could be used in commercial aviation, the manufacturer was required to demonstrate that

a new airplane could "be evacuated from the airplane to the ground under simulated emergency

conditions within ninety seconds. Compliance with this requirement must be shown by actual

demonstration … unless the Administrator finds that a combination of analysis and testing will

provide data equivalent to that which would be obtained by actual demonstration. 14 C.F.R.

§ 25.803(c)." Id. at 1033. In 1990, the FAA published an "Advisory Circular" in the Federal

Register which stated that the FAA did not believe simulations were adequate and the

requirement had to be met through actual demonstrations. See Advisory Circular 25.803-1, 55

Fed. Reg. 4,934 (Feb. 12, 1990). Eight years later, the FAA changed its policy, and concluded

that simulations could be used to show that new airplane could be evacuated in less than 90

seconds. Hudson, 192 F.3d at 1033. The FAA subsequently allowed Boeing to demonstrate that

the new 777-300 met the requirement through the use of simulations rather than qualifying

through an actual demonstration. Id. at 1034. When the new policy was challenged an as

impermissible change in interpretation of the regulation, the Court of Appeals found that the

FAA was entitled to apply the requirements in 14 C.F.R. § 25.803(c) to a new understanding of

the facts without violating the principles articulated in Alaska Hunters and Paralyzed Veterans.

The court stated that "there is no dispute as to the regulation's meaning" and concluded that

"[w]hether this test is met requires a factual determination by the FAA, and clearly, as methods

of analysis and other considerations develop over time, the FAA's response to the test can also."

18

See Hudson at 1036.

The argument that Montefiore makes in this case is nearly identical to the argument rejected by the Court of Appeals in Hudson.   In that case, the plaintiffs argued that FAA changed its "interpretation" of the regulation because the application of the factual test in the regulation resulted in a different conclusion – i.e., that Boeing could show the 777-300 safe through a simulation.  Here, Montefiore argues that the Secretary has changed his "interpretation" of 42 C.F.R. § 413.30(f) because the application of the factual test (payments are only made to the extent costs are reasonable) resulted in a different conclusion – i.e., that some of Montefiore's costs above the cost limit were not reimbursable.[4]  The Court of Appeals properly recognized that an agency could reach a different result simply because of a different understanding of the facts without changing the applicable legal standard.  Montefiore's argument in the case is that because the Secretary had not previously disallowed costs above the cost limit, that he cannot do so now.  This argument is not really that he cannot change his interpretation of the regulation, but that he cannot apply the regulation.  There is simply no authority to support Montefiore's argument. The Secretary's decision simply reflects the application of the test in 42 C.F.R. § 413.30(f) to the costs incurred by Montefiore.  The Secretary found that hospital-based SNFs systematically have unnecessarily high costs due to inefficiencies in the hospital-based SNF model and, consequently, that unnecessary costs are not reasonable.  This is not a different

---

[4] One notable distinction is that, unlike the FAA, the Secretary never actually adopted the policy that he is accused of departing from.  The alleged pattern of practice at issue is simply that the Secretary had not denied costs above the cost limit as unreasonable, not that he had specifically addressed the question and consistently concluded that all costs above the cost limit were reasonable.  Hudson would be a perfect analogy if the FAA had not issued the Advisory Circular and the FAA's practice had been demonstrated by the fact that it had not previously found simulations adequate to demonstrate that a new design was safe.

interpretation of the regulation, just an application of the regulation to a changed situation which calls for a different result.

Moreover, the cases that have applied <u>Paralyzed Veterans</u> make clear that an informal or unofficial statement of an agency's interpretation is not subject to the rule – and with good reason, since otherwise "an agency's initial, often chaotic process of considering an unresolved issue could prematurely freeze its thinking into a position that it would then be unable to change without formal rulemaking." <u>Association of Am. R.Rs.</u>, 198 F.3d at 950.  Thus, in <u>Paralyzed Veterans</u> itself, a speech by an agency official and statements by an advisory board that had drafted a regulation were insufficient to establish an official agency interpretation of that regulation.  <u>See</u> 177 F.3d at 586-87.  So too, in <u>Association of American Railroads</u>, were letters from agency officials setting out their interpretation of a regulation.  <u>See</u> 198 F.3d at 948.

In addition to being embodied in an official statement, a prior interpretation must also be clear and unambiguous.  For example, in <u>Alaska Professional Hunters</u>, notice-and-comment rulemaking was required to change a regulatory interpetation when the agency had "consistently advised" regulated parties of its prior interpretation over a thirty-year period.  177 F.3d at 1031.  Conversely, an ambiguous agency statement "cannot be said to mark a definitive interpretation from which the agency's [new] construction [would be] a substantial departure."  <u>Darrell Andrews Trucking, Inc. v. Federal Motor Carrier Safety Admin.</u>, 296 F.3d 1120, 1126 (D.C. Cir. 2002).  Likewise, if the agency's prior understanding "can reasonably be interpreted" to be consistent with the new interpretation, then the agency will not be deemed to have "'significantly revise[d]' a previous 'definitive interpretation'" of its regulation.  <u>Air Transport Ass'n of Am. v. FAA</u>, 291 F.3d 49, 57-58 (D.C. Cir. 2002) (quoting <u>Alaska Hunters</u>, 177 F.3d at 1034).

The <u>Mercy</u> court therefore erred when it concluded that the Secretary "had a long established practice of granting atypical cost exceptions," that established a definitive interpretation of 42 C.F.R. § 413.30(f).  <u>Mercy</u> at *3.  The court noted that in a series of decisions by fiscal intermediaries, the Provider Reimbursement Review Board, and the Administrator, SNFs were awarded all of their atypical costs above the cost limits.  <u>Mercy</u> at 2-3.  These decisions did not establish a definitive interpretation of the regulation, for two reasons.  First, even if the relevant adjudications were clear and unambiguous, they would not have established an official interpretation, since decisions of the Board and of the Administrator lack precedential effect and do not bind the Secretary in future cases.  <u>See</u> Provider Reimbursement Manual § 2927 ("Decisions by the Administrator are not precedents for application to other cases."); <u>see also</u> <u>Community Care Found. v. Thompson</u>, 318 F.3d 219, 226-27 (D.C. Cir. 2003).

Second, the decisions did not clearly establish a rule of full reimbursement, because they did not state that full reimbursement through the exceptions process was <u>required</u> by 42 C.F.R. § 413.30(f).  That regulation allows exceptions for "reasonable" costs, and the administrative decisions reflect case-by-case determinations of reasonableness.  Such decisions do not – either explicitly or implicitly – establish any interpretation of the regulation that would be inconsistent with determining reasonableness through a categorical principle such as PRM § 2534.5.

Contrary to <u>Mercy</u>'s view, there is considerable evidence that the Secretary has never interpreted 42 C.F.R. § 413.30(f) to require full reimbursement of all atypical costs through the exceptions process.  At the time the regulation was adopted in its present form, the Secretary explained the difference between exemptions from the cost limits and exceptions to the limits.  In a preamble to the final rule, he noted that "[a]n exception differs from an exemption," because

21

"[i]f a provider receives an exemption, it is not affected at all by the cost limits," while "if a provider receives an exception, it is reimbursed on the basis of the cost limit, <u>plus an incremental sum for the reasonable costs warranted by the circumstances that justified its exception</u>."  44 Fed. Reg. 31,802 (1979) (Emphasis added).  This preamble language makes clear that the Secretary considered the distinction that 42 C.F.R. § 413.30(f) makes between exceptions and exemptions, <u>see</u> <u>id.</u> § 413.30(e),(f), to be important.  It therefore casts doubt on the idea that the Secretary intended to eliminate this distinction by providing for the automatic reimbursement of all atypical costs above the cost limit through the exceptions process – an approach that would use the "exceptions" process to "exempt" all costs relating to atypical services from the cost limit.  In any event a per se rule that all costs above the cost limit are necessarily reimbursable clearly conflicts with the plain language of the regulation that costs are reimbursable to the extent that they are reasonable. 42 C.F.R. § 413.30(f).  A reading that all costs above the cost limit are per se reasonable reads this language completely out of the regulation.

In fact, the Secretary did not provide full reimbursement to every SNF that qualified for an atypical-services exception.  Prior to 1994, the Secretary based atypical-services exceptions on the number of nursing hours provided.  This approach did not necessarily result in full reimbursement, even when a provider qualified for an exception.  For example, the Secretary has consistently applied a "low-occupancy adjustment," which is currently set out at PRM § 2534.5.A.  That adjustment reduces compensation to SNFs that have less than 75% occupancy, ensuring that Medicare does not pay for costs associated with excess capacity.  <u>See</u>, <u>e.g.</u>, <u>Hospice of St. John v. Blue Cross & Blue Shield Ass'n</u>, PRRB No. 93-D28, Medicare & Medicaid Guide (CCH) ¶41,463 (H.C.F.A. 1993) (applying 75% occupancy standard); <u>Bay Harbor Rehab. Ctr. v.</u>

Blue Cross & Blue Shield Ass'n, PRRB No. 85-D55, Medicare & Medicaid Guide (CCH)

¶34,854 (H.C.F.A. 1985) (same).  So even before PRM § 2534.5 was adopted, the Secretary

interpreted 42 C.F.R. § 413.30(f) to provide that not all costs could be compensated with an

atypical-services exception, but only those deemed "reasonable."  The methodology in PRM

§ 2534.5 is entirely consistent with this interpretation.

Under any interpretation, the Secretary's practice falls short of establishing the "express,

direct, and uniform" interpretation of the regulation that would be required to make Paralyzed

Veterans applicable.  Association of Am. R.Rs., 198 F.3d at 949.  But if there were any doubt

about the proper interpretation of the Secretary's prior practice, it should be resolved in favor of

the Secretary, consistent with the general rule that an "agency's interpretation of its own

precedent is entitled to deference."  Boca Airport, Inc. v. FAA, 389 F.3d 185, 190 (D.C. Cir.

2004) (quoting Cassell v. FCC, 154 F.3d 478, 483 (D.C. Cir. 1998)).

A principal concern underlying the Paralyzed Veterans line of cases is the possibility of

detrimental reliance by regulated parties.  Moreover, the Supreme Court has recently stated that

the fact that an agency "may have interpreted the two regulations differently at different times in

their history is not a ground for disregarding the present interpretation," noting that there was no

chance of  "unfair surprise."  Long Island Home Care v. Coke, 127 S. Ct. 2339 (2007).  That

concern is not present in this case, making application of the doctrine inappropriate here.

Paralyzed Veterans and the cases following it make clear that notice-and-comment

rulemaking is required only when an agency abandons an interpretation on which the public has

reasonably relied.  For example, in rejecting a claim that the Justice Department had changed its

interpretation of disability regulations, the Paralyzed Veterans Court emphasized that "it is not

open to appellants to claim that they reasonably relied to their detriment on the speech" by a Department official setting out the prior interpretation.  117 F.3d at 587.  Similarly, <u>Alaska Hunters</u> stressed that the regulated parties had "relied on the advice FAA officials imparted to them – they opened lodges and built up businesses dependent" on the agency's regulatory interpretation.  177 F.3d at 1035.  And <u>Association of American Railroads</u> declined to apply <u>Paralyzed Veterans</u>, in part because "[n]othing in this record suggests that the railroads relied . . . in any comparable way," since they had not "made large capital expenditures based on their interpretation . . . or altered their business practices in any significant way."  198 F.3d at 950.

Here, any reliance by hospital-based SNFs on a supposed right to dollar-for-dollar payment of costs in excess of the cost limit would have been unreasonable.  The governing statute and regulations both make clear that the granting of exceptions is a matter of regulatory grace.  And, as we have explained, the Secretary stated as early as 1979 that exceptions amounts would be limited to incremental sums reflecting a provider's reasonable costs.  PRM § 2534.5 could not have upset any reasonable expectations on the part of providers, and it therefore is not subject to <u>Paralyzed Veterans</u>.

Application of <u>Paralyzed Veterans</u> in this case is inappropriate for the additional reason that the Secretary's prior approach to 42 C.F.R. § 413.30(f) was developed through adjudication. The Supreme Court has recognized that the Administrative Procedure Act "does not require that all the specific applications of a rule evolve by further, more precise rules rather than by adjudication."  <u>Shalala v. Guernsey Mem'l Hosp.</u>, 514 U.S. 87, 96 (1995); <u>see also</u> <u>NLRB v. Bell Aerospace Co.</u>, 416 U.S. 267, 294 (1974) ("[T]he choice between rulemaking and adjudication lies in the first instance within the Board's discretion."); <u>SEC v. Chenery Corp.</u>, 332 U.S. 194

(1947). Instead, "[w]here a statute or legislative rule has created a legal basis for enforcement, an agency can simply let its interpretation evolve ad hoc in the process of enforcement or other applications." American Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106, 1111-12 (D.C. Cir. 1993). As the Court of Appeals has observed, if agencies were required "to promulgate every regulatory or statutory interpretation arrived at in the course of adjudicating specific cases, agencies would be condemned to inactivity, since interpretation of the statutory and regulatory framework under which an agency must act is the sine qua non of reasoned agency action." Orengo Caraballo v. Reich, 11 F.3d 186, 195 (D.C. Cir. 1993).

It is well-established that an agency may change the approach that it has taken in adjudications. See, e.g., Consolidated Edison Co. of New York v. FERC, 315 F.3d 316, 323 (D.C. Cir. 2003). Of course, the agency must give a reasoned explanation for its change, and the new policy must not be arbitrary and capricious. See id.; cf. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983). But the requirement that the new adjudicative approach be substantively reasonable does not mean that it must be adopted through particular procedures, such as notice-and-comment rulemaking. The APA contains no such procedural requirement, and courts may not create one. See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519 (1978).

It follows that even if the Secretary had clearly established an interpretation of 42 C.F.R. § 413.30(f) in prior adjudications, he would be able to change that approach in a new adjudication. There is no reason why he should not be able to issue policy statements to advise the public of his intent to do so. If Paralyzed Veterans were extended to this context, it would greatly restrict the ability of agencies to develop policies through adjudication. By freezing the

results of an agency's initial adjudicative approach, it would limit the degree to which agency decision makers could consider the individual circumstances of the parties before them. As the Court of Appeals has observed, it thereby "would seriously hamstring agency efforts to interpret and apply their own policies." Association of American Railroads, 198 F.3d at 950. Such an extension of the doctrine is unwarranted and should be rejected.

**III.    PRM § 2534.5 IS NOT A SUBTANTIVE RULE**

Montefiore also incorrectly argues that the Secretary's decision should be overturned because PRM § 2534.5 is a legislative rule that the Secretary promulgated without notice-and-comment rulemaking. See Pl.'s brief 21-23. The PRM section is not a legislative rule. It provides no authority, in and of itself, for the Secretary to take any action. It is not binding on the Secretary, nor was it binding upon the PRRB. Moreover, the Secretary did not rely on the PRM as a rule in order to justify his decision in this case; rather, he found that the PRM is a reasonable method of applying the rule contained in 42 C.F.R. § 413.30(f) that SNFs not be reimbursed for unreasonable costs. See A.R. at 11-14. The Secretary did not find that some of Montefiore's costs were not allowable under the authority of PRM § 2534.5; he found that the disallowed costs were not allowable under the authority of 42 C.F.R. § 413.30(f). See A.R. at 11-14.

The PRM section is not a "rule" of any kind, as it expresses no proposition of law; rather, it expresses the Secretary's understanding of how best to determine the reasonable costs for a hospital-based SNF that receives an exception to the applicable cost limit. Even if, however, it is considered a rule, it is clearly not a substantive rule. As the Supreme Court has explained, legislative rules "have the force and effect of law," while interpretive rules are "issued by an

26

agency to advise the public of the agency's construction of the statutes and rules which it administers." Chrysler Corp. v. Brown, 441 U.S. 281, 302 n.31 (1979) (quoting Attorney General's Manual on the Administrative Procedure Act 30 n.3 (1947)); see also Molycorp, Inc. v. EPA, 197 F.3d 543, 545 (D.C. Cir. 1999) ("[T]he ultimate focus of the inquiry is whether the agency action partakes of the fundamental characteristic of a regulation, i.e., that it has the force of law."). While this principle is not always easy to apply – the Court of Appeals has described the distinction between legislative and interpretive rules as "enshrouded in considerable smog," General Motors Corp. v. Ruckelshaus, 742 F.3d 1561, 1565 (D.C. Cir. 1984) (en banc) – in this case, PRM § 2534.5 lacks the force of law and should be treated as a general statement of policy.

    In American Mining Congress v. Mine Safety & Health Administration, the Court of Appeals identified four factors that determine whether an agency action has legal effect and should be considered a legislative rule:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule.

995 F.2d 1106, 1112 (D.C. Cir. 1993).

    All four of these factors suggest that PRM § 2534.5 is not a legislative rule. First, in the absence of the PRM, there still would be an adequate basis for the Secretary's reimbursement decision in this case. The governing statute and regulation simply authorize the Secretary to grant exceptions to the routine cost limits. See 42 U.S.C. § 1395yy(c) ("The Secretary may make adjustments . . . to the extent the Secretary deems appropriate.") (emphasis added); 42 C.F.R.

§ 413.30(f) ("Limits established under this section <u>may</u> be adjusted upward.") (emphasis added).

They do not require him to grant any exceptions at all, nor do they specify the amount of the

exceptions that he should give.  Thus, even if PRM § 2534.5 had not been issued, the Secretary

would have had the discretion to grant the hospitals the exception he did – <u>i.e.</u>, one limited to that

portion of the hospitals' costs that exceeded 112% of the mean cost of providers in their peer

group to the costs that the Secretary found to be reasonable.  Medicare contractors have the

overarching legal duty to deny claims for items and services that are not "reasonable" because the

regulation and the Medicare Act proscribe payment for such claims.  <u>See</u> 42 C.F.R. § 413.30(f),

42 U.S.C. § 1395x(v)(1)(A).  That legal duty would exist regardless of whether or not the

Secretary had promulgated the PRM.  In other words, assuming the Secretary was correct in

finding that the higher costs of hospital-based SNFs are in part due to inefficiencies, those costs

could not have been paid regardless of whether PRM § 2534.5 had ever been issued.

　　　Second, PRM § 2534.5, like other provisions of the Provider Reimbursement Manual,

was not published in the Code of Federal Regulations.  Third, PRM § 2534.5 does not invoke the

Secretary's general legislative authority.  On the contrary, the Foreword to the Provider

Reimbursement Manual notes that the provisions of the manual do not have the force of law.  <u>See</u>

Provider Reimbursement Manual, Foreword ("The provisions of the law and the regulations are

accurately reflected in this manual, but it does not have the effect of regulations.").  In applying

the Provider Reimbursement Manual, the Secretary has repeatedly made clear that its provisions

are not binding.  For example, the Administrator of the Health Care Financing Administration

has declined to follow Manual provisions, noting that "statements in the PRM are generally

considered interpretative rules and, thus, are not binding."  <u>St. Anthony Mem'l Hosp. v. Blue</u>

Cross & Blue Shield Ass'n, PRRB No. 2000-D5, 1999 WL 33105619, at *8 (H.C.F.A. 1999);

see also Paragon Health Network, Inc. v. Thompson, 251 F.3d 1141, 1147 (7th Cir. 2001) ("The

PRM, while a useful guide to interpreting the Medicare statute and regulations, is not strictly

binding on the Secretary."); Providence Health Sys.-Washington v. Thompson, 353 F.3d 661,

667 (9th Cir. 2003) ("[T]he PRM provides interpretative advice; it does not constitute legally

binding authority.").  Indeed, the Provider Reimbursement Review Board declined to follow the

very provision at issue in this case.  See A.R. at 31-45.   Moreover, the Administrator reversed

the Board on the merits, but did not criticize its refusal to follow PRM § 2534.5.  A.R. at 10-14.

see also 42 C.F.R. § 405.1867 (Board "must comply with" statutes and regulations but need only

"afford great weight" to interpretative rules and general statements of policy).  Thus, if

Montefiore had convinced the Administrator that the costs in question were reasonable, the

Secretary would have reimbursed them and, in fact, would have been required to, even though

doing so would have been inconsistent with PRM § 2534.5.

Fourth, PRM § 2534.5 does not amend a prior legislative rule.  Although the Mercy court

believed – erroneously – that the provision represents a changed interpretation of 42 C.F.R.

§ 413.30(f), the prior "interpretation" was never expressed in a legislative rule.  The only relevant

legislative rule is 42 C.F.R. § 413.30(f) itself, and PRM § 2534.5 is entirely consistent with that

provision.  Provider Reimbursement Manual § 2534.5 is therefore not a legislative rule and is not

subject to the notice-and-comment requirement.

The Secretary considers PRM § 2534.5 to be a statement of policy because it does not

purport to actually interpret any language in the regulation, but merely expresses how the

Secretary intends to apply the controlling legislative rule that SNFs be reimbursed only for

reasonable costs.  However, the distinction between general statements of policy and interpretative rules is far from clear as there is a strong "tendency of courts and litigants to lump interpretative rules and policy statements together in contrast to substantive rules."  Syncor Int'l Corp. v. Shalala, 127 F.3d 90, 93-94 (D.C. Cir. 1997); id. at 94 (stating that a policy statement "simply lets the public know [the agency's] current enforcement or adjudicatory approach," thus the "agency retains the discretion and the authority to change its position–even abruptly–in any specific case because a change in its policy does not effect the legal norm.") (citations omitted).  For a statement to be a substantive rule, it must indicate that "an agency intends to bind itself to a particular legal position."  Id.

It is quite clear, however, that no court that has addressed PRM § 2534.5 believed it to be a substantive rule, and both courts of appeals that have addressed PRM § 2534.5 have found that it was not a substantive rule.  See St. Francis Health Care Ctr. v. Shalala, 205 F.3d 937, 947 (6th Cir. 2000) ("Even beyond the simple fact that PRMs are generally characterized as interpretive, the work done by PRM § 2534.5 places it within the . . . definition of an interpretive rule."); St. Luke's Methodist Hosp. v. Thompson, 315 F.3d 984, 986 (8th Cir. 2003) (discussing PRM § 2534.5 and noting that "[t]he interpretive rules in [the PRM] do not require notice and comment").  More generally, courts have repeatedly explained that the provisions of the Provider Reimbursement Manual are interpretive rules.  See Maryland Gen. Hosp., Inc. v. Thompson, 308 F.3d 340, 347 n.3 (4th Cir. 2002) ("[T]he provisions of the PRM are treated as interpretive rules."); South Shore Hosp., Inc. v. Thompson, 308 F.3d 91, 103 (1st Cir. 2002) ("The Manual is merely an interpretive guide, and interpretive guides generally do not have the force of law.").  But whether PRM § 2534.5 is thought to be an interpretive rule setting out an interpretation of

30

"reasonable" costs in 42 C.F.R. § 413.30(f) or a policy statement setting out a policy for

exercising the discretionary exception-granting authority conferred by that regulation, it is

exempt from notice-and-comment requirements in either case.

**IV.    The Secretary's Decision Was Reasonable.**

This Court should uphold the Secretary's decision under 42 C.F.R. § 413.30(f).  By

statute, the Secretary's decision in this case may only be overturned if it is unreasonable or

unsupported by substantial evidence.  The Secretary's decision is entitled to substantial deference

under <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410 (1945).  And PRM § 2534.5 explains

a reasonable method of applying 42 C.F.R. § 413.30(f); it simply describes the general conditions

under which an exception may be granted.  It does not require the Secretary to grant an exception

to any given provider, nor does it describe the amount of the exception that is appropriate.  The

Medicare Manual provision also reasonably implements the policies underlying Congress's

decision to lower the cost limit for hospital-based SNFs.

Assuming that Montefiore is correct in arguing that PRM § 2534.5 is an "interpretation"

of 42 C.F.R. § 413.30(f), it is clearly a reasonable interpretation and must be upheld by this

Court. Under <u>Seminole Rock</u>, regulatory interpretations must be upheld unless it is "plainly

erroneous or inconsistent with the regulation."  325 U.S. at 414; <u>accord</u> <u>Thomas Jefferson Univ.</u>

<u>v. Shalala</u>, 512 U.S. 504, 512 (1994); <u>Entergy Servs., Inc. v. FERC</u>, 375 F.3d 1204, 1209 (D.C.

Cir. 2004).  PRM § 2534.5 is not inconsistent with 42 C.F.R. § 413.30(f), because nothing in that

regulation precludes the use of the methodology of PRM § 2534.5.

The regulation is phrased in permissive terms: "Limits established under this section <u>may</u>

be adjusted upward for a provider under the circumstances specified in paragraphs (f)(1) through

(f)(5) of this section." 42 C.F.R. § 413.30(f) (emphasis added).  It does not require the Secretary

to grant any exceptions at all.  In this respect, the regulation echoes the statute, which provides

that "[t]he Secretary <u>may</u> make adjustments" to the cost limits.  42 U.S.C. § 1395yy(c) (emphasis

added).  In upholding PRM § 2534.5, the Sixth Circuit recognized that these provisions leave the

Secretary with "broad discretion."  <u>St. Francis Health Care Ctr. v. Shalala</u>, 205 F.3d 937, 944

(6th Cir. 2000); <u>accord</u> <u>St. Luke's Methodist Hosp. v. Thompson</u>, 315 F.3d 984, 988 (8th Cir.

2003) ("[W]e agree that the Secretary has discretion.").  The Eighth Circuit, which has struck

down PRM § 2534.5, misunderstood the significance of this discretion when it suggested that the

statute and regulation are intended to prevent SNFs "from being penalized for providing

necessary atypical services."  <u>St. Luke's</u>, 315 F.3d at 989.  A limitation on an exception does not

"penalize" a SNF, because there is no entitlement to an exception in the first place.  The granting

of <u>any</u> exception is entirely a matter of grace.

 To be sure, the regulation does not leave the Secretary's discretion completely

unconstrained.  Instead, it specifies the five circumstances in which an exception may be granted.

Under 42 C.F.R. § 413.30(f), the Secretary may not grant an exception to a provider that cannot

demonstrate one of the circumstances listed in the rule.  But the regulation's permissive language

does not require that an exception be granted to every provider who does demonstrate one of the

specified circumstances.

 It is true that PRM § 2534.5 sets out a more specific requirement for exceptions eligibility

than that contained in the regulation.  But when an agency has discretion (as the Secretary does

under the open-ended language of § 413.30), it need not exercise that discretion on a case-by-

case basis.  Rather, it is free to lay out principles to guide the exercise of that discretion.  <u>Cf.</u>

Lopez v. Davis, 531 U.S. 230 (2001) (holding that, when a statute provided that the Bureau of Prisons "may" grant early release to a class of inmates, the Bureau had discretion to adopt a rule categorically denying early release to inmates whose offenses involved firearms).

More importantly, the regulation here gives the Secretary discretion not only as to who can qualify for an exception, but also as to how much of an exception may be granted.  It does so in two different ways.  First, the regulation places only an upper limit on the size of exceptions by providing that "[a]n adjustment is made only to the extent the costs are reasonable, attributable to the circumstances specified, separately identified by the provider, and verified by the intermediary." 42 C.F.R. § 413.30(f) (emphasis added).  This provision leaves the Secretary with the discretion to determine whether, and to what extent, the costs incurred by a provider seeking an exception are "reasonable."  As explained more fully below, PRM § 2534.5 represents the Secretary's effort to specify the "reasonable" costs to which the regulation refers.

Second, the regulation requires the Secretary to determine whether the costs are "attributable to the circumstances provided," that is, whether the provider's costs "excee[d] the applicable limit because [the provider's services] are atypical." 42 C.F.R. § 413.30(f)(1)(i) (emphasis added).  All costs that a provider incurs, whether due to the treatment of sicker patients or due to systematic inefficiencies will contribute to the provider's total costs.  Therefore, all costs that a provider incurs are part of the reason why the total cost exceeds the cost limit.  The regulation does not specify how all of these contributing factors are to be sorted out, or how the Secretary should decide which costs to count in determining whether a provider has exceeded the cost limit because it provides atypical services, or because it is simply inefficient.  PRM § 2534.5 fits comfortably within the range of discretion created by 42 C.F.R.

33

§ 413.30(f).

The Eighth Circuit's rejection of PRM § 2534.5 in <u>St. Luke's</u> rests, fundamentally, on its failure to appreciate this point.  That court believed that the Secretary had "confuse[d] two distinct concerns: reimbursement of SNFs for their typical costs . . . and reimbursement of an individual SNF for providing services atypical of similarly classified providers."  315 F.3d at 988.  But any SNF's costs will be a mix of both of these factors, and the Secretary must somehow disaggregate them in order to determine what portion of the costs are "attributable to" the atypical services and what portion are attributable to the inefficiency of hospital-based SNFs generally.  As we explain below, the Secretary has appropriately chosen to base his analysis on the congressional judgment reflected in 42 U.S.C. § 1395yy(a).

The approach represented by PRM § 2534.5 reasonably furthers the policies of the Medicare statute and its regulations.  In particular, it implements the congressional determination that some of the excess costs associated with hospital-based SNFs are unreasonable and should not be reimbursed.  In the case of free-standing SNFs, Congress set the cost limit at 112% of mean per diem costs, determining that costs below that limit are reasonable.  For hospital-based SNFs, on the other hand, Congress determined that a level of 112% of mean per diem costs would not be reasonable because it would include unjustified costs that were the product of inefficiency.  Specifically, it determined that half of the difference in cost between hospital-based and free-standing SNFs should not be reimbursed.

In its treatment of providers who furnish atypical services, PRM § 2534.5 follows exactly the same approach that the statute follows for all other providers.  It sets the threshold for hospital-based SNF exceptions at 112% of mean per diem cost.  This has the effect of allowing

providers to recover all of their costs except those that fall between the cost limit and 112% of mean per diem cost. That difference is precisely the amount of the excess cost associated with hospital-based SNFs that Congress has determined to be unreasonable. In this way, PRM § 2534.5 furthers Congress's purpose of not reimbursing that portion of the excess costs of hospital-based SNFs that is due to inefficiency. The Sixth Circuit reached this same conclusion, recognizing that it was appropriate for the Secretary "to account for the systemic cost inefficiencies identified by Congress, while still allowing [hospital-based] SNFs to obtain reimbursement when they demonstrate that costs above the 112% threshold are due to atypical services." St. Francis, 205 F.3d at 946.

Under Montefiore's approach, all costs above the hospital-based SNF cost limit – including those implicitly deemed unreasonable by Congress when it enacted 42 U.S.C. § 1395yy(a) – would be reimbursable through the exceptions process, as long as providers furnish atypical services. This disregards the fact that the costs disallowed by PRM § 2534.5 represent the higher costs associated with hospital-based SNFs generally, not just those providing atypical services. Congress has made a decision not to reimburse these costs, because they may be the product of inefficiency. That is equally true even if a provider furnishes atypical services and therefore is eligible for an exception.

We recognize that PRM § 2534.5 is not the only way that Secretary could have chosen to take account of inefficiency at hospital-based SNFs in considering exception requests. For example, rather than use the methodology of § 2534.5, he might have applied a percentage discount to all costs above the cost limit. But the question is not whether the Secretary was required to adopt the approach he did, or even whether his approach is best – it is not the function

of a reviewing court to determine whether the Secretary's interpretation "promotes efficiency or helps medicare recipients receive the care they need." St. Luke's, 315 F.3d at 989. Rather, the issue is simply whether the Secretary's approach is permissible under the statute and under 42 C.F.R. § 413.30(f). Because it falls within the range of discretion created by those provisions, it must be upheld.

## V.    PRM § 2534.5 DOES NOT DISCRIMINATE AGAINST HOSPITAL-BASED SNFs

As previously discussed, the methodology described in PRM § 2534.5 simply applies the regulatory requirement that hospital-based SNFs receiving an exception to the cost limit be reimbursed only to the extent that their costs are reasonable. 42 C.F.R. § 413.30(f). Montefiore's allegations of an equal protection violation are devoid of merit. Montefiore has not alleged, and cannot establish, that it has a constitutionally recognized "fundamental right" or "suspect classification" is at issue. See Pl.'s brief at 33-35. Thus, the actions complained of "'cannot run afoul of the Equal Protection Clause if there is a rational relationship between disparity of treatment and some legitimate governmental purpose.'" Central St. Univ. v. Amer. Ass'n of Univ. Professors, 526 U.S. 124, 125 (1999) (per curiam) (citation omitted). Montefiore argues that the Secretary's decision denying it reimbursement for all of its costs above the cost limit lacks a rational basis, but this argument is premised upon Montefiore's misunderstanding that the Secretary has decided not to reimburse it for costs that were reasonable. As the Administrator's decision makes clear, the costs at issue in this case were denied because the Secretary found that they were not reasonable. A.R. at 11. There is clearly a rational basis to deny reimbursement for unreasonable costs, and, in fact, this is the same standard that is applied to free-standing SNFs – both types of SNFs may receive reimbursements for all of their

36

reasonable costs over the cost limit.[5]  The difference is that the Secretary has evidence that hospital-based SNFs have higher costs due to their inefficiencies, but does not have evidence of similar inefficiencies in free-standing SNFs.  Moreover, St. Francis explicitly rejected the argument that the Secretary's treatment of hospital-based SNFs treated them unfairly as compared to free-standing SNFs, finding that "once discounted for their unreasonable costs as determined by Congress, HB-SNFs and FS-SNFs are treated relatively the same."  205 F.3d at 946.  Montefiore's argument that the Secretary's policy of reimbursing it only for reasonable costs is arbitrary, capricious, or unconstitutional fails at every level of analysis.

## VI.   THE SECRETARY'S DECISION IN THIS CASE IS NOT THE RESULT OF THE IMPERMISSIBLE RETROACTIVE APPLICATION OF A REGULATION

The Secretary's decision in this case is not the result of the retroactive application of a regulation.  Montefiore argues that the Secretary issued PRM § 2534.5 in 1994, after the cost years at issue in this case (FYEs 1991 and 1993) and that the PRM therefore cannot be applied to the years at issue in this case.  Pl.'s brief at 36-38.  Montefiore's argument on this point makes the same mistake that it has in every other argument that it has made.  It assumes, contrary to the record and without argument, that the Secretary has denied it reimbursement costs that were reasonable.  The Secretary determined that the costs at issue in this case were not reasonable.  The costs were therefore not reimbursable under 42 C.F.R. § 413.30(f).  That regulation was first promulgated in 1979.  See 44 Fed. Reg. 31,802 (1979).  There is nothing retroactive about the application of a regulation promulgated in 1979 to cost years ending in 1991 and 1993.

---

[5]  Montefiore's argument completely ignores the fact that Congress obviously feels that hospital-based and free-standing SNFs are not similarly situated for the purposes of Medicare reimbursement.  Congress set different cost limits for free-standing and hospital based SNFs. See 42 U.S.C. § 1395yy(a)(3)-(4).

Montefiore's real argument is that PRM § 2534.5 is a legislative rule that could not affect cost years before it was issued, because PRM § 2534.5 would only have an impermissible retroactive under <u>Bowen v. Georgetown University Hospital</u>, 488 U.S. 204 (1988), if functioned substantive rule and created a new legal standard applicable to Montefiore.    As previously discussed, PRM § 2534.5 does not create a new legal standard (<u>see</u> section III supra).  In any event, Montefiore's retroactivity argument adds little to the analysis because if the PRM were a legislative rule, it would be invalid because it was issued without notice-and-comment regardless of whether or not it was applied retroactively.

Montefiore's argument also indicates a fundamental misunderstanding of the nature of this case.  Montefiore brings this lawsuit pursuant to 42 U.S.C. § 1395oo, which allows dissatisfied providers to challenge final determinations of the Secretary as to the amount of reimbursement to which they were entitled.  Montefiore's challenge is to the Secretary's decision, found at A.R. 2-14, in which the Secretary denied it reimbursement for costs he found to be unreasonable.  Montefiore does not have standing to challenge, nor would this Court have jurisdiction to entertain a challenge to, a non-binding policy statement contained in the PRM. Montefiore's appeal is of the Secretary's decision in this case, not the decision to issue the PRM. For example, Montefiore's assertion that the court should refuse to entertain the Secretary's post hoc rationalizations "as embodied in the Administrator's Decision" (Pl.'s brief at 34) is nonsensical.  According this proposed standard, courts should not listen to administrative agencys reasons for taking action in deciding whether they are reasonable, and the Administrator's decision in this case becomes a post hoc rationalization for itself.   These arguments should be rejected out of hand.

## CONCLUSION

For the foregoing reasons, the Secretary's decision to reimburse Montefiore for its costs only to the extent they are reasonable is consistent with the controlling regulation and the Secretary's statutory authority.  Accordingly, the defendant respectfully requests that the Court grant defendant's motion for summary judgment and dismiss plaintiff's complaint with prejudice.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610

OF COUNSEL:
DANIEL MERON

CAROL BENNETT                        _____/s/_____
Acting Associate General Counsel     CHARLOTTE A. ABEL
                                     D.C. Bar No. 388582
MARK D. POLSTON                      Assistant United States Attorney
Deputy Associate General Counsel     555 Fourth Street, N.W.
for Litigation                       Washington, D.C. 20530
                                     (202) 307-2332
United States Department of Health
and Human Services

                                     DAVID L. HOSKINS
_____      U.S. Department of Health and Human Services
                                     Office of the General Counsel
                                     Centers for Medicare and Medicaid Services
                                     330 Independence Ave., S.W., Room 5309
                                     Washington, D.C. 20201

Attorneys for Defendant,
Michael O. Leavitt,
Secretary of Health and Human Services