# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

MONTEFIORE MEDICAL CENTER    )
                                 )
        **Plaintiff,**           )
    **v.**                       )     **Case No. 1:06-CV-01636 (RMU)**
                                  )
MICHAEL O. LEAVITT, Secretary,    )
U.S. DEPARTMENT OF HEALTH AND )
   HUMAN SERVICES                )
                                  )
        **Defendant.**          )
_____ )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REPLY IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Dennis M. Barry
   DC Bar No. 375152
J. Harold Richards
   DC Bar No. 469524
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Suite 600
Washington, D.C. 20004-1008
(202) 639-6500 (phone)
(202) 639-6604 (fax)

Counsel for Plaintiff

November 27, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

MONTEFIORE MEDICAL CENTER    )
                             )
            Plaintiff,       )
    v.                       )        Case No. 1:06-CV-01636 (RMU)
                             )
MICHAEL O. LEAVITT, Secretary,    )
U.S. DEPARTMENT OF HEALTH AND )
    HUMAN SERVICES           )
                             )
            Defendant.       )
_____ )

PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND REPLY IN FURTHER SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT

The Secretary's motion rests upon the faulty premise that the Secretary's Provider

Reimbursement Review Board ("PRRB" or "Board"), the Eighth Circuit Court of Appeals, the

Plaintiff Hospital, and most importantly, this very Court, have all been wrong in their

interpretation of the Manual provision at issue in this case.  For example, according to the

Secretary, this Court's analysis in Mercy Medical Skilled Nursing Facility v. Thompson, 2004

WL 3541332 (D.D.C. May 14, 2004) ("Mercy"), was "in error and represents a fundamental

misapplication" of the law.  See Defendant's Memorandum of Points and Authorities in Support

of Defendant's Cross-Motion for Summary Judgment ("Def. Mem.") at 15.  Furthermore,

according to the Secretary, the Eighth Circuit "misunderstood the significance of [the

Secretary's] discretion" in striking down the Manual provision.  Def. Mem. at 32.  The Secretary

goes on to state that the Plaintiff Hospital has a "fundamental misunderstanding of the nature of

this case."  Def. Mem. at 38.  Indeed, according to the Secretary, Def. Mem. at 1-2, 9, the PRRB

also got it wrong when it invalidated the Manual, finding that there was no dispute that the

Provider's costs were, in fact, reasonable and that the Secretary had an established 15-year practice of measuring exception requests from the cost limit. A.R. at 33, 41. From reading the Secretary's brief, it appears that only the Secretary – after 15 years of getting it wrong[1] – finally got it right.

But it is the Secretary who is fundamentally wrong. Indeed, in creating and applying the Manual provision at issue, the Secretary has ignored the plain language of his own regulation, which requires that exceptions be measured from the cost limit, Plaintiff's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment ("Pl. Mem.") at 16-17, and his Manual flies in the face of the intent of Congress, as expressed in the legislative history to the 1984 statutory amendments, that "both hospital-based and freestanding facilities" that are "eligible for exceptions could receive, where justified, up to all of their reasonable costs." Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984, Committee on Finance, United States Senate, Senate Print 98-169, v.1, as reprinted in Medicare and Medicaid Spending Reductions in the Deficit Reduction Act of 1984, Explanation by the Senate Finance Committee and Text of Title IX of the Bill, MEDICARE AND MEDICAID GUIDE (CCH), Pt. II, No. 423 at p. 948 (Apr. 13, 1984). The Secretary argues that his decision is entitled to "substantial deference," Def. Mem. at 31, but where, as here, the Secretary's interpretation conflicts with the plain language of the Secretary's own regulation, the Secretary's decision is entitled to *no deference*. See C.F. Communications Corp. v. FCC, 128 F.3d 735, 738 (D.C. Cir. 1997) (finding that an agency's interpretation of its regulation is entitled to deference unless it is "plainly erroneous or inconsistent with the regulation"); Guard v. U.S. Nuclear Regulatory Comm'n, 753 F.2d 1144, 1148-49 (D.C. Cir. 1985) (finding that deference is

---

[1] The Board specifically found that the Secretary had an established 15-year practice of granting the Provider's exception request for *all* of its costs in excess of the cost limit. A.R. at 41, 43.

"appropriate only so long as the agency's interpretation does no violence to the plain meaning" of the regulation).

The Secretary argues that the Hospital's costs were determined to be unreasonable, but he can point to <u>no</u> evidence in the record that he ever made a determination regarding the reasonableness of the Hospital's costs.  Indeed, as shown below, Plaintiff Hospital submitted voluminous documentation to the Secretary supporting that *all* of its atypical costs were reasonable, and the Secretary has not disputed one iota of that evidence.  A.R. at 829-1261.  The only "evidence" that the Secretary has pointed to in support of his position that the Hospital's costs were unreasonable is a single sentence in the CMS Administrator's Decision, A.R. at 11, referencing a 1985 Report to Congress – a report that "candidly acknowledges that the methodologies in effect at the time … yielded inconsistent results and precluded accurate assessment of the contributing factors to the cost differences."  <u>St. Luke's Methodist Hosp. v. Thompson</u>, 182 F.Supp.2d 765, 780 (2001) ("<u>St. Luke's I</u>").  In other words, the only evidence to support the Secretary's broad conclusion is a single sentence regarding a report which by its own admission is inaccurate and unreliable.

Indeed, the Secretary consistently interpreted the regulation for a period of at least 15 years to allow reimbursement for all of a SNF's reasonable costs in excess of the cost limit.  A.R. at 41, 43.  Then, in 1994, the Secretary abruptly changed his interpretation of the regulation to require that exceptions for hospital-based SNFs be measured from a point well above the cost limit.  In order to make such a sweeping change in the cost limit methodology, the Secretary was required to engage in notice and comment rulemaking under the Administrative Procedure Act ("APA"), as this Court found in <u>Mercy,</u> 2004 WL 3541332 at *2-*3.  The Secretary failed to do so.

Finally, even if the Secretary's Manual were not contrary to the plain language of the regulation (which it is), and even if it were not a changed interpretation which requires notice and comment rulemaking under the APA (which it is), the Secretary's Manual must still be invalidated because it is arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with law. See Pl. Mem. at 23-35.

**I.    UNDER THE PLAIN LANGUAGE OF THE SECRETARY'S REGULATION AND CLEARLY EXPRESSED CONGRESSIONAL INTENT, ALL OF THE PROVIDER'S REASONABLE COSTS IN EXCESS OF THE COST LIMIT MUST BE REIMBURSED UNDER THE ATYPICAL SERVICES EXCEPTION**

The Secretary's regulation requires that the amount of the cost limit exception be measured from the "applicable limit," 42 C.F.R. § 413.30(f)(1), not from some arbitrary point above the limit.[2]  In setting the threshold at 112% of the peer group mean rather than the "applicable limit," the Secretary has contradicted the plain language of his own regulation. See Pl. Mem. at 17; St. Luke's Methodist Hosp. v. Thompson, 315 F.3d 984, 989 (8th Cir. 2003) ("St. Luke's II").  As the Eighth Circuit found, and as any reasonable reading of the regulation shows, the "'applicable limit' is the RCL [i.e., the cost limit] for that particular SNF, not 112% of the mean per diem cost for hospital-based SNFs." Id.

The Secretary asserts that "a per se rule that all costs above the limit are necessarily reimbursable clearly conflicts with the plain language of the regulation that costs are reimbursable to the extent that they are reasonable." Def. Mem. at 22.  While that is true, the Secretary misses the point on two levels.  First, Plaintiff is not arguing that all costs above the cost limit should per se be reimbursed.  Plaintiff is arguing that all costs that are documented to be related to atypical services and shown to be reasonable (as required by the regulation and as

---

[2] The regulation has since been amended and redesignated as 42 C.F.R. § 413.30(e).  Medicare Program; Revisions of the Procedures for Requesting Exceptions to the Cost Limits for Skilled Nursing Facilities and Elimination of Reclassifications, 64 Fed. Reg. 42610, 42612-13 (Aug. 5, 1999).

Plaintiff has done) should be reimbursed.  Second, while a per se rule that *all* costs above the

cost limit must be reimbursed would clearly conflict with the plain language of the regulation, it

is equally clear that a per se rule – *like the Manual provision at issue here* – that all costs

between the limit and 112 percent of the mean per diem costs are necessarily not reimbursable,

also "clearly conflicts with the plain language of the regulation that costs are reimbursable to the

extent that they are reasonable." <u>See</u> Def. Mem. at 22.

Furthermore, in establishing the threshold level for reimbursement as 112% of the mean

per diem costs for hospital-based SNFs, the Secretary has flouted the clearly expressed

legislative intent of Congress.  The Secretary asserts that Congress in 1984 changed the routine

cost limits because it "determined that a level of 112% of mean per diem costs would not be

reasonable because it would include unjustified costs that were the product of inefficiency," Def.

Mem. at 34, <u>see also</u> Def. Mem. at 35.  The Secretary cites no authority for these assumptions

about Congress' intent.  To the contrary, when it changed the cost limits in 1984, Congress was

very clear that it was not changing the exception process for hospital-based SNFs:

> Under this provision, *both hospital-based and freestanding facilities* could
> continue to apply for and receive exceptions from the cost limits in circumstances
> where high costs result from more severe than average case mix or circumstances
> beyond the control of the facility ... *Facilities eligible for exceptions could
> receive, where justified, up to all of their reasonable costs*.

Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on

March 21, 1984, Committee on Finance, United States Senate, Senate Print 98-169, v.1, <u>as</u>

<u>reprinted in</u> Medicare and Medicaid Spending Reductions in the Deficit Reduction Act of 1984,

Explanation by the Senate Finance Committee and Text of Title IX of the Bill, MEDICARE AND

MEDICAID GUIDE (CCH), Pt. II, No. 423 at p. 948 (Apr. 13, 1984) (emphasis added).  Therefore,

even if the Secretary's assumption is correct, and Congress was concerned about certain

inefficiencies in hospital-based SNFs, that concern only applied in the setting of the cost limits and not to the exception process. As Congress noted, SNFs could "continue to apply for" and receive exceptions for "up to *all* of their reasonable costs." Id. (emphasis added). The approach espoused by the Secretary in this case flies in the face of Congress' clearly expressed legislative intent. To be sure, a facility's costs must be *reasonable* in order to be reimbursed, but as shown below, all of the relevant evidence in this case shows that the costs for Plaintiff's SNF *were reasonable.*

The Secretary claims that the "premise which underlies all of Montefiore's arguments, that the Secretary has denied it reimbursement for reasonable costs, is directly contradicted by the record." Def. Mem. at 13. Not so. The Secretary cites no evidence in the record in support of this bold claim, instead citing to the CMS Administrator's decision – the very decision that is being challenged in this case – as support for his claim. That decision cites no evidence in the record of the unreasonableness of the Plaintiff Hospital's costs. Indeed, the Secretary's claim that the Hospital's costs are unreasonable is wholly unsupported by the record evidence. The PRRB concluded that the Hospital's costs were reasonable, A.R. at 33, and the Secretary himself can point to no evidence in the record to the contrary. Indeed, there is no evidence in the record to suggest that the Secretary even *tried* to make a specific finding that any of the Hospital's costs were unreasonable.

When the Hospital filed its exception request, the Secretary complied with the Secretary's requirements to break down its atypical costs into categories. With respect to each category, the Hospital demonstrated with well-documented facts that its costs were reasonable and exceeded the cost limits for reasons specified in the regulation, i.e., atypical patients who required more intensive services than patients in other facilities.

For its 1993 cost reporting period, the Hospital submitted a detailed forty-one page explanation setting forth with great specificity why its costs met the definition contained in the Secretary's regulation.  A.R. 829-872; see also 42 C.F.R. § 413.30(f)(1).  Along with that explanation, the Hospital submitted approximately 400 pages of supporting documentation in support of the costs for which it was requesting an exception.  A.R. 873-1261.  The Hospital's explanation and supporting documentation showed with great specificity that the Hospital's SNF's costs in twelve categories were both atypical *and reasonable*.[3]

For example, Plaintiff showed that its atypical direct nursing costs were due to a number of factors, including the complex medical treatment programs that were handled in-house by the SNF, the greater need for assistance with daily living by residents, the greater nursing needs of residents in the SNF's Restorative Rehabilitation Program, and the greater level of medical and ancillary services provided by the SNF.  See A.R. at 846-54.  As one example of the complex medical treatment programs provided by its SNF, the Hospital showed that less than 1% of residents at a typical SNF receive IV therapy or blood transfusions, as compared to almost 30% for Montefiore's SNF.[4]  A.R. at 849.  These types of services require a much greater commitment of resources to the nursing staff.  A.R. at 849.  Further, the SNF's nursing costs were higher because nurses at Montefiore's SNF spent a much greater percentage of their time providing assistance with activities of daily living than at the typical facility.  A.R. at 850-52.  As an example, 65% of Plaintiff's residents required total assistance with mobility, while only 4% of residents at a typical facility require this level of assistance.  A.R. at 851.  In addition, Montefiore's SNF had a large population of restorative rehabilitation patients (e.g., residents

---

[3] The twelve categories are direct nursing, pharmacy, central service and supplies, employee health and welfare, administration and general, maintenance and plant operations, housekeeping, laundry, medical records, social services and activities, dietary, and maintenance of personnel.

[4] The Hospital also showed that 15.66% of residents at the typical SNF received rehabilitation services, compared to almost 60% of those in Montefiore's SNF.  A.R. at 849.

with hip or knee replacements or residents recovering from cardiac surgery), which require more intense nursing care due to frequent dressing changes, maintenance programs, application and removal of braces, and other factors. A.R. at 852-53. Not only has Montefiore – in painstaking detail and with supporting documentation – shown that all of its nursing costs in excess of the cost limit were reasonable, it has done so for all of its atypical costs in *eleven other* categories as well. A.R. at 854-72.

The Secretary's assertion that the reasonableness of Montefiore's costs is "directly contradicted by the record" is laughable, given the complete lack of record evidence that the Secretary has produced in support of this proposition. Def. Mem. at 13. The Secretary boldly asserts that he "has evidence that hospital-based SNFs have higher costs due to their inefficiencies," Def. Mem. at 37, but the only "evidence" that the Secretary has actually produced in this case to support his position that this Hospital's costs were unreasonable is a single sentence in the CMS Administrator's Decision referencing a 1985 Report to Congress. Def. Mem. at 4, 13; A.R. at 11. Indeed, it is the Secretary's assertion that Montefiore's costs are unreasonable that is "directly contradicted by the record." The only so-called evidence that the Secretary has offered to rebut Montefiore's detailed 41-page explanation and voluminous documentation in support of its *reasonable* costs is a single reference to a report that *isn't even in the record* and that was issued long before the time period at issue in this case.

To the extent that the Administrator and now the Secretary relied on the 1985 report to Congress in reaching their decisions in this case, that reliance was improper, because 1) the study was never included in the record; 2) the study was admittedly inaccurate; and 3) the study deals with the costs of hospital-based SNFs generally and not the costs of this particular SNF.

First, the Plaintiff notes that the study referenced by the Secretary was not cited at any point during the PRRB proceedings, and under the Secretary's own rules, even the reference to it should not have been considered in the Administrator's decision in this case.[5]     42 C.F.R. § 405.1875(g)(3).     As with the Medicare regulations, both the Social Security Act and the Administrative Procedure Act require that an agency's decision be supported by substantial evidence *in the administrative record*, and require that a reviewing court overturn agency action that is not supported by such evidence in the record.     See 42 U.S.C. § 1395oo(d), 5 U.S.C. § 706(2).     The D.C. Circuit Court of Appeals and this court have in turn held that the administrative record consists of "neither more nor less information" than was before the agency at the time of its decision. Walter O. Boswell Memorial Hospital v. Heckler, 749 F.2d 788, 792 (D.C. Cir. 1984); Fund for Animals v. Williams, 245 F.Supp.2d 49, 54-55 (D.D.C. 2003), *order vacated on other grounds by* Fund for Animals v. Hagan, 428 F.3d 1059 (D.C. Cir. 2005).     This court on review should not consider evidentiary materials, such as the agency report on which the Secretary now relies, which were not made part of the administrative record.     See Edison Electric Institute v. Occupational Safety and Health Administration, 849 F.2d 611, 623 fn. 16 (D.C. Cir. 1988) ("[E]videntiary materials that were not part of the rulemaking record [] are not appropriately considered by the court."); see also Ass'n of Data Processing Service Organizations, Inc. v. Board of Governors of the Federal Reserve System, 745 F.2d 677, 684

---

[5] The regulation provides that the Administrator's decision shall be confined to the record of the PRRB and any materials submitted with a party's request to review a PRRB decision or in written comments to the Administrator. The Administrator's decision notes that the Centers for Medicare Management submitted comments after the 15 day comment period and that those comments "were not considered" in the Administrator's decision. See A.R. at 5, fn. 8. However, the only place in the record where the 1985 report to Congress is discussed – other than a one-sentence reference in the Administrator's decision – is in CMS' comments. See A.R. at 18-19. Thus, it appears that, contrary to the Secretary's own regulation, 42 C.F.R. § 405.1875(g)(3), the 1985 report to Congress was considered even though it was not a part of the PRRB proceedings below and comments regarding it "were not considered." See A.R. at 5, fn. 8.

(D.C. Cir. 1984) (noting that even informal agency rulemaking must be reviewed only on the basis of the administrative record).

Even if the Court does consider the study relied upon by the Secretary, it is clear that that study cannot be relied upon and it does not support the Secretary's arguments in this case. At least one Court has noted that the study referenced by the Secretary used methodologies that "yielded inconsistent results and precluded accurate assessment of the contributing factors to cost differences," St. Luke's I, 182 F.Supp.2d at 780. But, even assuming that this report did say what the Secretary says it does (which the Hospital does not know, because a copy of the report is not in the administrative record and the Hospital has been unable to obtain a copy), it does not follow that any particular hospital-based SNF's costs are due to inefficiencies and therefore unreasonable. Indeed, there are more than 400 pages of documented evidence in the record showing that Montefiore's costs are reasonable, and the Secretary has pointed to no record evidence at all that Plaintiff's costs were unreasonable.

In making his argument, the Secretary states that "[t]he regulation simply could not be more clear on this point – costs incurred by a SNF above the cost limit that are found to be unreasonable are not reimbursable." Def. Mem. at 13 (emphasis added). The Plaintiff fully agrees that unreasonable costs are not reimbursable. But, in order to find that the SNF's costs were unreasonable, there must be substantial evidence in the record to support this finding. Here, there is simply no basis in the record for the Secretary's finding that the Provider's atypical costs are unreasonable. The Hospital's costs are not unreasonable simply because the Secretary says that they are. The Secretary's PRRB correctly determined that there was no question in this case about the reasonableness of the Hospital's costs. A.R. at 33.

Contrary to what the Secretary now says, he did not make a specific determination that this SNF's costs were unreasonable. Instead, he imposed the blanket and arbitrary limit of the Manual – which bears no relation to the reasonableness of a SNF's costs – to disallow costs between the cost limit and 112% of the peer group mean per diem costs.

## II. THE SECRETARY'S MANUAL PROVISION IS INVALID BECAUSE IT WAS NOT ISSUED THROUGH NOTICE AND COMMENT RULEMAKING

But, even if the Court concludes that the Secretary's Manual is a permissible interpretation of the regulation (which it is not), the Secretary's Manual must still be invalidated because the Secretary failed to follow the notice and comment rulemaking procedures required by the APA to change his established interpretation that measured the amount of the atypical services exception from the cost limit. It is undisputed in this case that the Secretary consistently reviewed the hospital-based SNFs' atypical services exception requests for all costs in excess of the cost limit from the inception of such limits in 1979 to 1994, a period of fifteen years. A.R. at 41, 43.

Indeed, this issue was already decided in favor of the plaintiffs by this Court in Mercy Medical Skilled Nursing Facility v. Thompson, 2004 WL 3541332 (D.D.C. May 14, 2004). In Mercy, this Court held that under controlling D.C. Circuit authority, the Secretary's Manual violated the APA because it was enacted without following notice and comment rulemaking procedures. Id. at *2-3. There is no basis for distinguishing this case from Mercy, and the Secretary does not attempt to do so. Instead, the Secretary argues that Mercy was incorrectly decided.[6] Def. Mem. at 15. But it is the Secretary who has fundamentally misapplied the law.

Although the Secretary attempts to convince this Court that the D.C. Circuit's decisions in Paralyzed Veterans of America v. D.C. Arena, 117 F.3d 579 (D.C. Cir. 1997), and Alaska

_____

[6] Defendant Secretary appealed Mercy but subsequently dropped his appeal.

<u>Professional Hunters Ass'n v. FAA</u>, 177 F.3d 1030 (D.C. Cir. 1999), should not be applied here, those cases control the Court's decision in this case, just as this Court previously found in <u>Mercy</u>. The Secretary contends that <u>Paralyzed Veterans</u> and <u>Alaska Professional Hunters</u> are inapplicable because "PRM § 2534.5 does not articulate a new interpretation of 42 C.F.R. §413.30(f)," because "the Secretary gives exactly the same meaning to every word in the regulation that he did from when it was first promulgated." Def. Mem. at 15. The Secretary's position is flatly wrong.

It could not be more clear that the Secretary's interpretation of the regulation has changed. The regulation states that the amount of an atypical services exception is to be measured from the "applicable limit." 42 C.F.R. § 413.30(f)(1). Prior to the issuance of the 1994 Manual provision, the Secretary had consistently interpreted that phrase to mean the published cost limit and not an amount above the cost limit. The PRRB specifically found that it was undisputed that the Secretary for at least 15 years prior to the issuance of the Manual, reviewed hospital-based SNF exception requests for the full amount above the *cost limit*. A.R. at 41, 43. Similarly, this Court in <u>Mercy</u> found that for at least ten years, "the Secretary had a long established practice of granting atypical cost exceptions from the [cost] limit." <u>Mercy</u>, 2004 WL 3541332 at *3. Then, in 1994, without explanation and without notice and the opportunity for comment, the Secretary issued the Manual provision at issue in this case, which changed his interpretation of the words "applicable limit" in the regulation. Through the Manual, the Secretary declared that atypical services exceptions would not be measured from the cost limit, as had been the Secretary's interpretation of the regulatory term "applicable limit" for 15 years before 1994, but would be measured from a point significantly above the cost limit.

The Secretary's abrupt shift in his interpretation of the regulation accompanied by his failure to engage in notice and comment rulemaking falls squarely within the parameters of the D.C. Circuit's decision in <u>Alaska Professional Hunters</u>. Beginning in 1963, the FAA's Alaskan Region consistently advised Alaskan guide pilots that they were not governed by regulations dealing with commercial pilots. <u>See</u> 177 F.3d at 1031. The FAA never set forth its interpretation in a written statement, but nevertheless followed that interpretation consistently for a period of approximately thirty years. <u>Id.</u> at 1031-32. In 1998, the FAA issued a notice requiring for the first time that Alaskan guide pilots meet the requirements of the regulations governing commercial pilots. <u>Id.</u> at 1033. As the D.C. Circuit Court found in <u>Alaska Professional Hunters</u>:

> Those regulated by an administrative agency are entitled to "know the rules by which the game will be played." Alaskan guide pilots and lodge operators relied on the advice FAA officials imparted to them – they opened lodges and built up businesses dependent on aircraft, believing their flights were [not subject to the regulations governing commercial pilots.] That advice became an authoritative departmental interpretation, an administrative common law applicable to Alaskan guide pilots. The FAA's current doubts about the wisdom of the regulatory system followed in Alaska for more than thirty years does not justify disregarding the requisite procedures for changing that system. Throughout this period, guide pilots and lodge operators had no opportunity to participate in the development of the [new regulations].

<u>Id.</u> at 1035 (internal citations omitted).

This case is an even stronger case for the rule applied in <u>Alaska Professional Hunters</u>. In <u>Alaska Professional Hunters</u>, the "authoritative departmental interpretation" was an unpublished interpretation that the Alaskan region of the FAA followed for a period of approximately thirty years. <u>Id.</u> Here, the Secretary's interpretation was based on the clear, explicit language of the regulation – that atypical services exceptions be measured from the "applicable limit." 42 C.F.R. § 413.30(f)(1). From the time period when the routine cost limits were first applied to SNFs, <u>see</u>

- 13 -

44 Fed. Reg. 51542 (Aug. 31, 1979), the Secretary – for a period of fifteen years – followed the plain language of the regulation by consistently granting atypical services exception requests from the cost limit and not from some arbitrary higher amount. A.R. at 41, 43. Then, in 1994, the Secretary suddenly decided to change the system he had followed for more than fifteen years. At that point, the Secretary issued the Manual provision at issue in this case, which fundamentally changed the Secretary's interpretation of the words "applicable limit" used in the regulation, thereby fundamentally altering how the atypical services exception is measured. Just like the Alaskan guide pilots and the Plaintiff SNF in Mercy, Montefiore "relied on this interpretation for [15] years and shaped [its] practices on the basis of it." Mercy, 2004 WL 3541332 at *3.

The Secretary attempts to argue that Montefiore's case is distinct because here, it was the Secretary's "application" of the regulation that changed rather than his "interpretation." Def. Mem. at 17. The Secretary somewhat inartfully states that he:

> found that hospital-based SNFs systematically have unnecessarily high costs due to inefficiencies in the hospital-based SNF model and, consequently, that unnecessary costs are not reasonable. This is not a different interpretation of the regulation, just an application of the regulation to a changed situation which calls for a different result.

Def. Mem. at 19-20. Among several problems with the Secretary's argument is that there is no evidence in the record to support it. There is no evidence in the record that hospital-based SNFs as a group are inefficient. (If such evidence were in the record, it would still not excuse an examination of Plaintiff Hospital's individual costs since Congress made clear that all SNFs are eligible for exception relief for the full amount of costs above the applicable limits.) There is no evidence in the record that there was, as the Secretary now contends, a "changed situation" in 1994 when the new policy interpretation was published. Def. Mem. at 20.

- 14 -

In any event, the new interpretation in 1994 should stand on its own based on whatever explanation the agency tendered at the time of its publication – a post-hoc rationalization offered more than ten years later for a policy published without any explanation is unacceptable even disregarding the utter lack of evidence in the record for that post-hoc rationalization.

The distinction that the Secretary attempts to draw between a different interpretation and a new application of a regulation is based on <u>Hudson v. FAA</u>, 192 F.3d 1031 (D.C. Cir. 1999). In <u>Hudson</u>, there was no dispute regarding the regulation's meaning. <u>Id.</u> at 1036. The regulation at issue in <u>Hudson</u> required that manufacturers of passenger airplanes demonstrate that their airplanes could be evacuated within 90 seconds, <u>see id.</u> at 1033, but said that where the Administrator found that a combination of analysis and testing would provide data equivalent to an actual demonstration, that analysis could be used in place of an actual evacuation. <u>Id.</u> at 1036.

<u>Hudson</u> is distinguishable on multiple grounds:

1.      In <u>Hudson</u>, the agency's new policy was entirely consistent with the literal wording of the governing regulation, <u>id.</u> at 1036; here it is not;

2.      In contrast to CMS's 1994 Manual revision, the FAA had stated a basis for its change in interpretation – people were suffering injuries in demonstration evacuations of airplanes for which FAA certification was being sought, <u>id.</u> at 1036;

3.      The FAA dealt with newly emerging information – injuries occurring in demonstration evacuations, <u>id.</u> – while nothing changed with respect to the applicable limits or the hospital-based SNFs to which they applied;

4.      The FAA did not categorically state that in *no* case would an aircraft manufacturer be required to demonstrate that a plane could be evacuated with an actual

demonstration and under the new policy, the FAA continued to assess individual cases individually, id. at 1035; CMS, however, has categorically decided that it will not grant except relief in *any* case regardless of the individual circumstances for a band of costs regardless of how compelling the provider's explanation for those costs may be; and

5.      The FAA sought public comment on its new policy, albeit after applying that policy, id. at 1033-34; CMS sought no comment and instead clings to the fiction that its policy about-face was not a change at all.

The remainder of the Secretary's challenges to the application of Mercy are also easily disposed of.  For example, the Secretary argues that to fall within the scope of Paralyzed Veterans and Alaska Professional Hunters, an interpretation must be "embodied in an official statement" and "clear and unambiguous."  Def. Mem. at 20.  Although the Secretary attempts to argue that decisions of the CMS Administrator "lack precedential effect and do not bind the Secretary in future cases," Def. Mem. at 21, the consistent 15-year practice by the head of the Medicare program of measuring exception requests from the cost limit rather than an arbitrary higher amount speaks for itself.  Indeed, in Alaska Professional Hunters the interpretation that the Court relied upon was an unwritten oral policy that was consistently followed by "FAA personnel" in Alaska.  See 177 F.3d at 1031-32.  Certainly, *CMS'* consistent 15-year practice of measuring exception requests from the cost limits qualifies as a definitive interpretation of the regulation.

Although this Court in Mercy specifically found that the plaintiffs in that case had reasonably relied on the Secretary's established interpretation of the regulation at issue in this case, the Secretary argues that "any reliance by hospital-based SNFs on a supposed right to dollar-for-dollar payment of costs in excess of the cost limit would have been unreasonable"

because the "governing statute and regulations both make clear that the granting of exceptions is a matter of regulatory grace." Def. Mem. at 24. The Secretary's argument that exceptions are a "matter of regulatory grace" is unsupported by the Secretary's own regulations, which make clear that exception requests are reviewable just like any other final determination of the Secretary. See 42 C.F.R. § 413.30(c) (The "decision is subject to review under subpart R of part 405 of this chapter."); see also 44 Fed. Reg. 31802, 31802 (June 1, 1979) ("[T]he request would be subject to the standard review process set forth in Subpart R of the Medicare regulations."). In addition, the Secretary entirely ignores the legislative history to the 1984 statutory amendments, where Congress stated that it was leaving the exception process unchanged and specifically stated that facilities eligible for exceptions could receive "up to all of their reasonable costs." Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984, Committee on Finance, United States Senate, Senate Print 98-169, v.1, as reprinted in Medicare and Medicaid Spending Reductions in the Deficit Reduction Act of 1984, Explanation by the Senate Finance Committee and Text of Title IX of the Bill, MEDICARE AND MEDICAID GUIDE (CCH), Pt. II, No. 423 at p. 948 (Apr. 13, 1984).

Finally, the Secretary argues that an agency may change its established interpretation made through adjudication without notice and comment rulemaking. Def. Mem. at 24-25. We need not argue over the extent of the Secretary's power to change his interpretation through adjudication in the normal case. The Secretary himself recognizes that "[o]f course, the agency must give a reasoned explanation for its change, and the new policy must not be arbitrary and capricious." Def. Mem. at 25; see Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29 (1983). Here, the Secretary never gave *any explanation at all* for the changed interpretation, much less a *reasoned* explanation.

**III.    THE SECRETARY'S MANUAL PROVISION IS ARBITRARY AND CAPRICIOUS, AN ABUSE OF DISCRETION AND OTHERWISE NOT IN ACCORDANCE WITH LAW**

Furthermore, the Secretary's Manual is arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with the law for at least four reasons: (1) the language of the provision is inconsistent with the legislative intent of the Medicare statute; (2) it violates the statutory prohibition against cross-subsidization; (3) it is an unexplained departure from the Secretary's longstanding practice of measuring atypical services exceptions from the routine cost limit, and as such is an abuse of discretion; and (4) it discriminates in favor of freestanding SNFs and against hospital-based SNFs without providing a reasonable explanation.

The Secretary argues that under Bowles v. Seminole Rock & Sand Co., 325 U.S. 410 (1945), he has "broad discretion," Def. Mem. at 31-32, and that his decision is entitled to "substantial deference," Def. Mem. at 31. But where, as here, the Secretary's interpretation conflicts with the plain language of the Secretary's own regulation, see Pl. Mem. at 16, the Secretary's interpretation is entitled to *no deference*. See C.F. Communications Corp., 128 F.3d at 739 (finding that an agency's interpretation of its regulation is entitled to deference unless it is "plainly erroneous or inconsistent with the regulation"); Guard v. U.S. Nuclear Regulatory Comm'n, 753 F.2d at 1148-49 (finding that deference is "appropriate only so long as the agency's interpretation does no violence to the plain meaning" of the regulation).

Indeed, under the Secretary's reading of the statute and regulations, there would apparently be no limit at all to the Secretary's ability to arbitrarily grant or deny exception requests for any amount that he wishes:

The Eighth Circuit, which has struck down PRM § 2534.5, misunderstood the significance of [the Secretary's] discretion when it suggested that the statute and regulation are intended to prevent SNFs "from being penalized for providing necessary atypical services." A limitation on an exception does not "penalize" a

> SNF, because there is no entitlement to an exception in the first place.  The
> granting of <u>any</u> exception is entirely a matter of grace.

Def. Mem. at 32 (emphasis in original) (internal citation omitted).  Indeed, the Secretary states

that "when an agency has discretion … it is free to lay out principles to guide the exercise of that

discretion."  Def. Mem. at 32.

The Secretary apparently misunderstands the scope of his authority.  While the Secretary

certainly has some discretion in determining the scope of the exception process, that discretion is

not unfettered.  He must conform his approach to the plain language of his own regulation, to

Congress' clearly expressed intent, and to the requirements of the Administrative Procedure Act.

<u>See</u> <u>C.F. Communications Corp.</u>, 128 F.3d at 738; <u>Mova Pharmaceutical Corp. v. Shalala</u>, 140

F.3d 1060, 1068 (D.C. Cir. 1998); 5 U.S.C. § 706; Pl. Mem. at 13.  The Secretary has not done

so.

In the legislative history to the 1972 statutory amendments authorizing the cost limits,

Congress made it clear that there would be an exception process:

> Providers would, of course, have the right … to obtain relief from the effect of the
> cost limits on the basis of evidence of the need for such an exception.

H.R. Rep. No. 92-231, 92nd Cong., 2d Sess. (1972) <u>reprinted in</u> 1972 U.S.C.C.A.N. 5071.

Furthermore, when Congress revised the cost limits in 1984, it made it clear that "both hospital-

based and freestanding facilities could continue to apply for and receive [atypical services]

exceptions from the cost limits" and that "facilities eligible for exceptions could receive, where

justified, up to all of their reasonable costs."  Deficit Reduction Act of 1984, Explanation of

Provisions Approved by the Committee on March 21, 1984, Committee on Finance, United

States Senate, Senate Print 98-169, v.1, <u>as reprinted in</u> Medicare and Medicaid Spending

Reductions in the Deficit Reduction Act of 1984, Explanation by the Senate Finance Committee

- 19 -

and Text of Title IX of the Bill, MEDICARE AND MEDICAID GUIDE (CCH), Pt. II, No. 423 at p. 948 (Apr. 13, 1984).  See also St. Luke's II, 315 F.3d at 989.

Further, the Secretary's application of the Manual to the Plaintiff's SNF is arbitrary and capricious under the APA because it constitutes an unexplained departure from the plain language of the regulations and from the Secretary's established fifteen year policy of granting exception requests for the full amount of a hospital's reasonable costs above the cost limit.  See Transactive Corp. v. United States, 91 F.3d at 237 ("In order to ensure that an agency's decision has not been arbitrary, we require the agency to have identified and explained the reasoned basis for its decision.").  Therefore, the Secretary is required to "identif[y] and explain[] the reasoned basis for its decision."  Id.  But here, the Secretary has offered *no explanation at all* with respect to his sudden shift in policy other than to state that there was some unexplained change in the Secretary's understanding of the facts that led the Secretary to adopt the Manual almost ten years later.  Def. Mem. at 16-17 ("[Plaintiff] argues that there is a new interpretation … that can be demonstrated simply because the Secretary reached a new result, without acknowledging that the new result stems from a different understanding of the facts").

Furthermore, the Secretary's Manual is arbitrary and capricious under the APA because the Secretary has provided no rational basis for discriminating between hospital-based and freestanding SNFs.  Transactive Corp. v. United States, 91 F.3d 232, 237 (D.C. Cir. 1996) (agency action is arbitrary and capricious where the agency has "offered insufficient reasons for treating similar situations differently").  Pursuant to the Secretary's Manual, freestanding SNFs that provide atypical services are at a distinct advantage, being reimbursed for all of their costs in excess of the cost limit, while hospital-based SNFs receive less than full reimbursement for their costs.  See Pl. Mem. at 33.

- 20 -

The Secretary apparently believes that the same standard is applied to both hospital-based and freestanding SNFs – the regulatory definition of "reasonable costs." Def. Mem. at 36. Indeed, the Secretary notes that "both types of SNFs may receive reimbursements [sic] for all of their reasonable costs over the limit." Def. Mem. at 36-37. That is simply not true. No matter how efficient a hospital-based SNF is, and no matter how reasonable its costs, under the Secretary's interpretation as embodied in the Manual, the SNF will never be reimbursed for all of its reasonable costs in excess of the cost limit. The Manual mechanically denies any costs between the cost limit and 112 percent of the mean per diem costs. See St. Luke's I, 182 F.Supp.2d at 772-73; Pl. Mem. at 9-10 (diagram of the "gap"), 11.

Indeed, the *only* basis that the Secretary has advanced in this case for the Secretary's discriminatory treatment is the Secretary's assumptions about Congress' intent in the 1984 amendments to the cost limits and a one-sentence reference in the Administrator's Decision to a 1985 Report to Congress that allegedly showed that certain costs of hospital-based SNFs were inefficient. See e.g., Def. Mem. at 4, 13; A.R. at 11. Even assuming that the Secretary relied on this report in enacting the Manual provision at issue here, the Secretary waited nearly ten years after the issuance of his 1985 report to do so and his decision is not entitled to deference. See Sioux Valley Hospital v. Bowen, 792 F.2d 715, 719 (8th Cir. 1986) ("Deference is due when an agency has developed its interpretation contemporaneously with the regulation, when the agency has consistently applied the regulation over time, and when the agency's interpretation is the result of thorough and reasoned consideration.")

Further, even if the Secretary is correct in his assumptions about Congress' belief, the legislative history to the statute shows that Congress did not intend to differentiate between freestanding and hospital-based SNFs with respect to their *atypical* costs and the exception

- 21 -

process.  Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984, Committee on Finance, United States Senate, Senate Print 98-169, v.1, <u>as reprinted in</u> Medicare and Medicaid Spending Reductions in the Deficit Reduction Act of 1984, Explanation by the Senate Finance Committee and Text of Title IX of the Bill, MEDICARE AND MEDICAID GUIDE (CCH), Pt. II, No. 423 at p. 948 (Apr. 13, 1984) (stating that "both hospital-based and freestanding facilities could continue" to apply for and receive exceptions" for "up to all of their reasonable costs.").

Finally, the Secretary's Manual is "not otherwise in accordance with the law" because it violates the Medicare prohibition against cross-subsidization because, in effect, it forces non-Medicare payers to subsidize the costs of Medicare patients.  <u>See</u> Pl. Mem. at 31-32; 42 U.S.C. § 1395x(v)(1)(A); <u>St. Luke's I</u>, 182 F.Supp.2d at 787.

## IV.    THERE IS NO GENUINE ISSUE OF MATERIAL FACT

Plaintiff now briefly addresses the Secretary's responses to Plaintiff's Statement of Material Facts As to Which There Is No Genuine Dispute ("Plaintiff's Statement").  Four paragraphs of Defendant's response do not address Plaintiff's Statement.  For example, paragraph 16 of Defendant's response purports to address footnote 2 to paragraph 19 of Plaintiff's Statement.  There is no footnote 2 in Plaintiff's Statement.  Similarly, paragraphs 17-19 of Defendant's response purport to address points and citations not raised in Plaintiff's Statement, and fail to address points and citations that are raised.  Because these four paragraphs of Defendant's response fail to address the facts as set forth in the corresponding paragraphs of Plaintiff's Statement, the facts alleged in paragraphs 16-19 of Plaintiff's Statement must be taken as true.  <em>See</em> Fed.R.Civ.P. 56(e); LCvR 7(h).

The remaining allegations also may be taken as true either because Defendant admits them, Defendant fails to "set forth specific facts showing that there is a genuine issue," id., or fails to refer to affirmative record evidence giving rise to something more than "metaphysical doubt" as to the facts set forth in Plaintiff's Statement.[7]  In most instances, Defendant's response merely disputes Plaintiff's "characterization" of the record, without referring to any record evidence raising a genuine issue as to the facts set forth in Plaintiffs' Statement.  As a result, the Court may take all of those facts as true.

## V.    CONCLUSION

For the foregoing reasons, the Plaintiff respectfully requests that the Court grant its motion for summary judgment.

_/s/_____

Dennis M. Barry
  DC Bar No. 375152
J. Harold Richards
  DC Bar No. 469524
VINSON & ELKINS L.L.P.
1455 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-1008
202.639.6791
dbarry@velaw.com
jrichards@velaw.com

DC 724002v.3

---

[7]  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Frito-Lay, Inc. v. Willoughby, 863 F.2d 1029, 1033-34 (D.C. Cir. 1988); see also Williams v. United States, 932 F. Supp. 354, 355 (D.D.C. 1996); Rubin v. Estate of Warner, 881 F. Supp. 23, 25 (D.D.C. 1995); Campbell-El v. District of Columbia, 874 F. Supp. 403, 405-06 (D.D.C. 1994).